**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **No. 19-cr-00093 (EGS)** |
| | ) | |
| **JOHN VICTOR REED,** | ) | |
| | ) | |
| **Defendant** | ) | |

_____)

## <u>MOTION TO DISMISS</u>

Defendant John Reed stands before the Court charged with one count of unlawful possession of a firearm, in violation of Title 18, Section 922(g)(1) of the United States Code.  In ordinary times, the U.S. Attorney's Office for the District of Columbia would have prosecuted Mr. Reed and other similarly situated defendants in the Superior Court of the District of Columbia, and would have charged them with the same substantive offense—unlawful possession of a firearm—under Title 22, Section 4503(a)(1) of the District of Columbia's own penal code.  But on February 6th of 2019, U.S. Attorney Jessie K. Liu announced a new initiative for her office, pursuant to which "all 'felon-in-possession' gun cases" would be prosecuted in "U.S. District Court instead of D.C. Superior Court."[1]  This new initiative is now in effect, and is the reason why Mr. Reed stands before this Court charged with a federal crime, rather than before the Superior Court charged with a violation of the District of Columbia's own penal code.  The new initiative, however, is patently unlawful, for at least three separate reasons.

---

[1]   Spencer S. Hsu & Peter Hermann, _U.S. to Push D.C. Gun Cases into Federal Court as Washington Struggles with a 40 Percent Murder Spike_, WASH. POST (Feb. 5, 2019), https://perma.cc/5V4K-F8QR; _see also_ U.S. Attorney Jessie K. Liu & Mayor Muriel Bowser, Press Conference (Feb. 6, 2019), at 22:55, https://perma.cc/Q8P3-68W7.

First and foremost, the initiative nullifies the District of Columbia's locally enacted felon-in-possession statute and strips the Superior Court of the District of Columbia of authority to adjudicate those local offenses.  It thus contradicts two federal statutes: The Home Rule Act of 1973, 87 Stat. 774, in which Congress stated its express "intent . . . to grant to the inhabitants of the District of Columbia powers of local self-government," *id.* § 102, 87 Stat. 777; and the Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473, in which Congress assigned the Superior Court sole "responsibility for trying and deciding those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact beyond the local jurisdiction."  *Palmore v. United States*, 411 U.S. 389, 409 (1973).

Second, the Government's new policy not only contravenes the District's local autonomy but also was adopted without giving the local public any notice or opportunity to comment on the policy's wisdom—or lack thereof.  Moreover, the U.S. Attorney's Office failed to take essential policy considerations into account when enacting the initiative, and offered a public rationale for the new policy that is demonstrably false.  The process through which the initiative was adopted thus violates multiple tenets of the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*

Finally, there are strong reasons to suspect that the true motivating rationale for the initiative is unlawful.  Indeed, the evidence suggests that the Government adopted its new policy in retaliation against an entire class of criminal defendants for having "done what the law plainly allows [them] to do," namely, exercising their fundamental right to seek pretrial release in the Government's disfavored forum—the Superior Court.  *United States v. Goodwin*, 457 U.S. 368, 372 (1982)).  In this respect, the Government's initiative constitutes a wide scale policy of vindictive prosecution, and is "a due process violation 'of the most basic sort.'"  *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)).

All together, this new policy—pursuant to which Mr. Reed and scores of other defendants are currently being prosecuted—contravenes not only a set of foundational statutes designed to limit the Government's power, but also the Constitution itself.  Accordingly, Mr. Reed respectfully moves this Court to dismiss the indictment in this case, pursuant to Federal Rule of Criminal Procedure 12, the Home Rule Act of 1973, the Court Reform Act of 1970, the Administrative Procedure Act, and the Due Process Clause of the Constitution of the United States.

## BACKGROUND

**A.     The U.S. Attorney for the District of Columbia Occupies a Unique Role Within the Framework of Local Government Established for the District by Congress.**

In the early 1970s, Congress fundamentally altered the structure of government for the District of Columbia through two major acts: the District of Columbia Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473, and the District of Columbia Self-Government and Governmental Reorganization Act, 87 Stat. 774, also known as the Home Rule Act of 1973.

The first of these statutes was colloquially known at the time of its passage as "the D.C. crime bill," and was viewed as a "legislative response to the District's rapidly growing crime rate." Sen. Joseph D. Tydings, *Foreword to District of Columbia Court Reorganization, 1970*, 59 GEO. L.J. 477, 479 (1971).[2]  To address that local crime problem, Congress created "an entirely new local court system," comprising the Superior Court of the District of Columbia and the Court of Appeals of the District of Columbia.  Wesley S. Williams, Jr., *District of Columbia Court Reorganization*, *1970*, 59 GEO. L.J. 483, 484 (1971).  Intended to be fully "independent of the federal judiciary," this local judiciary was granted "jurisdiction over all local civil and criminal

---

[2] *See* H. Rep. 91-907, at 25 ("The fundamental reason for reorganization of the District of Columbia courts is the soaring crime rate."); S. Rep. 91-405, at 1 ("[T]he bill's principal purpose is to improve the administration of justice in the District of Columbia, especially in the area of criminal law.").

matters," *id.*, with the end result being "a Federal–State court system in the District of Columbia analogous to the court systems in the several States," H.R. Rep. No. 91-907, at 34–35 (1970).

Significant as the Crime Bill was, the Home Rule Act's impact was even more substantial. That statute "granted greater rights of self-determination to District citizens and set forth the structural framework of the District government in the District Charter." *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 776 (D.C. Cir. 1998). "Similar in certain respects to a state constitution," *id.*, that Charter—enacted by Congress and ratified by the people of the District of Columbia—redefined the balance of power between local and federal authorities within the District. Indeed, as the text of the Home Rule Act expressly declares, the Act's central purpose was to grant "the inhabitants of the District of Columbia powers of local self-government." Home Rule Act § 102.[3]

To effectuate this grant of local authority, the Home Rule Act "established a Council of the District of Columbia," *id.* § 401(a), and afforded that Council "legislative power [over] the District . . . extend[ing] to all rightful subjects of legislation within the District." *Id.* § 302. Congress reserved certain oversight authority over the District and cabined some of the District's powers in certain enumerated domains. *Id.* § 602. But among the powers of local self-government that it "expressly grant[ed] the Council" was "the authority to enact 'act[s], statute[s], or rule[s]' . . . pertaining to the District's substantive and procedural criminal law." *In re Crawley*, 978 A.2d 608, 611 (D.C. 2009) (alterations in original) (quoting Home Rule Act § 602(9)). The District, in turn, has exercised that authority to enact a penal code that is comparable in scope and structure to the penal codes of the several states. *See generally* D.C. Code, tit. XXII (2013).

---

[3] Citations to the Home Rule Act in this motion use the Act's original section numbers, as codified at 87 Stat. 774. The Act has also been recodified and renumbered as D.C. Code §1-201.01, *et seq.*

In creating a local penal system, however, Congress departed from the familiar State-Federal structure in one noteworthy respect: It maintained a single prosecutorial office—the U.S. Attorney's Office for the District of Columbia—as the chief administrator of its newly enacted local penal system.  *See* Court Reform Act, tit. II, § 210 (codified at D.C. Code § 23-101); *see also* Home Rule Act, § 602(8).  As a consequence, the U.S. Attorney's Office in this jurisdiction occupies a unique position not found anywhere else in the country.  It is in part a local prosecutor's office, responsible for implementing the penal code and policies of the D.C. Council.  But it is also in part a traditional federal U.S. Attorney's Office, responsible for initiating federal prosecutions that "serve a substantial federal interest" and that are not "subject to effective prosecution in another [forum]."   U.S. DEP'T OF JUSTICE, JUSTICE MANUAL, PRINCIPLES OF FEDERAL PROSECUTION § 9.27.220 (2018).

In practice, the U.S. Attorney's Office has a long tradition of honoring this dual role by prosecuting local crime locally, under the penal law of the District of Columbia.  Indeed, while the U.S. Attorney's Office operates simultaneously in both the Superior Court and the District Court, its Superior Court docket generally dwarfs its District Court docket.  In fiscal year 2017, for example, the Office filed 15,910 prosecutions in Superior Court, including 4,686 felony cases.  Its federal docket, however, comprised only 189 cases—the equivalent of only four percent of the Superior Court's felony docket.  *See* U.S. ATTORNEYS' ANNUAL STATISTICAL REPORT, FISCAL YEAR 2017, at 2, 65 (2018), https://perma.cc/T8HH-4AAE.

**B.**     **Pursuant to Its Congressional Mandate, the District of Columbia Has Recently Enacted a Series of Legislative Reforms to Its Local Penal Code, All of Which Have Been Vigorously Opposed by the Current U.S. Attorney.**

Given the U.S. Attorney's unique role within the local system of government, it is not uncommon for the U.S. Attorney's Office to lobby local officials or the D.C. Council on matters

concerning local crime-control policy.  *See, e.g.*, Letter from Kenneth L. Wainstein, U.S. Attorney, to Councilmember Phil Mendelson (Apr. 18, 2006) (noting that the U.S. Attorney "worked with the Mayor and his staff in creating [a] bill" to strengthen the District's firearm laws), *reprinted in* Council Rep. 16-247, at 347 (D.C. 2006), https://perma.cc/3WPL-WRQN.   In recent years, however, the Council and the U.S. Attorney have parted ways, disagreeing frequently—and often sharply—over local penal policy.

The disagreement dates back at least three years, to when the Council first began enacting a series of legislative reforms aimed at reducing the local prison population.  The first of these statutes, entitled the Incarceration Reduction Amendment Act of 2016 (IRAA), permits juvenile offenders who have served at least twenty years in prison and who are still incarcerated to request a sentence reduction from a Superior Court judge.  *See* D.C. L. 21-238, §§ 301-06, Act 21-568. Two years later, the Council enacted the Youth Rehabilitation Amendment Act of 2018, which permits Superior Court judges to waive otherwise applicable mandatory minimum sentences for defendants who were between the ages of eighteen and twenty-four at the time of their offense. *See* D.C. L. 22-197, Act 22-451.   Presently, the Council is considering the Second Look Amendment Act, which would expand the IRAA's resentencing provisions to a somewhat broader group of offenders.  *See* Keith L. Alexander, *D.C. Is Considering Giving More Prisoners a Chance for Early Release. Prosecutors Are Pushing Back*, WASH. POST (Aug. 3, 2019), https://perma.cc/8GMC-UQBF.

While the Council's legislative agenda has enjoyed considerable support among the local electorate, it has been met with consistent opposition from the U.S. Attorney's Office.  With respect to the IRAA, the U.S. Attorney's Office has routinely opposed resentencing, prompting Councilmember Charles Allen to express "concern[] that this unilateral opposition" defies the

Council's intent in enacting the statute.  Kira Lerner, *Federal Prosecutors Have Opposed Every Request for Early Release Under a Local Law Aimed at Juvenile Offenders*, DCIST (May 23, 2019, 3:12 PM), https://perma.cc/RUW7-DPFH.   As for the Second Look Amendment Act, U.S. Attorney Liu formally opposed the bill in a letter to the Council,[4] issued public statements claiming that the bill will "immediately" release "rapists and murderers" onto the streets,[5] and convened local commissioners to rally opposition to the legislation.[6]  But here too, the U.S. Attorney's actions have prompted considerable local criticism, including from those who see it as an intrusion on the District's local autonomy.  *See, e.g.*, James Forman, Jr., *Justice Sometimes Needs a Do Over*, WASH. POST (Sept. 20, 2019), https://perma.cc/9RTR-DL99 ("[W]hile the [Second Look Amendment Act] has the support of the majority of the city's elected officials, the unelected U.S. attorney is leading a campaign to scuttle it."); Mark Joseph Stern, *D.C. Residents Aren't Buying a Trump-Appointed Prosecutor's Campaign Against Criminal Justice Reform*, SLATE (Sept. 6, 2019), https://perma.cc/P84C-F5N3.

The U.S. Attorney's Office's opposition to local reforms has not been limited, however, to the Council's legislative agenda.  On the contrary, at the same time that it was opposing the statutory reforms described above, the U.S. Attorney's Office was also fighting a separate local

---

[4]   *See Hearing on Bill 23-0127, the "Second Look Amendment Act of 2019" and the Implementation of the Sentence Review Provisions of the Incarceration Reduction Amendment Act of 2016* (D.C. 2019) 368–81 (letter of Jessie K. Liu, U.S. Attorney for the District of Columbia), https://perma.cc/R6U8-SCLF.

[5]   Press Release, U.S. Attorney's Office for D.C., New Bill Seeks to Make over 500 Violent Criminals (Including Many Rapists and Murderers) Immediately Eligible for Early Release (Aug. 9, 2019), https://perma.cc/Z8QZ-S29G.

[6]   *See* Keith L. Alexander, *Prosecutor Admits Error in Statistics Revealed at Community Meeting on Early Release*, WASH. POST (Sept. 9, 2019), https://perma.cc/N7F7-P5FP.

reform proposal pending before the District of Columbia Sentencing Commission, which drafts the local Sentencing Guidelines for the Superior Court.  In 2018, the Commission set out to amend a provision of the local sentencing guidelines that double counted the predicate convictions of defendants charged with being felons in possession of a firearm.[7]  "The commission," on which the U.S. Attorney's Office sits, "voted 9-to-1 in support of [a] change" that would eliminate that double counting issue, with "[t]hree D.C. Superior Court judges, representatives from the Attorney General's Office and Public Defender Service, and two local citizen members . . . all in favor." James Forman, Jr., *D.C. Doubles Down on Destructive Prison-First Policies*, WASH. POST (Feb. 14, 2019), https://perma.cc/U9ED-5536.  The U.S. Attorney's Office cast the lone vote opposing the change—and subsequently went so far as to pen a letter in the *Washington Post* criticizing the Commission's decision.  *See* Peter Newsham & Jessie K. Liu, *Easing Penalties for Illegal Gun Possession Makes the District Less Safe*, WASH. POST (Aug. 5, 2018), https://perma.cc/R6QL-XJUT.

The Office, however, also took more concrete action: "Faced with [a] defeat" in its effort to persuade local policymakers to adopt its preferred approach to felon-in-possession sentencing policy, the U.S. Attorney's Office opted to "circumvent city officials by removing [those] cases from local court" to federal court, where the operative sentencing guidelines continue to double count prior convictions for felon-in-possession defendants.[8]  Forman, *D.C. Doubles Down*, *supra.*

---

[7]  Under the then-existing guidelines, a felon-in-possession defendant's prior felony conviction raised both his base offense score and his criminal history score.  *See* Letter from D.C. Sentencing Comm'n to Comm. on the Judiciary and Pub. Safety of the Council of D.C. 24–25 (Feb. 1, 2019), https://perma.cc/9FVR-7HA6 [hereinafter D.C. Sentencing Comm'n Letter].  Because "this double counting does not occur for other offenses," the D.C. Sentencing Commission concluded that its remediation would be "fair, just, and equitable."  *Id.* at 25.

[8]  *Compare* U.S. SENTENCING GUIDELINES MANUAL § 2K2.1(a) & cmt. n. 3 (U.S. SENTENCING COMM'N 2018), *with id.* § 4A1.1(a).

"The message," according to one knowledgeable observer, was "clear: If you don't narrow your vision of justice to match ours, we'll just go to federal court." *Id.*

**C.     In Early 2019, the U.S. Attorney's Office Formally Announced Its New Policy to Charge All Local Felon-in-Possession Cases in Federal District Court.**

On February 6, 2019, U.S. Attorney Liu formally announced her office's "new initiative" to "target felons who possess guns" by prosecuting them in federal court rather than in the local Superior Court.  U.S. Attorney Jessie K. Liu & Mayor Muriel Bowser, Press Conference (Feb. 6, 2019), at 6:16, https://perma.cc/Q8P3-68W7 [hereinafter FIP Press Conference].  As the U.S. Attorney made clear at that formal announcement, the new initiative is intended to be comprehensive: "We had somewhere in the neighborhood of 300 [felon-in-possession] cases last year in Superior Court.  We're phasing in bringing these cases in District Court . . . .  We'll be bringing essentially all of these in federal court." *Id.* at 22:35.  The Government's "phasing in" of its initiative is now well underway: It filed 114 felon-in-possession cases in this Court in the last ten months of 2019, compared to only 41 in all of 2017 and only 76 in all of 2018.[9]  Meanwhile, felon-in-possession prosecutions in Superior Court fell by nearly thirty percent last fiscal year and continue to decline.[10]

When the U.S. Attorney formally announced her new policy, she was joined by D.C. Mayor Muriel Bowser, who expressed support for the initiative.  *See* FIP Press Conference at 3:55.  Mayor

---

[9]  *Compare* Peter Hermann et al., *Killings in District Reach Decade High as Leaders Struggle to Reduce Gun Violence*, WASH. POST (Dec. 31, 2019, 6:54 PM), https://perma.cc/KUD6-RJSZ, *with* Patkowski Decl., Ex. A (attached). As recently as 2018, seventy-five percent of felon-in-possession cases in the District were prosecuted in Superior Court.  *See* Hsu & Hermann, *supra* note 1.

[10]  *See* Memorandum from Taylor Tarnalicki, Research Analyst, D.C. Sentencing Comm'n, to Andrew Crespo 2 (Jan. 23, 2020), Ex. B (attached) (reporting 417 cases in fiscal year 2018, but only 300 in fiscal year 2019, and an additional drop in the first three months of fiscal year 2020).

Bowser also made clear, however, that the initiative was "the U.S. Attorney's strategy." *Id.*  In fact, while the U.S. Attorney's Office had briefed federal officials on the plan months before its announcement, "the U.S. attorney briefed [the Mayor] on [the] new strategy" the same morning that the policy was announced. *Id.*; *see also* Paul Duggan, *D.C. Mayor: Taking Local Gun Cases to Federal Court Sends Message that "Violence Will Not be Tolerated,"* WASH. POST (Feb. 6, 2019), https://perma.cc/82HC-X948.  Moreover, by the time the initiative was announced, it had already quietly been in operation for months: Federal court felon-in-possession filings first began to increase in 2018.[11]  And in the months leading up to U.S. Attorney Liu's announcement, the Government transferred a number of already pending felon-in-possession cases from Superior Court to federal court.[12]  Thus, by the time the new initiative was unveiled alongside the District's mayor, it was already a *fait accompli*.

Once the policy became public, however, it was met with swift and significant criticism from local actors.  The local ACLU, for example, called the initiative "a slap in the face to D.C. residents," insofar as the policy "ignor[ed] [local] representatives' criminal-justice policy choices in favor of a federal system that D.C. residents had no voice in crafting."  Press Release, ACLU-

---

[11]  *See* Patkowski Decl., Ex. A (reporting that prosecutions in this Court brought under 18 U.S.C. 922(g)(1) jumped from 41 in 2017 to 76 in 2018).

[12]  *See United States v. Branison*, 2017 CF2 010933 (D.C. Super. Ct.), 17-cr-00164 (D.D.C.); *United States v. Mahone*, 2017 CF2 016594 (D.C. Super. Ct.), 17-cr-00236 (D.D.C.); *United States v. Thomas*, 2017 CF2 015400 (D.C. Super. Ct.), 18-cr-00004 (D.D.C.); *United States v. Armstrong*, 2017 CF2 002998 (D.C. Super. Ct.); 18-cr-000320 (D.D.C.); *United States v. Wilkins*, 2018 CF2 016149 (D.C. Super. Ct.), 18-cr-000363 (D.D.C.); *United States v. Earle*, 2018 CF2 009619 (D.C. Super. Ct.), 18-cr-00277 (D.D.C.); *United States v. Ashe*, 2018 CF2 018863 (D.C. Super. Ct.), 19-cr-00011 (D.D.C.); *United States v. Bellamy*, 2019 CF2 000004 (D.C. Super. Ct.), 19-cr-000015 (D.D.C.); *United States v. Lomax*, 2017 CF2 011468 (D.C. Super. Ct.), 17-cr-000142 (D.D.C.); *United States v. Smith*, 2017 CF2 021754 (D.C. Super. Ct.), 18-cr-000040 (D.D.C.); *United States v. Washington*, 2019 CF2 000138 (D.C. Super. Ct.), 19-cr-00024 (D.D.C.).

DC, ACLU-DC Statement Regarding Transfer of Gun Possession Cases from Superior to Federal Court (Feb. 6, 2019), https://perma.cc/44ZV-EAV2.  The Urban Institute similarly criticized the practice for "pull[ing] DC justice policy decisions further out of the hands of councilmembers and the voters who elect them."  Cameron Okeke & Leah Sakala, *Harsher Penalties Won't Stop Gun Violence in DC*, URBAN INSTITUTE – GREATER D.C. (Mar. 29, 2019), https://perma.cc/EQ8F-DB8E.  Indeed, the District's own chief law enforcement officer, Attorney General Karl Racine, expressed similar concern, criticizing the policy for moving "a large swath of cases that were going to be prosecuted in D.C. courts to the federal court," and for doing "it through a process that did not invite D.C. residents to participate in that decision-making."  Khary Armster, *Plan to Prosecute D.C. Gun Cases Faces Scrutiny*, HOWARD UNIV. NEWS SERVICE (Oct. 17, 2019), https://perma.cc/X8R4-YKGF.

The most notable reaction to the policy came from the D.C. Council itself.  Shortly after the initiative was unveiled, ten of the Council's thirteen members endorsed a formal resolution of censure, expressing the "Sense of the Council in Opposition to the Prosecution of Local Gun Offenses in Federal Court."  P.R. 194, 2019 Council, 23rd Period (D.C. 2019) [hereinafter Censure Resolution], https://perma.cc/6UZW-MQB3; *see also* Memorandum from Nyasha Smith, Sec'y to the Council, to Members of the Council, Referral of Proposed Legislation (Mar. 20, 2019), https://perma.cc/76NC-ZLQR (listing sponsors).  That censure resolution begins by noting that "federal prosecution of the offense of felon-in-possession is redundant" because the D.C. penal code "already criminalizes the possession of a firearm by an individual who has previously been convicted of a felony."  Censure Resolution § 2(2).  The resolution then homes in on the heart of the matter: The "new initiative," according to the Council, "circumvents the District's local sentencing and reentry" policies, as reflected in the Council's own "recently reformed . . .

sentencing laws." *Id.* § 2(8).  In the Council's view, the initiative thus "undermine[s] the District's efforts" to "control [its] justice system," a prerogative "of paramount importance," given that "[t]he prosecution of criminal offenses is a local function." *Id.* § 2(10)–(12).

Lest there be any doubt, the resolution expressly affirms that, had the Council's authority to set local penal policy been respected on this matter, it would have rejected the U.S. Attorney's initiative, which the censure resolution characterizes as a "speculative" and unduly "harsh" strategy that is inconsistent with the Council's own "approach to public safety." *Id.* § 3(3).  The resolution concludes with a concise exhortation: "[T]he United States Attorney should learn from the ineffectual and unjust criminal justice policies of the past and abandon their new initiative to prosecute certain firearm-related offenses in federal court." *Id.* § 3(4).

**D.     Individuals Charged Under the U.S. Attorney's New Policy Can Expect to Suffer Substantial Adverse Consequences.**

The Council was not solely concerned with the District's local autonomy.  It was also concerned for the wellbeing of its citizens, scores of whom will be adversely affected when prosecuted under the new initiative.  For as the Council's censure resolution explains: "Individuals sentenced in federal court for felon-in-possession are generally exposed to significantly longer prison sentences than in the Superior Court." *Id.* § 2(7).  These "[l]ong sentences," the Council fears, "are not proven to deter crime or prevent recidivism, contribute to the District having the highest incarceration rate in the United States, and overwhelmingly affect [the District's] Black men." *Id.*

The Council's concern that the initiative will lead to substantially longer prison sentences is well founded.  Between 2017 and 2018, the average felon-in-possession sentence in Superior Court was 20.89 months—an average that fell to 16.34 months in the latter half of 2018, after the D.C. Sentencing Commission eliminated the double-counting issue in the local sentencing guidelines. *See* D.C. Sentencing Comm'n Letter, *supra* note 7, at 26.  By contrast, the average

sentence imposed on felon-in-possession defendants in 2018 in this Court was 37.7 months, double the Superior Court average. *See* U.S. Sentencing Comm'n, 2018 Individual Offender Datafile, https://perma.cc/ND5Y-TJQZ.[13] Felon-in-possession defendants in federal court are also more likely to be convicted in the first place: In fiscal years 2017 and 2018 the conviction rate for felon-in-possession defendants in this Court was respectively 95% and 89%. By contrast, the conviction rate for felon-in-possession defendants in Superior Court was only 56% in fiscal year 2017 and only 52% in fiscal year 2018.[14] *Compare* Declaration of Alexandra Avvocato, Ex. C (attached), *with* Memorandum from Taylor Tarnalicki, *supra* note 10, at 3. Federal defendants are also detained prior to trial at dramatically higher rates than defendants in Superior Court—with attendant consequences on the outcomes of their cases. *See* Avvocato Decl., Ex. C (reporting a twenty-two percent higher release rate in Superior Court); *cf.* Will Dobbie et al., *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 AM. ECON. REV. 201, 203 (2018) (estimating that "initial pretrial release decreases the probability of being found guilty by 14.0 percentage points").

Given its simultaneous practice in both the local and federal courts, the U.S. Attorney's

---

[13] This figure reports the average sentence imposed in this Court in fiscal year 2018 under § 2K2.1 of the U.S. Sentencing Commission Guidelines. As the Council notes in its censure resolution, the sentencing disparity between local and federal defendants will be especially severe for young offenders, who will not be able to avail themselves of the slate of reforms recently enacted by the Council. *See* Censure Resolution § 2(8). In 2018, 74.2% of those sentenced on weapons charges in Superior Court were between the ages of 18 and 30. D.C. SENTENCING COMMISSION, AGE GROUPS BY OFFENSE TYPES SENTENCED, COUNT LEVEL (2018), https://perma.cc/KK2V-JKDW.

[14] These statistics report the proportion of felon-in-possession cases in which the defendant was convicted on any count at all. In other words, felon-in-possession defendants in Superior Court see their case fully dismissed or win an acquittal on all charges in upwards of 40% of cases. *See* Memorandum from Taylor Tarnalicki, *supra* note 10, at 3. The conviction rates for federal felon-in-possession defendants are drawn from the set of cases that were disposed in fiscal years 2017 and 2018, while the conviction rates for local felon-in-possession defendants are drawn from the set of cases that were filed in fiscal years 2017 and 2018.

Office surely knew about these discrepancies—and was thus in a position to choose the forum that it deemed most advantageous.

### E.  Mr. Reed is Being Prosecuted Pursuant to the Government's New Policy.

On March 11, 2019, Mr. Reed, a 63-year-old retiree, was stopped by local Metropolitan Police Department Officers based on their alleged observations of suspicious drug activity taking place near his vehicle.  Opp'n to Government's Mot. in Supp. of Pretrial Detention, ECF No. 6; Statement of Facts, ECF No. 1-1.  In the course of searching a closed backpack in the vehicle's rear seat, the officers allegedly discovered a firearm.  Mr. Reed would not have been allowed to possess such a firearm given his conviction, thirty years earlier, of a non-violent offense.  Believing the firearm to be his, the officers arrested Mr. Reed.

Under ordinary circumstances, Mr. Reed's arrest would have resulted in his being charged in the Superior Court with being a felon in possession of a firearm, in violation of D.C. Code § 22-4503(a)(1).  However, pursuant to the Government's new initiative, announced one month before his arrest, Mr. Reed's case was instead filed here.

## ARGUMENT

### I.  THE U.S. ATTORNEY'S INITIATIVE VIOLATES CONGRESS'S EXPRESS DECISION TO GRANT THE DISTRICT OF COLUMBIA COUNCIL AND SUPERIOR COURT PRIMARY RESPONSIBILITY FOR DETERMINING LOCAL PENAL POLICY AND FOR ADJUDICATING LOCAL OFFENSES.

As few Americans need reminding, democratic governments gain their legitimacy and derive "their just powers from the consent of the governed."  THE DECLARATION OF INDEPENDENCE para. 2 (U.S. 1776).  In recognition of that essential principle, Congress enacted the Home Rule Act of 1973, which expressly "grant[ed] to the inhabitants of the District of Columbia powers of local self-government."  Home Rule Act § 102.  The people of the District of Columbia exercise that fundamental power through their local institutions, including the Council of the District of

Columbia and the Superior Court of the District of Columbia—institutions that Congress has directed to take the lead role in setting local penal policy and in adjudicating "local criminal laws," *Palmore v. United States*, 411 U.S. 389, 409 (1973).

The U.S. Attorney's decision to transfer an entire class of criminal cases from the Superior Court of the District of Columbia to this Court—and to thereby effectively nullify the District's own duly enacted felon-in-possession statute—runs roughshod over Congress's carefully considered legislative scheme. That statutory framework, however, does not merely establish a careful balance of power between local and federal authorities. It also safeguards the constitutional rights of the residents of the District of Columbia to a minimal degree of local self-governance— a right they enjoy as citizens of "a distinct political society" that occupies a special status within our federal system, and "as citizens of the United [S]tates," *Hepburn v. Ellzey*, 6 U.S. (2 Cranch) 445, 452, 453 (1805), whose rights are no less inalienable by virtue of the city in which they live.

In order to safeguard those rights and to implement Congress's express intent to see "distinctively local controversies" prosecuted and adjudicated in the Superior Court, *Palmore*, 411 U.S. at 409, this Court must dismiss prosecutions initiated under the U.S. Attorney's new felon-in-possession initiative, unless the Government can show that a given case implicates a substantial federal interest such that it would have been prosecuted in this Court irrespective of the new policy. *Id.* Because that burden cannot be met in this case, Mr. Reed's indictment must be dismissed.

A.    **The Felon-in-Possession Initiative Categorically Nullifies the District of Columbia's Local Felon-in-Possession Offense, and thus Violates Congress's Express Decision, Set Forth in the Home Rule Act and the Court Reform Act, to Leave Local Penal Policy and Adjudication to the District of Columbia.**

Read together, the two congressional statutes that established the modern system of government in District of Columbia leave no room for doubt: local penal policy is to be determined by the locally elected City Council, and local crime is to be adjudicated in the local courts.

The latter of these two propositions was established first, when Congress created the local court system in the Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473.  Under that statute, this Court (like all other federal district courts) is directed to focus its attention on "matters of national concern."  *Palmore*, 411 U.S. at 408; *see id.* at 409 (noting that the Court Reform Act was intended, in part, to relieve this Court of the "smothering responsibility" of adjudicating "the great mass of litigation, civil and criminal, that inevitably characterizes the court system in a major city").  The Superior Court, by contrast, was intended "to serve as a local court system for a large metropolitan area," and was thus "to concern itself with local law," much like "the local courts found in the 50 States of the Union." *Id*. at 408, 409.  As the legislative reports accompanying the Court Reform Act make clear, the Act's express purpose was to effectuate a "total transfer" of "all purely local matters" to the Superior Court, H.R. Rep. No. 91-907, at 33, including "local felony offenses," S. Rep. 91-405, at 3–4 (noting that the Act was designed to grant the Superior Court "jurisdiction over all civil and criminal matters of a purely local nature").  Thus, "the full panoply of local legal matters" was removed from this Court's docket, *id.*, while the Superior Court was assigned sole "responsibility for trying and deciding those distinctively local controversies that arise under local . . . criminal laws having little, if any, impact beyond the local jurisdiction." *Palmore*, 411 U.S. at 409.

Three years after passing the Court Reform Act, Congress enacted the Home Rule Act. And while the Court Reform Act's assignment of local judicial authority to the Superior Court is clearly laid out in that statute's legislative history, the Home Rule Act's conferral of local legislative authority on the D.C. Council is expressly laid out in that statute's opening text:

> [T]he intent of Congress is to delegate certain legislative powers to the government of the District of Columbia[,] . . . [to] grant to the inhabitants of the District of Columbia powers of local self-government[,] . . . and, to the greatest extent possible, consistent with the constitutional mandate, [to] relieve Congress of the

burden of legislating upon essentially local District matters.

Home Rule Act § 102.  To effectuate this express reallocation of power to the District's local government, the Home Rule Act established a local Charter that was submitted to the people of the District of Columbia for ratification and that is "[s]imilar in certain respects to a state constitution." *Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.*, 132 F.3d 775, 776 (D.C. Cir. 1998); *see also* Home Rule Act §§ 701, 771 (rendering the Home Rule Act operative only upon its acceptance by District voters in a public referendum).  Through that Charter, Congress in turn established the D.C. Council as the local legislature for the District, vesting it with "power" that "shall extend to all rightful subjects of legislation within the District."  *Id.* § 302.

As the Supreme Court held when interpreting an identical phrase in an earlier (short-lived) home-rule statute for the District, Congress's decision to grant the Council authority over all "rightful subjects of legislation" affords the District legislative authority "as broad as the police power of a state."  *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 110 (1953) (construing the Organic Act of February 21, 1871, 16 Stat. 419).  And among those police powers, none is more essential—nor more traditionally local in nature—than the power to establish local penal law and policy.  Indeed, the inherently local nature of the criminal law was well recognized at the nation's founding, when Alexander Hamilton assured "the People of the State of New York" that, under the soon to be enacted Constitution, "the ordinary administration of criminal and civil justice" would forever "fall under the superintendence of the local administrations" of government.  THE FEDERALIST NO. 17 (Alexander Hamilton).  That prediction held true throughout the intervening centuries, with a long string of Supreme Court precedents recognizing that local state governments "possess primary authority for defining and enforcing the criminal law."  *Engle v.*

*Isaac*, 456 U.S. 107, 128 (1982).[15]

Notably, Congress reaffirmed this tenet of local authority in the Home Rule Act, the text of which "expressly grants the Council . . . the authority to enact 'act[s], resolution[s], or rule[s]' . . . pertaining to the District's substantive and procedural criminal law." *In re Crawley*, 978 A.2d 608, 610–11 (D.C. 2009) (alterations in original) (quoting Home Rule Act § 602). Indeed, as the Chairman of the committee that enacted the Home Rule Act explained, the Council's express "authority to make whatever [enactments] in the criminal code [it] deem[s] necessary" is an "appropriate and consistent [corollary] to the concept of self-determination" that Congress, through the Home Rule Act, cemented as a defining feature of the District's local government. *Id.* at 616 (quoting COMM'N ON THE DIST. OF COLUMBIA, 93RD CONG., 4 HOME RULE FOR THE DISTRICT OF COLUMBIA 1973–1974, 3041–42 (1974)).

In modern times, local governments' authority to regulate local crime carries with it the power to regulate one of the primary instruments of local crime: firearms. The D.C. Circuit has expressly confirmed as much in the specific context of assessing the powers conferred to the D.C. Council under the Home Rule Act. *See Heller v. District of Columbia*, 670 F.3d 1244, 1251 (D.C. Cir. 2011) ("[T]he grant of authority in the [Home Rule Act] comprises the subject of firearms . . . ."); *id.* ("[The District's] authority in the [Home Rule Act] over 'all rightful subjects of legislation' affirmatively gives it the power to enact . . . gun laws."). In exercise of that local

---

[15] *See also, e.g.*, *Bond v. United States*, 572 U.S. 844, 856 (2014) ("[T]he Constitution's division of responsibility between sovereigns . . . leav[es] the prosecution of purely local crimes to the States."); *Gonzales v. Raich*, 545 U.S. 1, 42 (2005) (Scalia, J., dissenting) ("The States' core police powers have always included authority to define criminal law and to protect the health, safety, and welfare of their citizens.") (citing *Brecht v. Abrahamson*, 507 U.S. 619, 635 (1993); and *Whalen v. Roe*, 429 U.S. 589, 603 n.30 (1977)); *United States v. Morrison*, 529 U.S. 598, 618 (2000) ("[W]e can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime . . . .").

authority, the District (like most States) has enacted "a comprehensive criminal regulatory scheme" to constrain the possession and use of guns in the city. *McIntosh v. Washington*, 395 A.2d 744, 753 (D.C. 1978). In fact, the District's gun-control laws are generally recognized as some of the most restrictive in the nation. *Cf. Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012).

Among the District's many local firearm laws is the local penal statute most directly relevant to this case: D.C. Code § 22-4503(a)(1) (2013), which makes it a felony for any person who "[h]as been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to "have a firearm in his or her possession." That statute, however, is nearly identical to another penal statute, contained in the *federal* code—and in Mr. Reed's currently pending indictment. Like its local counterpart, the federal felon-in-possession statute prohibits anyone "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" from possessing "any firearm." 18 U.S.C. § 922(g)(1) (2012). The substantive scope of the federal statute is thus virtually identical to that of its local counterpart.[16]

And therein lies the rub. For while felon-in-possession statutes in many states overlap with their federal analog, no other jurisdiction permits a single prosecuting office to choose which of

---

[16] Because the federal statute applies nationwide, it also contains a jurisdictional element requiring that the firearm in question have passed through interstate commerce. *Cf. United States v. Lopez*, 514 U.S. 549, 561 (1995) (requiring federal firearms statutes enacted under Congress's commerce-clause power to contain a "jurisdictional element [to] ensure . . . that the firearm possession in question affects interstate commerce"). As a matter of constitutional authority, this jurisdictional hook is unnecessary in the District of Columbia, given Congress's independent (and conceded) authority to pass federal legislation governing crime in the District. *See* U.S. CONST., art. I, § 8, cl. 17; *see also infra* pp. 24–25. In any event, the interstate-commerce element is always satisfied in the District because "[t]here are no firearm manufacturers in the District of Columbia." Government's Mem. in Supp. of Pretrial Detention 7. The federal and local felon-in-possession statutes are thus substantively identical in all relevant respects.

those two statutes to prosecute in a given case, as the U.S. Attorney's Office is able to do in the District of Columbia.  *See* John Payton, *Should the District of Columbia Have Responsibility for the Prosecution of Criminal Offenses Arising Under the District of Columbia Code?*, 11 U.D.C. L. REV. 35, 37 (2008) (observing that no other jurisdiction in the country lacks a locally selected prosecutor or assigns the totality of its local prosecutorial power to a federal actor).  Indeed, the U.S. Attorney's authority in this District is all the more atypical because "successive D.C. and federal prosecutions for the same conduct are subject to the bar on double jeopardy," which does not apply to state prosecutions.  *United States v. Mills*, 964 F.2d 1186, 1193 (D.C. Cir. 1992). Accordingly, the U.S. Attorney's decision to prosecute felon-in-possession offenses in this Court under federal law affirmatively precludes prosecution in the Superior Court under the District's own locally enacted statutes.  *See United States v. Shepard*, 515 F.2d 1324, 1331 (D.C. Cir. 1975) ("[T]he double jeopardy clause of the fifth amendment will bar separate prosecutions under the federal and D.C. statutes for the same offense, *i.e.*, where the offenses are identical or where one offense is a lesser included offense of the other.").[17]

The U.S. Attorney for this District thus has an entirely unique power: In any given felon-in-possession case, she can block enforcement of the local penal law and strip the Superior Court of authority to adjudicate such local offenses, simply by filing a federal charge.  With that unique power, however, comes a unique responsibility—namely, the responsibility to ensure that Congress's carefully considered distribution of local and federal power in the District does not

---

[17]  A federal felon-in-possession prosecution bars a local prosecution because the elements of the local offense are fully nested within the corresponding federal elements.  *See Blockburger v. United States*, 284 U.S. 299 (1932).  Indeed, a federal charge would nullify even a local charge that was simultaneously prosecuted in a single federal indictment.  *See United States v. Jones*, 527 F.2d 817, 821 (D.C. Cir. 1975) ("[W]here the federal and local offenses are identical or where one would be a lesser included offense of the other, the defendant may ultimately be sentenced under only one statutory scheme.").

come undone simply by virtue of the manner in which the U.S. Attorney administers her dual responsibilities as both a local and a federal prosecutor.  For under Congress's carefully considered legislative scheme, the "federal and D.C. Criminal Codes 'were intended to exist together' and 'were intended to mesh with each other.'"  *Shepard*, 515 F.2d at 1332 (quoting *United States v. Greene*, 489 F.2d 1145, 1150 (D.C. Cir. 1973)).  Those two penal codes cannot "exist together," *id.*, however, if the prosecuting authority tasked with enforcing them categorically decides to prosecute an entire swath of traditionally local crime in federal court.  "[N]ullifying one statute," after all, "is hardly the co-existence and meshing together of the two codes" required by the governing "congressional intent."  *See id.*

The U.S. Attorney's new felon-in-possession policy clearly contravenes that intent.  Not only does the policy categorically nullify the District's local felon-in-possession statute and strip the Superior Court of jurisdiction over such offenses—it does so in the face of criticism from the District's locally elected chief law-enforcement officer and in the face of an express resolution of censure endorsed by the District's locally elected legislators.  *See* Censure Resolution § 2(8)–(13); *see also supra* p. 11 (quoting Attorney General Karl Racine).[18]  The initiative thus goes beyond nullification.  It affirmatively usurps the authority of the very local government that Congress established to direct local penal policy and to adjudicate local offenses.

Where the U.S. Attorney for this District ignores not only the express desires of the local legislature and the locally elected chief law enforcement official, but also Congress's statutory

---

[18]  Pursuant to a 2010 Charter Amendment, the Attorney General is the only District official elected by the full population of the District of Columbia who has authority to prosecute local "criminal and delinquent offenses."  D.C. Code § 1-301.88c(a); *see also id.* § 1-301.81(a)(1) ("The Attorney General for the District of Columbia . . . [has] charge . . . of all law business of the . . . District and all suits instituted by . . . the government thereof."); *id.* §§ 23-101, 16-2305 (authorizing the Attorney General to prosecute juvenile delinquency matters and lower-level crimes).

directives, it becomes incumbent upon the courts—including this Court—to ensure that Congress's carefully considered legislative framework is obeyed.  *See, e.g.*, *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 681 (1986) ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").[19]  In the specific context of the issue at hand, such judicial enforcement requires this Court to insist upon and to apply a straightforward principle: The U.S. Attorney for the District of Columbia cannot adopt a categorical policy, opposed by the locally elected legislature of the District, that has the effect of nullifying a locally enacted penal statute and of stripping the local courts of the ability to adjudicate such local offenses.  If that principle is violated, this Court must effectuate Congress's statutory framework by dismissing any federal charges filed pursuant to such policy, much as it would dismiss any other case that was filed in contravention of congressional statutes that prescribe the proper forum for a criminal prosecution.  *Cf.* U.S. CONST. art. III, § 2 ("The Trial of all Crimes . . . not committed within any State . . . shall be at such Place or Places as the Congress may by Law have directed."); Fed. R. Crim. P. 18 (describing federal venue rules).

The notion that the Government must exercise its authority to initiate federal prosecutions with due regard for the overlapping interests of local governments is not foreign to the U.S. Attorney's Office.  On the contrary, in a well-known document entitled *The Principles of Federal Prosecution*, the Department of Justice itself observes that the mere fact "that a person's conduct constitutes a federal offense" under a lawfully enacted federal penal statute is "not sufficient" to merit federal prosecution.  U.S. DEP'T OF JUSTICE, JUSTICE MANUAL, PRINCIPLES OF FEDERAL

---

[19]  *See also Nader v. Saxbe*, 497 F.2d 676, 679 n.19 (D.C. Cir. 1974) ("[T]he exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review.").

PROSECUTION § 9-27.220.  Rather, such a prosecution "must also serve a *substantial federal interest*" above and beyond the alleged violation of a federal statute.  *Id.* (emphasis added).  The Department, moreover, generally eschews federal prosecution if the alleged misconduct is "subject to effective prosecution" in a local forum.  *Id.*  In other words, the Government itself treats federal prosecution as a tool reserved for those cases "that are most deserving of federal attention and are most likely to be handled effectively at the federal level, rather than state or local level."  *Id.* § 9-27.230.

To be sure, the U.S. Attorney's Office is generally entitled to deference in deciding whether "a *particular case* involves a 'substantial federal interest'" sufficient to warrant federal prosecution.  *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997) (emphasis added).  In ordinary circumstances, this Court thus could not second guess the Government's decision to file a given felon-in-possession case in this forum.  But the present situation is far from ordinary.  Rather, this case was filed pursuant to a categorical policy, the express "goal" of which "is to bring *all* 'felon-in-possession' gun cases to U.S. District Court instead of D.C. Superior Court."  Hsu & Hermann, *supra* note 1 (emphasis added); *see also* FIP Press Conference at 22:35 ("We'll be bringing essentially all of these in federal court.") (statement of U.S. Attorney Liu).  The Government has thus openly declared that it will ignore Congress's express intention that local crimes be prosecuted in the local courts.  As a result, the Government has lost the benefit of any presumption that it is acting in accordance with Congress's will or that it is appropriately focusing federal prosecutions on cases implicating federal interests.

The categorical nature of the Government's policy clearly distinguishes this case from *In re Sealed Case*, where the Court of Appeals deferred to the Government's decision to prosecute an individual juvenile in federal court, notwithstanding Congress's clear intent that state and local courts should ordinarily be the primary forum for juvenile delinquency matters.  131 F.3d at 209.

In that instance, the Government continued to prosecute most juveniles locally, but the defendant challenged the Government's determination that his "particular case involve[d] a 'substantial federal interest.'" *Id.* at 214. There is, however, a meaningful difference between retail and wholesale government action. Indeed, if the Court of Appeals in *In re Sealed Case* had confronted an express U.S. Attorney policy to prosecute *all* juveniles in federal court—in direct contravention of Congress's manifest intent—it would surely have reached a very different outcome.

For this same reason, the wholesale nature of the felon-in-possession initiative renders general appeals to prosecutorial discretion inapposite. Prosecutorial discretion, after all, does not include the discretion to ignore congressional statutes. Thus, in *United States v. Batchelder*, 442 U.S. 114 (1979), the Supreme Court permitted federal prosecutors to choose between multiple penal statutes applicable to the facts of a given case—but only because "nothing in the language, structure, or legislative history of" those statutes suggested that one provision should take precedence over the other. *Id.* at 118. Here, by contrast, the opposite is true: the language, structure, and legislative history of the Home Rule Act and the Court Reform Act make it abundantly clear that the U.S. Attorney cannot refuse to enforce an entire swath of the local penal code or strip the local courts of the ability to adjudicate such local offenses.

Likewise, in *Shepard*, the D.C. Circuit held that where "Congress has chosen to enact two statutes covering the same conduct" it is generally for "the U.S. Attorney to determine whether to prosecute under both statutes or only one" in any given case. 515 F.2d at 1336. The court, however, did not consider a categorical policy that would have nullified a local penal statute or stripped the local judiciary of authority to adjudicate such offenses, in direct contravention of Congress's intent. On the contrary, it said that "an express statement of congressional intent" would alter its analysis. *Id.* at 1336. Moreover, the *Shepard* court affirmatively rejected an

argument that would have barred the U.S. Attorney from bringing local charges when federal statutes apply to the same conduct. *See id.* at 1334. Such an approach, the court explained, would have had the effect of "nullifying [the District's local] statute[s]," contrary to "congressional intent." *Id.* at 1332. Here, by contrast, the Government itself is "nullifying" the local penal law through its wholesale refusal to enforce the District's local felon-in-possession statute. Such a refusal "hardly [effectuates] the co-existence and meshing together of the two codes which this [circuit's Court of Appeals] has interpreted as being the congressional intent" underlying the Home Rule Act and the Court Reform Act. *Id.*

Of course, Congress has enacted the federal felon-in-possession statute pursuant to its generally capacious enumerated powers. And the U.S. Attorney clearly has authority to prosecute that congressionally enacted offense in this Court. In the course of exercising her congressionally conferred authority, however, the U.S. Attorney must also heed Congress's distinct directives for *how* that authority is to be exercised: In the District of Columbia, "distinctively local controversies that arise under local . . . criminal laws having little, if any, impact beyond the local jurisdiction" are to be prosecuted in the Superior Court. *Palmore v. United States*, 411 U.S. 389, 409 (1973). By upending that carefully considered congressional scheme, the Government's categorical felon-in-possession policy impermissibly "renders traditionally local criminal conduct a matter for federal enforcement." *United States v. Bass*, 404 U.S. 336, 350 (1971).[20] The policy thus "dramatically

---

[20]   In *Bass*, the Supreme Court recognized that possession of a firearm by convicted felons constitutes "traditionally local criminal conduct." 404 U.S. at 350. Accordingly, the Court read a federal felon-in-possession statute to require that the gun at issue have a nexus with interstate commerce. *Id.* at 347, 350. Absent such a reading, the Court held, the statute would have threatened to upset "the sensitive relation between federal and state criminal jurisdiction," which the Court was loathe to do where "the legislative history provide[d] scanty basis for concluding that Congress . . . meant to" treat "traditionally local criminal conduct [as] a matter for federal enforcement." *Id.* at 350. Here, of course, the legislative history is far from "scanty." On the contrary, it directly answers the question at hand: Congress meant to *prohibit* the U.S. Attorney

intrudes upon [the] traditional . . . criminal jurisdiction" of the District of Columbia, *id.*, in direct contravention of Congress's express intent—as stated in the Home Rule Act, as captured in the statutory history of the Court Reform Act, and as confirmed by a long string of locally enacted felon-in-possession statutes that were submitted to Congress and received Congress's approval before going into effect.[21]

In sum, this case is squarely within the heartland of "those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact beyond the local jurisdiction." *Palmore*, 411 U.S. at 409. Were it not for the U.S. Attorney's categorical decision "to bring all 'felon-in-possession' gun cases to U.S. District Court instead of D.C. Superior Court," Hsu & Spencer, *supra* note 1, this case would have remained in the local judiciary and been adjudicated under the District's locally enacted penal code. The Government's contrary decision—undertaken pursuant to a categorical policy adopted in contravention of the locally elected D.C. Council—nullifies those local penal statutes and strips the local judiciary of the authority to adjudicate those offenses. In so doing, it runs roughshod over Congress's carefully enacted legislative framework. To preserve that statutory scheme, the indictment against Mr. Reed must be dismissed.

---

from "intrud[ing] upon [the] traditional . . . criminal jurisdiction" afforded to the District under the Home Rule Act and the Court Reform Act. *Id.*; *see supra* p. 17. That congressional intent precludes a categorical policy that has the effect of nullifying a local penal statute. Nor is that intent inconsistent with Congress's separate decision to enact a nationally applicable federal felon-in-possession statute, which Congress presumed the Government would enforce in this District in those cases presenting a substantial federal interest—not in every single case.

[21] *See* 2006 D.C. L. 16-306 (Act 16-482); 2009 D.C. L. 18-88 (Act 18-189); 2011 D.C. L. 18-377, § 13; 2012 D.C. L. 19-170, § 3(c); 2013 D.C. L. 19-317, §§ 240(a), 304; *see also* D.C. Code §§ 1-206.02(c)(1), 1-206.02(c)(2) (granting Congress sixty-day period of review during which it can, by joint resolution, prevent a D.C. Council enactment from becoming law).

**B.      Failure to Enforce Congress's Legislative Framework in this Context Would Raise Grave Constitutional Concerns, Given the Right Enjoyed by the People of the District of Columbia to a Minimal Degree of Local Self-Governance.**

Congress's intent here is clear, and is more than sufficient to require dismissal of Mr. Reed's case.  Even if Congress's intentions were ambiguous, however, this Court would be obliged to err on the side of respecting the local authority of the D.C. Council and the Superior Court— because to do otherwise would raise serious constitutional questions concerning the rights of the residents of the District of Columbia to a minimum degree of local self-governance.  *See United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916) (Holmes, J.) ("A statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score."); *Ashwander v. TVA*, 297 U.S. 288, 348 (1936) (Brandeis, J., concurring). "This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations."  *Rust v. Sullivan*, 500 U.S. 173, 191 (1991).  Here, that assumption is well founded, for the system of local government set out in the Home Rule Act safeguards the constitutional rights of the 700,000 Americans who call the District their home.

The District of Columbia is, of course, not a state—at least not as that term is used in the Constitution.  *See Hepburn*, 6 U.S. (2 Cranch) at 452. And yet, it is also "undoubtedly true that the District of Columbia is a separate political community," *Metro. R.R. Co. v. District of Columbia*, 132 U.S. 1, 9 (1889), and that it is thus, in a broader sense of the word, "as much a State as any of those political communities which compose the United States," *Geofroy v. Riggs*, 133 U.S. 258, 268 (1890); *see also Hepburn*, 6 U.S. (2 Cranch) at 452.  Recognizing this fact, the D.C. Circuit has long recognized that the "[p]rinciples of federalism" that divide power between the Federal Government and the States apply to the relationship between the District and the Federal

Government as well.  *Gatewood v. Fiat, S.p.A.*, 617 F.2d 820, 824 (D.C. Cir. 1980).[22]

Crucially, those principles of federalism do "not protect the sovereignty of States for the benefit of the States."  *New York v. United States*, 505 U.S. 144, 181 (1992).  Rather, they divide "authority between federal and state governments *for the protection of individuals*."  *Id.* (emphasis added).[23]  Just as crucially, those constitutional protections apply to the residents of the District of Columbia, who are no less entitled to "the freedom of the individual" that "[f]ederalism secures."  *Bond v. United States*, 564 U.S. 211, 221 (2011).  For as the Supreme Court held over a century ago, "There is nothing in the history of the constitution, or of the original amendments, to justify the assertion that the people of this District may be lawfully deprived of the benefit of any of the constitutional guaranties of life, liberty, and property."  *Callan v. Byrd*, 127 U.S. 540, 550 (1888).[24]

---

[22]  *See also, e.g.*, *JMM Corp. v. District of Columbia*, 378 F.3d 1117, 1125 (D.C. Cir. 2004) ("[G]eneral considerations of comity . . . apply with full force to the District of Columbia [because] . . . Congress has made clear that it intends federal courts generally to treat the District of Columbia judicial system as if it were a state system, an intent that this circuit has long respected and effectuated."); *cf. Electrolert Corp. v. Barry*, 737 F.2d 110, 112–13 (D.C. Cir. 1984) (treating the District as a state for Dormant Commerce Clause purposes); *Milton S. Kronheim & Co., Inc. v. District of Columbia*, 91 F.3d 193, 199 (D.C. Cir. 1996) (similar).

[23]  *See also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012) (*NFIB*) (noting that federalism protects individuals by ensuring that "the facets of governing that touch on citizens' daily lives are normally administered by smaller governments," which are "closer to the governed" and thus "more local and more accountable than [the] federal bureaucracy") (citing THE FEDERALIST NO. 45 at 293 (James Madison)).  For these reasons, criminal defendants have standing to raise federalism concerns implicated in federal prosecutions.  *See Bond v. United States*, 564 U.S. 211, 221 (2011) ("An individual has a direct interest in objecting to laws that upset [federalism's] balance . . . when the enforcement of those laws causes injury that is concrete, particular, and redressable.").

[24]  *See also Downes v. Bidwell*, 182 U.S. 244, 260–61 (1901) ("If, before the District was [created], Congress had passed an unconstitutional act affecting its inhabitants, it would have been void. If done after the District was created, it would have been equally void. . . . [because the District] remained a part of the United States, protected by the Constitution."); *O'Donoghue v. United States*, 289 U.S. 516, 540 (1933) (holding that residents of the District are "entitled to all the rights, guaranties, and immunities of the Constitution"); *cf. Bolling v. Sharpe*, 347 U.S. 497, 500 (1954) ("[I]t would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government [with respect to citizens of the District].").

Consistent with that basic understanding, James Madison, the author of the Constitution, considered it self-evident that "a municipal legislature for local purposes, derived from their own suffrages, [would] *of course* be allowed" to the people of the District.  THE FEDERALIST NO. 43 (James Madison) (emphasis added).  The path to the fulfillment of that promise was less than straight.  But the promise *was* fulfilled, when Congress enacted the Home Rule Act and thereby expressly granted "to the inhabitants of the District of Columbia powers of local self-government."  Home Rule Act § 102.  In so doing, Congress ensured that the principles of federalism that guarantee all Americans "the liberties that derive from the diffusion of sovereign power," *New York*, 505 U.S. at 144 (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)), would apply to those citizens who reside in "the capital—the very heart—of the Union itself," *O'Donoghue v. United States*, 289 U.S. 516, 539 (1933).

As indicated earlier, nowhere is that diffusion of power more important than with respect to the power to imprison, the literal deprivation of liberty.  *See supra* p. 16 & n.15.  Indeed, the Department of Justice has a history of respecting this basic premise of our Federalism in a similar context:  In the 1990s, the Department launched a program called "Project Exile," which sought to prosecute local gun crimes federally.  *See generally* Daniel C. Richman, *"Project Exile" and the Allocation of Federal Law Enforcement Authority*, 43 ARIZ. L. REV. 369, 374–96 (2001).  It did so, however, only with the unequivocal cooperation and consent of the local governments and prosecuting authorities affected by the initiative.  *See id.*[25]  In fact, at least one court considered

---

[25]  *See also* Memorandum from William P. Barr, Attorney General, to All U.S. Attorneys, All Heads of Dept. Components and All Law Enf't Agencies 1 (Nov. 8, 2019), https://perma.cc/3T8J-E6LL (describing similar initiatives in which "the Department worked in close partnership with state, local, and tribal law enforcement and prosecutors to ensure that criminals contributing to gun violence would face appropriate charges and sentences at the federal level"); *id.* at 4 ("[O]ur partnerships with—and support of—state, local, and tribal law enforcement and the communities they serve are critical to addressing gun crime.").

that local acquiescence to be essential to the initiative's constitutionality.  *See United States v. Nathan*, 202 F.3d 230, 233 (4th Cir. 2000) (noting that "[n]o part of the arrangement involve[d] federal compulsion of" state officials, who entered into a "voluntary, cooperative venture [with] the U.S. Attorney").[26]

Of course, the present case is precisely the opposite.  Far from pursuing a "voluntary, cooperative venture" with the District, *id.*, the U.S. Attorney's Office is persisting with its new felon-in-possession initiative in the face of an express resolution of *censure* authored by the D.C. Council—the very municipal legislature that Madison promised, and that the Home Rule Act delivered, to the people of the District.[27]  The clear congressional intent embodied in that statute requires that local felon-in-possession offenses be prosecuted primarily under the local penal code of the District and that they be adjudicated in the local Superior Court.  *See supra* Section I.A.  To hold otherwise would not only negate Congress's carefully enacted legislative scheme and the District's local Charter.  It would also threaten to violate "our great charter of liberty, set forth in our Constitution."  *Desist v. United States*, 394 U.S. 244, 277 (1969) (Fortas, J., dissenting).

In sum, the Government's new felon-in-possession initiative is unlawful because it categorically usurps the local authority conferred on the District by Congress.

---

[26]  Notably, at least one judge considered Project Exile constitutionally problematic notwithstanding such acquiescence.  *See United States v. Jones*, 36 F. Supp. 2d 304, 313 (E.D. Va. 1999) ("Project Exile raises serious questions respecting basic principles of federalism."); *see also* William Partlett, *Criminal Law and Cooperative Federalism*, 56 AM. CRIM. L. REV. 1663, 1686–87 (2019) ("Cooperative criminal prosecution of street crime strikes at the heart of . . . federalism concerns. . . . This is particularly true [with respect to] one of [the local government's] core police powers: the power to prosecute non-economic street crime.").

[27]  Moreover, unlike with Project Exile, the federal prosecutions at issue here affirmatively preempt the prosecution of local firearm offenses, given the Double Jeopardy bar.  *See supra* p. 20 & n.17; *cf. Nathan*, 202 F.3d at 233 (noting the absence of such a bar in upholding Project Exile).

## II.   THE FELON-IN-POSSESSION INITIATIVE VIOLATES THE ADMINISTRATIVE PROCEDURE ACT.

In addition to being unlawful for what it purports to do, the Government's new initiative is also unlawful because of the manner in which it was adopted.  In this respect, the initiative violates yet a third foundational statute that Congress enacted to check the Government's authority: the Administrative Procedure Act (APA), 5 U.S.C. § 500 *et seq.*  As Justice Marshall observed nearly half a century ago, "the *sine qua non* of the APA was to . . . constrain the exercise of discretionary administrative power—to rationalize and make fairer the exercise of such discretion."  *Heckler v. Chaney*, 470 U.S. 821, 848 (1985) (Marshall, J., concurring in the judgment).  Thus, even if one were to assume—contrary to the Home Rule Act, the Court Reform Act, and the Constitution— that the U.S. Attorney *had* the authority to transfer all felon-in-possession cases from the Superior Court to this Court, the APA would nonetheless constrain the *manner* in which that consequential decision was made.

As a court in this district has recently observed, the APA constrains such decision-making processes in order to fulfill two "core purposes."  *Make the Rd. N.Y. v. McAleenan*, No. 19-cv-2369, 2019 WL 4738070, at *49 (D.D.C. Sept. 27, 2019) (Jackson, J.).  First, "the APA establishes the public's right *to have input* into the rulemaking process."  *Id.* at *48.  And second, it protects the public's right "to be bound [only] by agency rules that are *the product of reasoned decision making* that has been informed by all of the relevant facts."  *Id.*  The Department of Justice and its U.S. Attorney's Offices are unquestionably "agencies" within the statute's scope.  *See, e.g.*, *United States v. Ross*, 848 F.3d 1129, 1131 (D.C. Cir. 2017) (applying the APA to the Department of Justice and the Attorney General); *cf. Santini v. Herman*, 456 F. Supp. 2d 69, 71–72 (D.D.C. 2006) (noting that, in certain circumstances, challenges to the actions of a "U.S. Attorney's Office . . . must proceed under the APA").  Here, however, the U.S. Attorney has made no effort to comply

with the APA's basic requirements.  On the contrary, the felon-in-possession initiative violates the

statute's ban on arbitrary-and-capricious agency action and its independent requirement of notice-

and-comment rulemaking.  A prosecution instituted pursuant to this policy thus cannot proceed.

## A.     The APA's Protections Can Be Invoked by Criminal Defendants Subject to Unlawful Agency Action.

As the D.C. Circuit has made clear, a criminal defendant can move "to dismiss [an]

indictment" on the ground that the Government's prosecution is "defective under the

Administrative Procedure Act."  *United States v. Ross*, 848 F.3d 1129, 1131 (D.C. Cir. 2017)

(vacating defendant's criminal conviction due to "the Attorney General's APA violations");

*accord United States v. Reynolds*, 710 F.3d 498 (3d Cir. 2013).  Indeed, the Court of Appeals has

held that "a criminal prosecution founded on an agency rule should be held to the strict letter of

the APA."  *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989).

To be sure, in each of the cases just cited, the specific action found to violate the APA was

the promulgation of a rule that proscribed the defendant's conduct and that thus served as the

substantive basis for his alleged criminal liability.  Here, by contrast, there is no question that the

statute criminalizing possession of a firearm by a felon, 18 U.S.C. § 922(g)(1), was lawfully

enacted (by Congress).  But the APA is not limited to rules proscribing or prescribing private

conduct by civilians.  Rather, it applies with equal force when the Government adopts a "policy

for applying" the enforcement "discretion" that Congress has afforded an agency under a given

statutory regime.  *Judulang v. Holder*, 565 U.S. 42, 52–53 (2011).  If such an enforcement policy

is "arbitrary and capricious," the Government "has failed to exercise its discretion in a reasoned

manner," and the courts "must reverse [the] policy."  *Id.* at 53, 64; *see id.* at 55 ("If the

[government] proposed to [make statutory enforcement decisions] by flipping a coin . . . we would

reverse the policy in an instant. That is because agency action must be based on non-arbitrary,

relevant factors, which here means that the [government's] approach must be tied, even if loosely, to the purposes of the [relevant statutory] laws or [to] the appropriate operation of the [relevant enforcement] system.").[28]

Here, much like in *Judulang*, the Government is prosecuting Mr. Reed pursuant to a newly adopted "policy for applying" the penal statutes that govern individual conduct in the District of Columbia. *Id.* at 52. That new policy is a final agency action that is currently in full force and effect.[29] It is also arbitrary and capricious, and was adopted without notice and comment. Accordingly, Mr. Reed's prosecution must be set aside.

---

[28] In *Judulang*, the Supreme Court struck down a Department of Justice policy concerning the enforcement of federal immigration laws. As noted *supra*, the APA applies with equal force to criminal enforcement. *See Picciotto*, 875 F.2d at 346 ("[A] criminal prosecution . . . should be held to the strict letter of the APA."). While Mr. Reed could raise this APA challenge in a separate civil action, *cf. U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016), he has not done so here in deference to doctrines disfavoring collateral attacks on pending prosecutions, *cf. Deaver v. Seymour*, 822 F.2d 66, 71 (D.C. Cir. 1987). He is, however, prepared to file a civil action raising the same APA claims if so instructed by the Court. *But cf. Office of Foreign Asset Control v. Voices in the Wilderness*, 382 F. Supp. 2d 54, 58 n.2 (D.D.C. 2005) ("[T]he [distinction] is of little moment here, because a defense under the APA and a claim under the APA both would seek the same relief in the setting of this case—preventing enforcement of the penalty that [the Government] seeks to enforce.").

[29] *See Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 636 (D.C. Cir. 2019) (*CCAT*). The felon-in-possession initiative was announced by the head of the agency, whose "authority to speak" for the agency is unquestioned. *Id.* (quoting *HM the Queen in Right of Ont. v. EPA*, 912 F.2d 1525, 1534 (D.C. Cir. 1990)). In that announcement, the U.S. Attorney "launched a new initiative," FIP Press Conference at 6:16, and thus clearly declared "the consummation" of the "decisionmaking process." *CCAT*, 934 F.3d at 636; *cf. Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 96 (D.C. Cir. 2002) (reviewing agency action announced in a "press release"); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment."). Nor can there be any doubt that the initiative gives "rise to 'direct and appreciable legal consequences,'" given the scores of defendants being prosecuted pursuant to its terms and the preclusive nature of federal prosecutions vis-à-vis local prosecutions. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1814 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)); *cf. supra* p. 20.

**B.      The Government's Felon-in-Possession Initiative Is Arbitrary and Capricious.**

The APA provides that any "person suffering legal wrong because of agency action . . . is entitled to judicial review thereof," 5 U.S.C. § 702, unless the agency action at issue has been "committed to agency discretion by law," *id.* § 701(a)(2).  Such judicial review includes an assessment of whether the challenged action was arbitrary and capricious.  *Id.* § 706(2)(A). Applying this standard, the reviewing court must "insist that [the] agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  This standard of review applies to the Government's felon-in-possession policy.  And because the policy fails to meet the standard, it must be held "unlawful and set aside."  5 U.S.C. § 706(2).

**1.      The Adoption of a Categorical Policy Such as the Felon-in-Possession Initiative Is Subject to APA Review, Notwithstanding the Otherwise Broad Deference Afforded to Prosecutorial Discretion in Individual Cases.**

As in all cases under the APA, the Court must "begin with the strong presumption that Congress intends judicial review of administrative action."  *Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667, 670 (1986).[30]  This well-established presumption permits few exceptions.  The Government, however, is certain to invoke one of them: the exception to judicial review for "agency action [that] is committed to agency discretion by law."  5 U.S.C. § 701(a)(2). That exception is read "quite narrowly."  *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018).  Still, the Government will likely insist that it bars review here, under the doctrine of *Heckler v. Chaney*, 470 U.S. 821 (1985), which is sometimes read to stand for the

---

[30] *Accord Lincoln v. Vigil*, 508 U.S. 182, 190 (1993); *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967); *see also Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 494 (9th Cir. 2018) ("The APA provides for broad judicial review of agency action.").

proposition that "when prosecutorial discretion is at issue, the matter is presumptively committed to agency discretion by law," *Drake v. FAA*, 291 F.3d 59, 71 (D.C. Cir. 2002).

But *Chaney* and its progeny do not apply to the present case, for two important reasons. First, the challenged agency action here is a far cry from the decision "whether or not to prosecute" an individual defendant whom "the prosecutor has probable cause to believe [has] . . . committed an offense." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Rather, Mr. Reed challenges the U.S. Attorney's decision to file "*all*" felon-in-possession cases in this Court rather than in the Superior Court. FIP Press Conference at 22:35 (emphasis added). This case thus falls squarely within a line of precedent that applies APA review to a "general enforcement policy," even where such review might be unavailable for a "single-shot" decision in a given case. *Crowley Caribbean Transp., Inc. v. Pena*, 37 F.3d 671, 676 (D.C. Cir. 1994) (emphasis omitted). Second, as the *Chaney* court itself emphasized, the "prosecutorial discretion" exception to APA review applies to challenges to a "decision *not* to prosecute or enforce" a given statute, in light of the "complicated balancing" of interests inherent in such nonenforcement decisions. *Chaney*, 470 U.S. at 831 (emphasis added). Here, however, the Government has not decided "not to prosecute" anyone at all. Rather, it has adopted a policy *to* prosecute an entire group of people in one forum rather than another. Thus, on its own terms, *Chaney* does not apply.

Consider first the wholesale nature of the Government's felon-in-possession policy. As the D.C. Circuit explained in the course of applying the *Chaney* doctrine, "[t]here are ample reasons for distinguishing" between "an agency's decision to decline enforcement in the context of *an individual case*" and "an agency's statement of a *general enforcement policy*." *Crowley*, 37 F.3d at 676–77 (first emphasis added). The former, *Chaney* holds, is presumptively unreviewable.

*Id.* at 677.   But the latter generally is "reviewable," so long as the agency has "articulated [its policy] in some form of universal policy statement."[31]   *Id.* at 676.   The Court of Appeals' reasons for this distinction are worth stating in full:

> [First,] [b]y definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are [thus less] likely to [entail] . . . the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are, as *Chaney* recognizes, peculiarly within the agency's expertise and discretion. Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," *Chaney,* 470 U.S. at 833 n.4, a situation in which the normal presumption of non-reviewability may be inappropriate. Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to forego enforcement tend to be cursory, ad hoc, or post hoc.

*Id.* at 677.

In this case, each of the considerations set forth above cuts in favor of subjecting the U.S. Attorney's new felon-in-possession initiative to APA review.   First, Mr. Reed's APA claim does not ask the Court to reconsider "the particular combination of facts" at issue in any "individual enforcement decision," *id.*; rather, he challenges the manner in which the felon-in-possession initiative *itself* was adopted.   Second, that initiative has been articulated in a "concrete statement" issued by the U.S. Attorney herself, which lays out the general policy at issue.   *People for the Ethical Treatment of Animals, Inc. v. U.S. Dep't of Agric.*, 60 F. Supp. 3d 14, 20 (D.D.C. 2014) (Boasberg., J.).   It is thus "more easily reviewable" than a "cursory, ad hoc, or post hoc" explanation of a charging decision in a specific case.   *Crowley*, 37 F.3d at 677.   Finally, as

---

[31]   *See also OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998).   As the *Crowley* court explained, this doctrine has roots in *Edison Electric Institute v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993), and *National Wildlife Federation v. EPA*, 980 F.2d 765 (D.C. Cir. 1992).

explained in detail earlier in this motion, there is in fact a "special risk[]" here that the challenged initiative "amount[s] to an abdication of [the Government's] statutory responsibilities" under the Home Rule Act and the Court Reform Act, which require the U.S. Attorney's Office to prosecute local felon-in-possession offenses primarily in the local courts, under local penal statutes.  *Id.* (quoting *Chaney*, 470 U.S. at 833 n.4.); *see supra* Section I.A.  The general policy challenged here thus presents "a situation in which the normal presumption of non-reviewability [is] inappropriate."  *Id.*  For all of these reasons, "the *Crowley* exception" (to the *Chaney* exception) applies and renders the felon-in-possession initiative reviewable under the APA.

More fundamentally, the *Chaney* exception itself is simply inapposite in this case—because the felon-in-possession initiative is not a "*nonenforcement*" policy at all.  *Id.* at 673 (emphasis added).  This is an essential point.  For the entire rationale of the *Chaney* exception turns on the unique considerations that underlie a prosecutor's "decision *not to undertake* certain enforcement actions," which the Supreme Court distinguished from "an affirmative act" to pursue enforcement.  *Chaney*, 470 U.S. at 831 (emphasis added).  Once again, the Court's full reasoning is instructive:

> [A]n agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise. Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all. An agency generally cannot act against each technical violation of the statute it is charged with enforcing. The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

*Id.* at 831–32.[32]

---

[32]  *See also Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019) (noting that there are "certain categories of administrative decisions that courts traditionally have regarded as committed

What is most striking about this justification is just how inapplicable it is to the present case. The felon-in-possession initiative, after all, has absolutely nothing to do with "the decision to prosecute" a given defendant, and thus does not implicate the central questions animating prosecutorial discretion: "whether or not to prosecute" and "whom to prosecute." *Wayte*, 470 U.S. at 607. On the contrary, the U.S. Attorney's Office has *already decided to prosecute* everyone to whom the felon-in-possession policy applies. The Government is thus not "balancing" case-specific factors, "ordering" office "priorities," or allocating "resources" when it decides to file a case in federal court rather than in the Superior Court. *Chaney*, 470 U.S. at 831–32. Rather, all this policy does is tell line prosecutors *where* to file the cases that the Government—in a bona fide exercise of prosecutorial discretion—has already decided to prosecute.

But crucially, the decision of where to prosecute a case is not one that "has traditionally been 'committed to agency discretion.'" *Chaney*, 470 U.S. at 832. Rather, questions of forum and venue are pervasively governed by statutes, and routinely policed by the courts. *See* Fed. R. Crim. P. 18; *id.* cmt. 2 (1944) (listing dozens of "special venue" statutes); *see also* U.S. CONST. art. III, § 2 (requiring "[t]he trial of all Crimes" committed in the District of Columbia to "be at such Place or Places as the Congress may by Law have decided"); *United States v. Morgan*, 393 F.3d 192, 195–96 (D.C. Cir. 2004) (describing judicial review of venue). Indeed, the Fourth Circuit has expressly held that courts have the "authority to review" a prosecutor's decision to prosecute someone in federal court as opposed to in state court "under the Administrative Procedure Act." *Cox v. United States*, 473 F.2d 334, 342 (4th Cir. 1973) (panel opinion).[33]

---

to agency discretion, such as a decision *not to institute* enforcement proceedings . . . .") (emphasis added) (citing *Chaney*, 470 U.S. at 831–32).

[33] The panel opinion in *Cox* addressed a prosecutorial decision to charge a juvenile in federal court and is reprinted as an appendix to the subsequent *en banc* opinion in the case. *En banc*, the court

In short, judicial review is the norm—not the exception—when it comes to a decision to prosecute an offense in one courthouse rather than another. The Government's wholesale policy to preference a federal forum over a local forum is thus simply not the type of decision that *Chaney* or its progeny deem "committed to agency discretion by law."[34]   5 U.S.C. § 701(a)(2). Accordingly, the APA's "basic presumption of judicial review" applies, *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967), "and instructs reviewing courts to set aside" the felon-in-possession policy if it "is 'arbitrary, capricious, [or] an abuse of discretion,'" *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019) (quoting 5 U.S.C. § 706(2)(A)).

### 2.   Judged on the Current Administrative Record, the U.S. Attorney's Felon-in-Possession Initiative Is Arbitrary and Capricious.

As noted at the outset, the arbitrary-and-capricious standard of review "constrain[s] the exercise of discretionary administrative power," *Chaney*, 470 U.S. at 848 (Marshall, J., concurring in the judgment), by insisting that an agency's actions "are the product of reasoned decision making that has been informed by all of the relevant facts," *Make the Rd. N.Y.*, 2019 WL 4738070, at *48 (emphasis omitted). The Supreme Court described the essential nature of this form of review in its seminal *State Farm* decision:

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must *examine the relevant data* and *articulate a satisfactory explanation*

---

reversed the panel decision but did "not consider the question of reviewability" under the APA. *Id.* at 337 (en banc opinion). In *In re Sealed Case*, the D.C. Circuit similarly rejected the proposition that a decision to prosecute a juvenile in federal court is subject to judicial review, but it did not consider an APA argument in that case. *See* 131 F.3d at 214.

[34]   It is an unremarkable statement that prosecutorial discretion is not unbounded. As one distinguished administrative law scholar summarizes: "Prosecutors are administrators. They are predominantly conscientious and careful. But like other administrators, some of them sometimes, in the technical sense, abuse their discretion. Just as a judicial check is needed to correct abuse of discretion by other administrators, a judicial check is needed to correct abuse of discretion by prosecutors." Kenneth Culp Davis, 2 Administrative Law Treatise 248 (2d ed. 1979).

for its action including a *rational connection between the facts found and the choice made*.  In reviewing that explanation, we must consider whether the decision was based on a *consideration of the relevant factors* and whether there has been a clear error of judgment.  Normally, an agency rule would be arbitrary and capricious if the agency has . . . *entirely failed to consider an important aspect of the problem*, offered an explanation for its decision that runs *counter to the evidence* before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."

*State Farm*, 463 U.S. at 43 (emphases added).[35]

Ordinarily, the "orderly functioning of [this] process of review requires that the grounds upon which the administrative agency acted be clearly disclosed."  *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943).  Thus, in the course of responding to an APA challenge, the Government "must" provide a complete copy of "the existing administrative record" that led up to its decision, so that the Court can examine "the agency's contemporaneous explanation" for its chosen course of action.  *Dep't of Commerce v. New York*, 139 S. Ct. at 2573.[36]  Accordingly, the Court should order the U.S. Attorney's Office to provide the Court and Mr. Reed with "the whole record" underlying its decision, 5 U.S.C. § 706, including "all documents and materials directly or indirectly considered by agency decision-makers," *Stainback v. Sec'y of the Navy*, 520 F. Supp.

---

[35]  Internal quotation marks are omitted; the quoted passage in turn quotes from *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962); *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285 (1974); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); and *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

[36]  *See also Citizens to Pres. Overton Park*, 401 U.S. at 420 ("[R]eview is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision.").

2d 181, 185 (D.D.C. 2007) (quoting *Holy Land Found. For Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 65 (D.D.C. 2002)).[37]

It bears emphasizing, however, that if the felon-in-possession initiative were to be judged solely on the basis of the publicly disclosed rationale offered by the U.S. Attorney to date, it would fail arbitrary-and-capricious review, for at least two reasons: The Government failed to account for essential considerations when adopting its new policy; and the rationale it has offered is at best illogical—and at worst pretextual.

Take first what the U.S. Attorney's publicly stated rationale for the new policy omits.  For starters, as the D.C. Council observed in its censure resolution, the U.S. Attorney does not appear to have "use[d] data and evidence-based practices" when adopting the policy, Censure Resolution § 3(1), notwithstanding the availability of studies examining—and raising concerns about—the consequences of prosecuting local gun crimes federally.[38]  Likewise, the U.S. Attorney does not appear to have considered the weighty federalism issues raised by moving an entire class of traditionally local crimes into federal court.[39]  And perhaps most strikingly, the U.S. Attorney appears to have wholly overlooked the impact—in terms of years of incarceration—that the new

---

[37] *See also id.* (noting that the whole record "includes evidence contrary to the agency's position"); *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 47 (D.D.C. 2015) ("The record must include all materials that might have influenced the agency's decision, not merely those on which the agency relied in its final decision.  An agency may not skew the record by excluding unfavorable information but must produce the full record that was before the agency at the time the decision was made." (internal quotations and alterations omitted) (first quoting *Stainback*, 520 F. Supp. at 186; then quoting *Blue Ocean Inst. v. Gutierrez*, 503 F. Supp. 2d 366, 369 (D.D.C. 2007)).  Mr. Reed reserves the right to supplement his APA argument once such disclosures have been made.

[38] *See, e.g.*, Steven Raphael & Jens Ludwig, *Prison Sentence Enhancements: The Case of Project Exile*, in EVALUATING GUN POLICY: EFFECTS ON CRIME AND VIOLENCE (Philip J. Cook & Jens Ludwig, eds., 2003); Censure Resolution § 2(9) ("Studies regarding the success of other efforts to prosecute firearms-related offenses in federal court . . . have been inconclusive at best.").

[39] *See supra* Part I; *cf.* Censure Resolution § 2(8), (10)–(13).

initiative will have on the people subjected to federal prosecution.  Indeed, when asked at the press conference announcing the new initiative whether defendants would get longer prison terms in federal court, U.S. Attorney Liu disclaimed any interest in obtaining longer sentences before suggesting that sentences might actually be *lower* in federal court—notwithstanding data showing precisely the opposite to be true.  *See* FIP Press Conference at 14:17–16:14; *cf.* Censure Resolution § 2(7) ("Individuals sentenced in federal court for felon-in-possession are generally exposed to significantly longer prison sentences than in the Superior Court."); *supra* p. 12–13 (citing comparative sentencing statistics).

Taking just these three examples, the U.S. Attorney thus appears to have "entirely failed to consider [multiple] important aspect[s]" of the new policy and to have failed to "examine the relevant data."  *State Farm*, 463 U.S. at 43.  As the Supreme Court has made clear, such failures "[n]ormally" render agency action "arbitrary and capricious."  *Id.*  That same conclusion follows here.  *See also Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (holding that when an agency changes its policy, it "must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'" (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009))).

Equally troubling is the rationale that the U.S. Attorney *did* offer for the new policy.  At the press conference announcing the new policy, U.S. Attorney Liu insisted time and again that she adopted the new initiative for one reason and one reason alone: to "enable [her office] to leverage local and federal law enforcement resources" at the *investigation* stage of the process, by allowing "the FBI's Washington field office, the U.S. Marshal Service, and the Bureau of Alcohol Tobacco Firearms and Explosives [to work] closely from the start with [the] MPD and [the U.S. Attorney's] office on cases involving these gun offenders."  FIP Press Conference at 6:40.  Indeed,

the U.S. Attorney asserted that the decision to file these cases in federal court is largely incidental to her desire to see federal agencies more involved at the investigatory stage. *See id.* at 10:01 ("The focus really should be on not so much where we're prosecuting these cases but what we're doing to investigate these cases and the thinking behind this new effort is that we can bring in all of our federal law enforcement partners. . . . What we're trying to do is bring together all of those resources and investigate these cases as thoroughly as we can . . . .").

There are two problems with this explanation. First, it doesn't make sense. As the D.C. Council observed in its censure resolution, "under current practice, those [same federal] agencies can *already* support *locally*-prosecuted felon-in-possession cases." Censure Resolution § 2(5) (emphasis added). Indeed, that is one of the unique advantages that the U.S. Attorney enjoys by virtue of her status as being the only local prosecutor in the country who is, in fact, a U.S. Attorney: She can ask the FBI's Washington field office to investigate her office's cases regardless of where she ultimately decides to file them.[40] The stated rationale for the policy thus lacks "a rational connection between the facts [asserted] and the choice made." *State Farm*, 463 U.S. at 43.

Second, and perhaps more concerning, the explanation simply doesn't seem to be true. Rather, a detailed examination of 145 felon-in-possession cases filed in this Court following the Government's announcement of its new policy shows that the Metropolitan Police Department (MPD) was the sole investigating agency in the vast majority of those cases. Indeed, according to

---

[40] At the press conference, Liu described federal agents' involvement as driving the decision to charge federally: "[T]hose cases will be prosecuted in federal court because we're going to be working more closely with our federal partners and that is typically where *they bring* these cases." FIP Press Conference at 10:54 (emphasis added). But of course, this explanation self-evidently "runs counter to the evidence," *State Farm*, 463 U.S. at 43, for it is the U.S. Attorney herself who decides where to "bring cases," not the officers who investigated the case. Indeed, *the entire point* of the felon-in-possession initiative is that the U.S. Attorney (not the FBI) has decided to bring cases in federal court rather than Superior Court. *Cf.* FIP Press Conference at 3:55 (Mayor Bowser describing the initiative as "the U.S. Attorney's strategy").

the Government's own statement of facts in those cases, it appears that only seventeen (11.7%) involved federal investigative agencies at all.  *See* Patkowski Decl., *supra* note 9.  By contrast, 121 of the cases (83.4%) exclusively involved local police officers.[41]  *See id.*; *see also* Federal Criminal Enforcement Report for Fiscal Year 2019, Judicial District of D.C., Lead Charge of 18 U.S.C. 922, Trac FED, https://perma.cc/9U94-TNEN (report generated Jan. 23, 2020) (reporting that 85.8% of federal cases referred to the D.C. U.S. Attorney's Office for prosecution in fiscal year 2019 were referred by the local Metropolitan Police Department).  "[T]he evidence," in other words, "tells a story that does not match the explanation the [U.S. Attorney] gave for [her] decision." *Dep't of Commerce v. New York*, 139 S. Ct. at 2575–76.  And that fact alone renders the initiative unlawful under the APA.  *See id.* at 2573, 2576 (reversing agency decision that rested "on a pretextual basis," because "[a]ccepting contrived reasons would defeat the purpose of the [APA] enterprise").

In sum, as the Supreme Court held in *State Farm*, it was incumbent on the U.S. Attorney, when promulgating her new felon-in-possession initiative, to "articulate a satisfactory explanation" for her decision.  *State Farm*, 463 U.S. at 43.  Her sole proffered explanation, however, lacks "a rational connection [to] the facts," *id.*, and seems to be "more of a distraction" than "an explanation," *Dep't of Commerce v. New York*, 139 S. Ct. at 2576.  Accordingly, on the basis of the administrative record currently before the Court, the felon-in-possession initiative is arbitrary and capricious and must be held "unlawful and set aside."  5 U.S.C. § 706(2).

---

[41]  In seven of the reviewed cases the investigating agency was not identified.

C.    **The Government's New Policy Was Adopted Without Notice and Comment.**

Separate and apart from being arbitrary and capricious, the U.S. Attorney's felon-in-possession initiative independently violates the APA because it was adopted without public notice and an opportunity for comment.[42]   As the D.C. Circuit has long recognized, this requirement serves a "dual purpose." *Nat'l Ass'n of Home Health Agencies v. Schweiker*, 690 F.2d 932, 949 (D.C. Cir. 1982).  It injects "public participation and fairness to affected parties" into government action that is otherwise "delegated to unrepresentative agencies." *Id.*  And it ensures "that the agency will have before it the facts and information relevant to a particular administrative problem, as well as suggestions for alternative solutions." *Id.*  Given these twin goals "of fairness and agency self-education," "[e]xceptions to the notice and comment provisions of section 553 are to be recognized 'only reluctantly.'" *Id.* (quoting *Humana of S.C., Inc. v. Califano*, 590 F.2d 1070, 1082 (D.C. Cir. 1978)).

That said, the notice-and-comment requirement applies "only to so-called 'legislative' or 'substantive' rules," *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993), a category that excludes "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice," 5 U.S.C. § 553(b)(A).  Here, however, it is clear that the felon-in-possession initiative is in fact a "substantive rule," for the reasons set forth in *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 5–8 (D.C. Cir. 2011) (*EPIC*).  As explained in that opinion, the determinative question "is whether a[n agency] statement is of present binding effect; if it is, then the APA calls for notice and comment." *Id.* at 7 (internal quotations and alterations omitted)

---

[42]   As the Supreme Court held in *Lincoln v. Vigil*, 508 U.S. 182 (1993), the APA's notice-and-comment requirements stand "quite apart from the matter of substantive reviewability." *Id.* at 195.  Thus, even if an agency action is deemed committed to agency discretion by law under 5 U.S.C. § 701(a)(2), it still must comply with the notice-and-comment provisions of 5 U.S.C. § 553.

(quoting *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988)).  "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding."  *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (citation omitted).[43]

Here, the U.S. Attorney herself announced that her office will be filing "all of these [cases] in district court."  FIP Press Conference at 22:35.  As a statement by the person with "plenary authority with regard to federal criminal matters" in this District, that formal announcement applies to and directs all Assistant U.S. Attorneys prosecuting felon-in-possession cases in this jurisdiction.  U.S. DEP'T OF JUSTICE, JUSTICE MANUAL § 9-2.001 (2018).  And of course, Mr. Reed has no opportunity to opt out of the initiative, which renders it binding as to him as well.  *See EPIC*, 653 F.3d at 7.  Thus, applying the straightforward reasoning of the Court of Appeals in *EPIC*, there is "no justification for [the Government's] having failed to conduct a notice-and-comment rulemaking" in this instance.  *Id.* at 8.  Accordingly, Mr. Reed's "indictment should be dismissed."  *Reynolds*, 710 F.3d at 503, 516 (vacating criminal conviction premised on agency action for which the Department of Justice "completely failed to provide notice and comment").

## III.   THE FELON-IN-POSSESSION INITIATIVE RAISES A PRESUMPTION OF VINDICTIVE PROSECUTION.

Finally, in addition to violating the statutes described thus far, the felon-in-possession initiative also runs afoul of the Due Process Clause's ban on vindictive prosecution, because there is a "realistic likelihood," *United States v. Meadows*, 867 F.3d 1305, 1311 (D.C. Cir. 2017), that

---

[43]  The felon-in-possession initiative does not purport to "resolve an ambiguity inherent in [the U.S. Attorney's] statutory and regulatory authority" and is thus not an interpretive rule.  *EPIC*, 653 F.3d at 7.  Likewise, it is not a procedural rule because it "alter[s] the rights or interests of parties" and "impose[s] new substantive burdens" on the people subjected to it—burdens that, in this context, are "grave" and "substantial."  *Id.* at 5.

the initiative was adopted "[t]o punish" a group of defendants for having "done what the law plainly allows [them] to do," *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Specifically, the circumstances surrounding the policy's adoption and early implementation create a reasonable likelihood that the Government decided to prosecute felon-in-possession defendants in federal court at least in part to retaliate against defendants who routinely and successfully asserted their constitutional right to seek pretrial release in Superior Court. Such behavior plainly violates the doctrine against vindictive prosecution.

In the months preceding the policy's formal adoption, Superior Court felon-in-possession defendants were being released pending trial in the majority of Superior Court cases (55%). *See* Avvocato Decl., Ex. C. By contrast, in that same period of time, felon-in-possession defendants in this Court were released in fewer than one-quarter of cases (23%). *Id.* As the only institutional actor consistently appearing before both the Superior Court and this Court, the Government was surely aware of this discrepancy—and was in a position to exploit these divergent pretrial release rates by moving the entire class of felon-in-possession defendants to this forum, either by transferring those cases from local court to federal court or by filing them in this Court directly, as occurred in Mr. Reed's case. Moreover, when the Government began implementing its new policy, it did so in a manner that directly demonstrated its willingness to move cases to this Court in order to detain specific defendants whom the Superior Court had already released—a practice that this very Court recently criticized as "outrageous." *United States v. Pitts*, 331 F.R.D. 199, 205 (D.D.C. 2019) (Sullivan, J.); *see also infra* Section III.D (describing the Government's tactics).

Taking these facts together, the circumstances surrounding the felon-in-possession policy "give rise to a presumption" that the Government is acting out of unconstitutional "vindictiveness"

with respect to an entire group of defendants, including Mr. Reed.  *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987).  In the ordinary case, vindictive prosecution claims are raised by individual defendants based on rights that they personally invoked prior to the Government's vindictive action.  Here, however, the vindictive action at issue is the Government's decision to adopt the felon-in-possession policy itself—a decision that by its very nature operates at a wholesale level, impacting an entire class of defendants.  Similarly, by its very nature, the Government's policy affirmatively strips defendants—including Mr. Reed—of the benefit of any opportunity to seek pretrial release in Superior Court.

Mr. Reed's claim is thus novel in the following respect: He seeks protection against potentially vindictive prosecutorial action that was taken against an identifiable group of defendants, of which he is a member.  To the extent the claim is novel, however, it is novel because the Government's conduct itself is novel in its breadth, affecting an entire class of defendants *en masse*.  But the breadth of the Government's action ought not bar Mr. Reed's claim.  It would, after all, be perverse to deem vindictive prosecution of an individual defendant "a due process violation 'of the most basic sort,'" but to permit such behavior simply because it is taken against scores of defendants all at once.  *Goodwin*, 457 U.S. at 372 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)).  This Court should accordingly assess Mr. Reed's vindictive prosecution claim from the perspective of the relevant class of defendants, who invoked their right to seek pretrial release in the Superior Court.  And if the Court agrees, as it should, that there is a reasonable likelihood that the Government acted vindictively toward those defendants, it should order the Government to present a valid, non-pretextual explanation for its policy—or to suffer dismissal of the indictment.

**A.    A Presumption of Vindictive Prosecution Arises When There Is a "Realistic Likelihood" that the Government Has Impermissibly Punished Criminal Defendants for Having Exercised Their Constitutional Rights.**

The vindictive prosecution doctrine "precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right[.]"  *Meadows*, 867 F.3d at 1311 (quoting *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (per curiam) (citations omitted)).  There are generally "two ways in which a defendant may demonstrate prosecutorial vindictiveness."  *Meyer*, 810 F.2d at 1245.  "First, a defendant may show 'actual vindictiveness'— that is, he may prove through objective evidence that a prosecutor acted in order to punish him for standing on his legal rights."  *Id.*  Alternatively, "a defendant may in certain circumstances rely on a presumption of vindictiveness . . . ."  *Id.*  Under this latter approach, "when the facts indicate a realistic likelihood of vindictiveness, a presumption will arise obliging the government to come forward with objective evidence justifying the prosecutorial action."  *Id.* (internal quotations and alterations omitted) (citing *Blackledge v. Perry*, 417 U.S. 21, 27–29, 29 n.7 (1974)).  "If the government produces such evidence," the defendant must "prove that the justification is pretextual and that actual vindictiveness has occurred."  *Id.*  "But if the government fails to present such evidence, the presumption stands and the court must find that the prosecutor acted vindictively."  *Id.*

As the D.C. Circuit has observed, the presumption-based component of this doctrinal framework is central to the doctrine's vitality.  After all, it is "exceedingly difficult" to produce the sort of smoking-gun evidence needed to establish "actual vindictiveness."  *Id.*  The presumptive vindictiveness doctrine thus serves as a "prophylactic rule" that protects defendants even when a vindictive motive cannot be proven directly.  *United States v. DeMarco*, 550 F.2d 1224, 1227 (9th Cir. 1977).  Indeed, the very nature of the presumptive approach is that it can lead to dismissal in cases where the Government "may not in fact have acted out of vindictiveness," because the presence of an actual illicit intent is "not determinative."  *United States v. Jamison*, 505 F.2d 407,

415 (D.C. Cir. 1974).[44]   Likewise, "[i]t is irrelevant that a particular defendant" may have "exercise[d] his statutory rights, despite his fear of vindictiveness," because the doctrine "is designed not only to [protect] the defendant who has asserted his right . . . but also to prevent chilling the exercise of such rights by *other* defendants who must make their choices under similar circumstances." *De Marco*, 550 F.2d at 1227 (emphasis added).  Due process, in short, "requires that even the appearance of vindictiveness must be absent from judicial proceedings." *United States v. Schiller*, 424 A.2d 51, 54 (D.C. 1980).

In order to raise a presumption of vindictive prosecution in the pretrial context, a defendant must point to three things.  First, he must show that the targeted "defendants had asserted their constitutional rights."  *Meyer*, 810 F.2d at 1246.  Second, he must show that "the prosecutor increased the charges against the defendants after" that assertion.  *Id.*  Finally, he must point to some "additional facts [that] combine with this sequence of events to create . . . a realistic likelihood" of vindictive prosecution.  *Id.*  In this case, all three showings are satisfied.

**B.     Viewed as a Group, Felon-in-Possession Defendants Asserted Their Legal Right to Seek Pretrial Release in Superior Court Before the Government's Vindictive Policy Was Enacted.**

As laid out above, Mr. Reed's vindictive prosecution claim is unique—because the practice he is challenging is unique.  Seen plainly for what it is, the felon-in-possession initiative is a wide scale policy through which the Government views, treats, and targets an entire class of criminal defendants as a group.  To treat the initiative as anything else would be to ignore the extent to which the Government is acting against a class of people as a class of people, and would thus threaten to render the policy's true nature—and its potential vindictiveness—invisible.

---

[44]   *See also id.* at 415 ("[T]he evil to which [the doctrine] is directed is the apprehension on the defendant's part of receiving a vindictively-imposed penalty for the assertion of rights.").

For this reason, courts assessing constitutional violations inflicted on criminal defendants *en masse* have appropriately observed that "a class of indigent defendants may seek relief for a widespread, systematic" constitutional violation. *Kuren v. Luzerne Cty.*, 146 A.3d 715, 743 (Pa. 2016) (addressing wholesale denial of right to counsel); *see also Hurrell-Harring v. New York*, 930 N.E.2d 217 (N.Y. 2010) (same). Likewise, courts reviewing constitutional challenges raised by individual defendants who have been impacted by systemic wrongdoing frequently consider the systemic nature of the misconduct at issue. Thus, in the context of evaluating *Batson* claims raised in individual prosecutions, courts consider "the pattern and practice" of an entire "office," particularly if "the office ha[s] a systematic policy" of engaging in the challenged behavior. *Miller-El v. Cockrell*, 537 U.S. 322, 334 (2003); *see also Miller-El v. Dretke*, 545 U.S. 231, 253, 263 (2005). Similarly, in enforcing *Brady v. Maryland*, 373 U.S. 83 (1963), judges may ask whether an alleged individual violation is indicative of a greater systemic problem.[45]

The vindictive prosecution doctrine itself reflects similarly group-oriented concerns. Its purpose, after all, is not just to protect individual defendants such as Mr. Reed who may have been treated unlawfully, "but also to prevent chilling the exercise of such rights by *other* defendants who must make their choices under similar circumstances in the future." *DeMarco*, 550 F.2d at 1227 (emphasis added); *see also United States v. Jenkins*, 504 F.3d 694, 700 (9th Cir. 2007). The D.C. Circuit has accordingly vacated a criminal conviction where a defendant was subjected to a

---

[45] *See, e.g.*, Transcript of Oral Order at 34, *United States v. Minor*, 2014 CMD 4284, (D.C. Super. Ct. June 4, 2014) ("[W]hile I believe that the [trial] prosecutor who is here[] is as diligent as any . . . I don't believe that the office is proceeding in these cases in a manner consistent with the constitutional rights of the defendants who appear in this courthouse . . . ."); *District of Columbia v. Barbusin*, No. 2012 CDC 000913, at 2 (D.C. Super. Ct. Aug. 8, 2013), https://perma.cc/L4Y3-ZGXN ("The most troubling thing at this point is . . . for it to go all the way up the chain of command within the [prosecutor's office] and for me to get a pleading signed by the [Deputy Attorney General] that persists in calling this evidence non-exculpatory — [that] suggests to me that the . . . Office has a different view of *Brady* tha[n] the rest of us. . . .").

wide scale "practice" of vindictive prosecution. *Dixon v. District of Columbia*, 394 F.2d 966, 969 (D.C. Cir. 1968). *See also Meyer*, 810 F.2d at 1248 ("The Supreme Court's decisions concerning vindictive prosecution have focused on the conduct of the government as a whole . . . . To do otherwise would be to ignore that the desire to punish defendants for exercising their legal rights arises more often from institutional rather than from personal wellsprings.").

Here, the policy that Mr. Reed challenges was expressly designed to affect "*all*" of the felon-in-possession defendants in the District of Columbia.   FIP Press Conference at 22:35 (emphasis added).  The Government, in other words, views this entire class of defendants as a unit, and has treated them as such in implementing its policy.  Any judicial effort to protect defendants against the policy must therefore see the affected defendants as a group as well.  And viewed as such, it is clear that the Government adopted the felon-in-possession initiative after this targeted group of "defendants had asserted their constitutional rights" to seek pretrial release in the Superior Court. *Meyer*, 810 F.2d at 1246; *cf. United States v. Salerno*, 481 U.S. 739, 755 (1987) ("[L]iberty is the norm, and detention prior to trial . . . the carefully limited exception.").

Indeed, as noted above, these defendants not only consistently invoked their right to seek pretrial release, but did so successfully: Of the seventy-seven defendants prosecuted in Superior Court for felon-in-possession in the months leading up to the felon-in-possession initiative, 43% were released at their initial detention hearing and another 12% were released later in the proceedings.  *See* Avvocato Decl., Ex. C.  By contrast, of the twenty-six felon-in-possession defendants prosecuted in this Court during that same time period, nearly all of them (85%) were *detained* at their initial detention hearing, and only two (8%) were subsequently released later in the proceedings. *Id.*  The Government, in other words, decided to transfer into federal court a class of "defendants [who] had asserted their constitutional rights" in Superior Court—and through that

very decision, it succeeded in making those rights less meaningful.  *Meyer*, 810 F.2d at 1246.

**C.    The Felon-in-Possession Policy Increases the Charges Against the Defendants it Targets.**

Defendants asserting a vindictive prosecution claim must also show that the Government "increased the charges against the defendants" following their invocation of their rights.  *Id.*  As the Supreme Court has made clear, substituting one charge with another can give rise to a presumption of vindictive prosecution if the "potential period of incarceration" increases. *Blackledge*, 417 U.S. at 28.  The felon-in-possession initiative does precisely this: It swaps the local felon-in-possession offense for a federal one.  And as the D.C. Council accurately observes, "the potential period of incarceration," *id.*, confronting each of these defendants is substantially higher as a result.  *See* Censure Resolution § 2(7) ("Individuals sentenced in federal court for felon-in-possession are generally exposed to significantly longer prison sentences than in the Superior Court."); *see also supra* p. 12–13 (citing comparative sentencing statistics).  Accordingly, the second requirement for establishing a presumption of vindictive prosecution is easily met; there can be no question that the charge against Mr. Reed has increased.

**D.    Additional Facts Demonstrate a "Reasonable Likelihood" that the Government's New Policy Seeks to Punish Felon-in-Possession Defendants for Having Sought Pretrial Release in Superior Court.**

Finally, "additional facts combine with th[e] sequence of events" described above to suggest that the Government adopted the felon-in-possession initiative with a "motivation to act vindictively" against this group of defendants by retaliating against them for having exercised their right to seek pretrial release in Superior Court.  *Meyer*, 810 F.2d at 1246.  These additional facts are apparent if one examines the early cases prosecuted in this Court pursuant to the Government's new policy—cases that were not filed in this Court directly, but rather were transferred here after having previously been pending in the Superior Court.

Crucially, many of those early cases followed a consistent pattern: A Superior Court judge *released* the defendant pending trial.  The Government then re-indicted the defendant in federal court for the exact same alleged offense, and immediately sought a second bite at the pretrial detention apple.  As part of this maneuver, the Government unilaterally forced the released defendant to be re-arrested.  *See* Fed. R. Crim. P. 9(a).  Once the defendant was brought to Court, it then unilaterally forced a three-day period of incarceration by moving to continue the federal detention hearing that commences a federal prosecution. *See* 18 U.S.C. § 3142(f)(1)(E).  The Government sought these continuances even though it had already litigated—and lost—the question of the defendant's release at a *local* detention hearing.  The Government employed these tactics in a long string of transferred cases, securing in each one not only the released defendants automatic re-arrest and automatic re-incarceration for three days, but also a chance to argue that someone whom the Superior Court had just released should now be detained.[46]  Perhaps most strikingly, the Government often employed these tactics without mentioning to the federal magistrate judges that the defendants had been released by the Superior Court and were in full

---

[46] *See* Release Order, *United States v. Bellamy*, No. 2019 CF2 000004 (D.C. Super. Ct. Jan. 15, 2019); Indictment, *United States v. Bellamy*, No. 19-cr-00015 (D.D.C. Jan. 17, 2019); Mem. for Pretrial Detention, *United States v. Bellamy*, No. 19-cr-00015 (D.D.C. Jan. 24, 2019); Release Order, *United States v. Fuentez*, No. 2018 CF2 008405 (D.C. Super. Ct. June 7, 2018); Indictment, *United States v. Fuentez*, No. 19-cr-00037 (D.D.C. Feb. 6, 2019); Mot. for Temporary Detention, *United States v. Fuentez*, No. 19-cr-00037 (D.D.C. Feb. 12, 2019); Release Order, *United States v. Jones*, No. 2018 CF2 019046 (D.C. Super. Ct. Jan. 3, 2019); Indictment, *United States v. Jones*, No. 19-cr-00091 (D.D.C. Mar. 12, 2019); Mem. for Pretrial Detention, *United States v. Jones*, No. 19-cr-00091 (D.D.C. Mar. 23, 2019); Release Order, *United States v. Mayes*, No. 2018 CF2 019056 (D.C. Super. Ct. Jan. 3, 2019); Indictment, *United States v. Mayes*, No. 19-cr-00111 (D.D.C. Mar. 29, 2019); Mem. in Support of Pretrial Detention, *United States v. Mayes*, No. 19-cr-00111 (D.D.C. Apr. 16, 2019); Release Order, *United States v. Wilkins*, No. 2018 CF2 016149 (D.C. Super. Ct. Nov. 2, 2018); Indictment, *United States v. Wilkins*, No. 18-cr-00363 (D.D.C. Dec. 6, 2018); Mem. in Support of Pretrial Detention, *United States v. Wilkins*, No. 18-cr-00363 (D.D.C. Jan. 11, 2019).

compliance with the terms of their release at the time of their federal re-arrest.[47]

If this practice seems "outrageous," that is because it is—as this very Court recently observed. *Pitts*, 331 F.R.D. at 205 (Sullivan, J.) (dismissing transferred felon-in-possession case on Speedy Trial grounds, with prejudice due to concerns of potential prosecutorial harassment). Other courts have deemed such maneuvers unconstitutional. *See State v. Reimonenq*, No. 2019-KK-0367, 2019 WL 5445065 (La. Oct. 22, 2019) ("[F]undamental fairness and due process prohibit the state from dismissing and reinstituting criminal charges in order to circumvent the normal order of criminal proceedings [or] . . . adverse rulings in the trial court."). At the very minimum, the Government's behavior in these early felon-in-possession cases constitutes an "additional fact" that sheds light on the Government's true "motivation" for enacting its new policy. *Meyer*, 810 F.2d at 1246. Indeed, courts have found similarly retaliatory behavior to be vindictive. *See, e.g.*, *United States v. Ladeau*, 734 F.3d 561, 564 (6th Cir. 2013) (finding a presumption of vindictiveness where the Government increased the charge of a defendant who successfully moved to suppress evidence); *Simms v. United States*, 41 A.3d 482, 491–93 (D.C. 2012) (finding a presumption of vindictiveness where the Government added a charge after the defendant exercised his right to compulsory process).

As the early history of the felon-in-possession initiative shows, this case is thus a far cry from *United States v. Mills*, 925 F.2d 455 (D.C. Cir.), *vacated upon reh'g on banc*, 964 F.2d 1186 (D.C. Cir. 1992), in which the D.C Circuit held that the factual record was insufficient to support

---

[47] *See* Government's Mem. in Supp. of Pretrial Detention, *United States v. Mayes*, 19-cr-00111 (D.D.C. Apr. 16, 2019); Transcript of Detention Hearing 7–9, 12–13, *United States v. Mayes*, 19-cr-00111 (D.D.C. Apr. 17, 2019); Government's Mem. for Pretrial Detention, *United States v. Pitts*, 19-cr-00049 (D.D.C. Feb. 26, 2019); Transcript of Detention Hearing 10, *United States v. Pitts*, 19-cr-00049 (D.D.C. Feb. 27, 2019); Government's Mem. in Supp. of Pre-trial Detention, *United States v. Wilkins*, No. 18-cr-00363 (D.D.C. Jan. 11, 2019); Transcript of Detention Hearing 7, *United States v. Wilkins*, No. 18-cr-00363 (D.D.C. Jan. 16, 2019).

a presumption of vindictiveness when a defendant challenged a prior U.S. Attorney's decision to transfer certain defendants from Superior Court to federal court.  In that case, the D.C. Circuit found determinative the Government's "consistent and nonretaliatory explanation . . . for its decisions to transfer the indictments," *id.* at 463, namely, the pursuit of higher sentences, *id.* at 464.  Here, by contrast, the Government has explicitly disclaimed any intention to seek higher sentences through the felon-in-possession initiative.  *See* FIP Press Conference at 15:25.  Indeed, the U.S. Attorney has gone so far as to assert (incorrectly) that sentences in this Court may actually be lower than in Superior Court.  *See* FIP Press Conference at 14:17–16:14.

Perhaps more significantly, the only justification that the Government *has* offered for the initiative is the false claim that it was adopted to facilitate investigative assistance from federal agencies—all of whom could "already support locally-prosecuted felon-in-possession cases" before the initiative was adopted and none of whom actually appear to be involved in the cases being prosecuted under the new policy. Censure Resolution § 2(5); *see supra* Section II.B.2.  Thus, not only does this policy rely on a different justification than the one the Court of Appeals approved in *Mills*, but the justification upon which it does rely is demonstrably pretextual, which suffice to say was not the case in *Mills*.

Indeed, the very fact that the Government's proffered explanation for its new initiative is pretextual is itself an "additional fact[]" that raises a "realistic likelihood" that "the government's [true] motivation" is improper here.  *Meyer*, 810 F.2d at 1246–47.  After all, "[w]hat is a pretext" if not a "spurious . . . false or otherwise unsupportable" explanation for a decision that is driven by an "illegal animus" or an "illicit motive"?  *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 140 n.8 (D.D.C. 2010).  Taken together with the "outrageous" transfer practices described above, *Pitts*, 331 F.R.D. atth 205, the Government's pretextual explanation for its

initiative renders an inference of improper motive more than justified here.

In sum, a group of defendants invoked their right to pretrial release in Superior Court and were frequently successful in doing so.  The Government decided to prosecute that entire group of defendants in federal court—with the foreseeable consequence, given this Court's more stringent pretrial detention practices and higher conviction rates, that the very same group of defendants would be less successful in obtaining pretrial release and more likely to be convicted.  If the Government's intent was to punish the targeted defendants for having exercised their rights, it thus succeeded in doing so.  *Cf. Local 357, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. N. L. R. B.*, 365 U.S. 667, 675 (1961) ("Some conduct may by its very nature contain the implications of the required intent; the natural foreseeable consequences of certain action may warrant the inference.").[48]

In view of this course of conduct, the three preconditions for finding a presumption of vindictiveness are satisfied here.  The Government is thus obligated "to come forward with objective evidence justifying" its decision to subject this entire class of defendants to prosecution in federal court.[49]  *Id.* at 1245; *see also United States v. Dwyer*, 287 F. Supp. 2d 82, 91 (D. Mass.

---

[48] That Mr. Reed was fortunate enough to eventually be released in his federal case does not alter the analysis.  *See De Marco*, 550 F.2d at 1227 ("It is irrelevant that a particular defendant exercise[d] his . . . rights, despite his fear of vindictiveness . . . .  The prophylactic rule is designed not only to [protect] the defendant who has asserted his right . . . but also to prevent chilling the exercise of such rights by other defendants . . . .").  Multiple other defendants who were released in Superior Court were in fact later detained—for the exact same offense—after the Government transferred their cases to federal court pursuant to its new initiative.  *See, e.g., United States v. Mayes*, No. 2018 CF2 019056 (D.C. Super. Ct. 2019); *United States v. Mayes*, No. 19-cr-00111 (D.D.C. 2019); *United States v. Lomax*, No. 2017 CF2 011468 (D.C. Super. Ct. 2017); *United States v. Lomax*, No. 17-cr-00142 (D.D.C. 2018); *United States v. Smith*, No. 2017 CF2 021754 (D.C. Super. Ct. 2018); *United States v. Smith*, No. 18-cr-00040 (D.D.C. 2018).

[49] *But see supra* Part I.A (observing that Congress has directly barred the U.S. Attorney from adopting such a policy, for any reason).  Mr. Reed's vindictive prosecution argument stands independent of his Home Rule argument.  The Court thus need not reach his vindictive prosecution

2003) (ordering discovery after presumption of vindictiveness was raised). Unlike the rationale offered thus far, the one the Government presents next cannot be "pretextual." *Meyer*, 810 F.2d at 1245. If it is, or "if the government fails to present [any] evidence" rebutting the presumption of vindictiveness supported by the current record, then "the presumption stands and the Court must find that the prosecutor acted vindictively," and dismiss the case. *Id.*

## CONCLUSION

For the foregoing reasons as well as any others set forth at a hearing on this motion or that this Court may deem just and proper, Mr. Reed respectfully requests that the Court grant this motion and dismiss this case.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

ANDREW MANUEL CRESPO

_____/s/_____

_____/s/_____

Carlos Vanegas
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500

Faculty Director
The Impact Defense Initiative of
Harvard Law School[*]
1525 Massachusetts Avenue
Cambridge, MA 02138
(617) 495-3168

---

claim if it agrees with his Home Rule claim. If it rejects his Home Rule claim, however, it should nonetheless require the Government to present a nonretaliatory (and nonpretextual) justification for the felon-in-possession initiative.

[*] The Impact Defense Initiative of Harvard Law School is a clinical legal education program and independent clinical law office operating under the auspices of Harvard Law School and under the direction of Professor Andrew Manuel Crespo (D.C. Bar No. 998215). Consistent with D.C. Ct. App. R. 49, cmt. § 49(b)(2) at 88, and pursuant to the clinic's core mission as an educational program, the clinic relies heavily upon the skill and research of its student associates, each of whom is pursuing a *juris doctorate* degree at Harvard Law School. The following students' efforts were integral to the preparation of this motion: Alexandra Avvocato, Nicholas Hine, Laura Londoño Pardo, Daniel Meyer, Isabel Patkowski, and Nathaniel Sobel. Professor Crespo signs this brief pursuant to Local R. Crim. P. 44.1(c).