IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 19-cr-00093 (EGS) |
| | ) | |
| JOHN VICTOR REED, | ) | |
| | ) | |
| *Defendant* | ) | |

**BRIEF OF THE DISTRICT OF COLUMBIA AS *AMICUS CURIAE***

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS CURIAE*.............................................1

ARGUMENT ......................................................................................................4

    I.     There Is No Need To Resort To Federal Prosecution Because The District Has The Authority And The Ability To Punish Local Gun Crimes......................................................................................4

          A.    Congress granted the D.C. Courts the authority to try local criminal cases.........................................................4

          B.    Congress authorized the Council to enact criminal laws for the District.........................................................6

          C.    The Council has enacted robust firearms laws, including a strong prohibition on the possession of a firearm by a convicted felon............................................................7

    II.    The USAO's FIP Policy Needlessly Disturbs The Balance Of Federal And Local Authority In The District......................................9

          A.    The FIP Policy makes federal cases out of purely local criminal matters.........................................................9

          B.    The FIP Policy will strain the limited resources of the district courts..........................................................11

    III.    The FIP Policy Will Disparately Impact Individuals Selected For Federal Prosecution, Especially Minorities.......................................14

          A.    The FIP Policy will result in disparate sentences among similarly situated defendants......................................14

          B.    The FIP Policy will have a disparate impact on African Americans in the District ............................................20

CONCLUSION ....................................................................................................25

i

# TABLE OF AUTHORITIES*

## *Cases*

*Holloway v. United States*, 951 A.2d 59 (D.C. 2008) ...............................................16

*In re Monaghan*, 690 A.2d 476 (D.C. 1997) ...............................................................9

*Palmore v. United States*, 411 U.S. 389 (1973)...........................................................5

*United States v. Jones*,
    36 F. Supp. 2d 304 (E.D. Va. 1999) (per curiam) ................................... 9, 11, 23

## *Statutes*

D.C. Code § 11-721 ....................................................................................................4

D.C. Code § 11-923 ....................................................................................................4

*D.C. Code § 22-4503 ....................................................................................... 8, 14, 15

D.C. Code § 23-101 ....................................................................................................9

D.C. Code § 24-403.03 ......................................................................................... 2, 15

D.C. Code § 24-901 ..................................................................................................15

D.C. Code § 24-903 ..................................................................................................15

*18 U.S.C. § 922(g) ........................................................................................... 8, 23

*18 U.S.C. § 924................................................................................. 8, 9, 14, 15

18 U.S.C. § 3162........................................................................................................12

Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, 47 Stat. 650 (1932)....................7

---

\*        Authorities upon which we chiefly rely are marked with asterisks.

Comprehensive Youth Justice Amendment Act, D.C. Law 21-238,
63 D.C. Reg. 15312 (eff. Apr. 4, 2017) ........................................................ 2, 15

District of Columbia Court Reorganization Act, Pub. L. No. 91-358, tit. I,
84 Stat. 475 (1970) ........................................................................................ 4

District of Columbia Law Enforcement Act of 1953, Pub. L. No. 83-85,
67 Stat. 90 (1953) .......................................................................................... 8

District of Columbia Self-Government and Governmental Reorganization
Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) ................................................ 6

Firearms Amendment Act of 2012, D.C. Law 19-170, 59 D.C. Reg. 5691
(eff. Sept. 29, 2012) ...................................................................................... 7

Firearms Control Amendment Act of 2008, D.C. Law 17-372,
56 D.C. Reg. 1365 (eff. Mar. 31, 2009) ........................................................ 7

Firearms Control Regulations Act of 1975, D.C. Law 1-85,
23 D.C. Reg. 2464 (1976) .............................................................................. 7

Inoperable Pistol Amendment Act of 2008, D.C. Law 17-388,
56 D.C. Reg. 1162 (eff. May 20, 2009) .......................................................... 7

Youth Rehabilitation Amendment Act, D.C. Law 22-197, 65 D.C. Reg. 9554
(eff. Dec. 13, 2018) ........................................................................................ 2

## Legislative History

Council of the District of Columbia Comm. on the Judiciary, Notice of Public
Hearing, Bill 21-0683, the "Comprehensive Youth Justice Amendment
Act of 2016" (Apr. 15, 2016) .......................................................................... 16

Council of the District of Columbia Comm. on the Judiciary, Report on Bill
6-47, Youth Rehabilitation Act of 1985 (1985) ............................................. 16

Council of the District of Columbia Comm. on the Judiciary,
Report on Bill 21-0683, the "Comprehensive Youth Justice
Amendment Act of 2016" (2016) .................................................................... 22

Council of the District of Columbia Comm. on the Judiciary & Pub. Safety, Report on B22-0451, the "Youth Rehabilitation Amendment Act of 2018" (2018) .................................................................................................3

Staff of H. Comm. on the District of Columbia, 93d Cong., Home Rule for the District of Columbia 1973-1974, Background and Legislative History of H.R. 9056, H.R. 9682, and Related Bills Culminating in the District of Columbia Self-Government and Governmental Reorganization Act (Comm. Print 1974) ...............................................................................7

*Legislation*

Second Look Amendment Act of 2019, B23-0127, 23rd Council ..................... 2, 16

*Other*

Martin Austermuhle, *District of Corrections: Does D.C. Really Have the Highest Incarceration Rate in the Country?*, WAMU (Sept. 10, 2019) ..............1

*Sara Sun Beale, *Too Many and Yet Too Few: New Principles to Define the Proper Limits for Federal Criminal Jurisdiction*, 46 Hastings L.J. 979 (1995)............................................................. 12, 13, 18, 20

Bureau of Justice Statistics, *Federal Criminal Case Processing Statistics*.............10

Todd R. Clear & James Austin, *Reducing Mass Incarceration: Implications of the Iron Law of Prison Populations*, 3 Harv. L. & Pol'y Rev. 307 (2009) ..................................................................17

D.C. Dep't of Youth Rehab. Servs., *Youth Population Snapshot* ..........................22

D.C. Health Matters, *2020 Demographics* .............................................................22

D.C. Office of Planning, *What's My Ward?*...........................................................22

District of Columbia Courts, *Statistical Summary* (2018)......................................18

Shawn M. Flower, *District of Columbia Custodial Population Study: Seeking Alignment between Evidence Based Practices and Jail Based Reentry Services*, Justice Res. & Stats. Ass'n (Sept. 2017) ........................................ 1, 21

*Bonita R. Gardner, *Separate and Unequal: Federal Tough-on-Guns Program Targets Minority Communities for Selective Enforcement*, 12 Mich. J. Race & L. 305 (2007) .......................................................... 10, 23, 24

John Gramlich, *The Gap Between the Number of Blacks and Whites in Prison Is Shrinking*, Pew Res. Ctr. (Apr. 30, 2019) ......................................................20

Shon Hopwood, *Improving Federal Sentencing*, 87 UMKC L. Rev. 79 (2018) ..............................................................................17

*Spencer S. Hsu & Peter Hermann, *U.S. to Push D.C. Gun Cases into Federal Court as Washington Struggles with a 40 Percent Murder Spike*, Wash. Post (Feb. 5, 2019) ......................................................................... 3, 12, 19

Letter from D.C. Sentencing Comm'n to Charles Allen, Chairman, Council of the District of Columbia Comm. on Judiciary & Pub. Safety (Feb. 1, 2019) ............................................................................................14

Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173 (2016) ....................21

Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87 UMKC L. Rev. 113 (2018) ............................................... 17, 18

Metro. Police Dep't, *2018 Annual Report* ..............................................................22

MPD Citywide Map ..................................................................................................22

Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Just. 199 (2013) ..............................................................18

Lauren M. Ouziel, *Legitimacy and Federal Criminal Enforcement Power*, 123 Yale L.J. 2236 (2014) .......................................................................................9

Athula Pathinayake, *Should We Deter Against General Deterrence?*, 9 Wake Forest J. L. & Pol'y 63 (2018) ......................................................... 17, 18

*David E. Patton, *Guns, Crime Control, and a Systemic Approach to Federal Sentencing*, 32 Cardozo L. Rev. 1427 (2011) ............................................... 19, 22

Prison Policy Initiative, *District of Columbia Profile* ...............................................1

Chief Justice William H. Rehnquist, *The 1998 Year-End Report of the Federal Judiciary*, 11 Fed. Sent'g Rep. 134 (1998)..........................................................11

*Daniel C. Richman, *"Project Exile" and the Allocation of Federal Law Enforcement Authority*, 43 Ariz. L. Rev. 369 (2001) ........................... 10, 12, 23

Allen Rostron, *Incrementalism, Comprehensive Rationality, and the Future of Gun Control*, 67 Md. L. Rev. 511 (2008).........................................................7

The Sentencing Project, *Trends in U.S. Corrections* (updated June 2019).............21

*Emma Luttrell Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing a Status, Disparately Affecting Black Defendants, and Continuing the Nation's Centuries-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143 (2018) ...................... 10, 20, 21, 22, 23, 24

Dean A. Strang, *Felons, Guns, and the Limits of Federal Power*, 39 J. Marshall L. Rev. 385 (2006) .......................................................................10

U.S. Courts, *Table C-3.  U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending March 31, 2014*...................................................................................................13

U.S. Courts, *Table C-3.  U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending March 31, 2019*...................................................................................................13

U.S. Courts, *Table D-3.   U.S. District Courts—Criminal Defendants Commenced (Excluding Transfers), by Offense and District, During the 12-Month Period Ending March 31, 2019* ................................................. 18, 19

U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* ...........................................................................................23

U.S. Sentencing Comm'n, *Quick Facts, Felon in Possession of a Firearm* .... 14, 23

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

Despite its small size, the District of Columbia has a higher per capita rate of incarceration than any U.S. state: 1,153 of every 100,000 people in the District are incarcerated, as compared with the national average of 698 per 100,000 people. Prison Policy Initiative, *District of Columbia Profile*.[1]  As of September 2019, there were 4,548 District residents in federal prisons and about 1,800 residents in the D.C. Jail.   Martin Austermuhle, *District of Corrections: Does D.C. Really Have the Highest Incarceration Rate in the Country?*, WAMU (Sept. 10, 2019).[2]  A majority of incarcerated residents are African American and a significant proportion are under the age of 30.  Shawn M. Flower, *District of Columbia Custodial Population Study: Seeking Alignment between Evidence Based Practices and Jail Based Reentry Services*, Justice Res. & Stats. Ass'n 7 (Sept. 2017)[3] (showing that 90% of individuals returning to the District from the D.C. Department of Corrections were African American and that individuals aged 17 to 24 composed the largest category of returning citizens); *id.* at 39 (showing that 92% of individuals returning to the District from federal prison were African American and that individuals aged 25 to 30 composed the largest category of returning citizens).

---

[1]     *Available at* https://tinyurl.com/prison-policy (last visited Apr. 15, 2020).

[2]     *Available at* https://tinyurl.com/district-corrections.

[3]     *Available at* https://tinyurl.com/custodial-population.

Concerned about these inequities, the Council of the District of Columbia has responded by enacting several measures to remedy the District's overincarceration problem.  For example, in 2016, the Council enacted the Comprehensive Youth Justice Amendment Act, D.C. Law 21-238, 63 D.C. Reg. 15312 (eff. Apr. 4, 2017) (codified in scattered sections of D.C. Code Titles 16, 22, 23, and 24), which includes a provision authorizing the Superior Court of the District of Columbia to review the sentences of individuals who committed their crimes as juveniles and have served at least 15 years in prison, D.C. Code § 24-403.03.  The Council is currently considering a bill to expand eligibility for sentence review under this provision to offenders who committed their offenses before the age of 25.  *See* Second Look Amendment Act of 2019, B23-0127, 23rd Council.  Similarly, in 2018, the Council passed the Youth Rehabilitation Amendment Act, D.C. Law 22-197, 65 D.C. Reg. 9554 (eff. Dec. 13, 2018) (codified at D.C. Code §§ 24-901 to 24-906.02, 24-481.01 to 24-481.08), a comprehensive reform of a 1985 law providing sentencing alternatives and rehabilitative measures for young adults convicted of certain crimes.  Critically, the Council noted in its report on the bill that "young adults—those ages 18 through 24—are emerging as a population in dire need" of criminal justice reforms, but that "the District is at a serious disadvantage in addressing the needs of the young adult population" because of its "lack of oversight of the federalized aspects of [its] criminal justice system."  Council of the District of

Columbia Comm. on the Judiciary & Pub. Safety, Report on B22-0451, the "Youth Rehabilitation Amendment Act of 2018," at 3 (2018).

Last year, the U.S. Attorney's Office for the District of Columbia ("USAO") announced a policy that threatens to erode the District's careful reform efforts. As explained by former U.S. Attorney Jessie Liu, the goal of the policy is to prosecute all felon-in-possession cases in federal court under federal law instead of in the Superior Court under District law ("FIP Policy"). Spencer S. Hsu & Peter Hermann, *U.S. to Push D.C. Gun Cases into Federal Court as Washington Struggles with a 40 Percent Murder Spike*, Wash. Post (Feb. 5, 2019).[4]   This policy is not only unnecessary to handle local gun crimes but also will result in harsh and inequitable sentences for young, minority offenders in the District.

The District's paramount concern is to protect the safety and welfare of its residents. To that end, the District has some of the most restrictive gun control laws in the country, and the D.C. Courts are well equipped to punish individuals who violate those prohibitions. At the same time, however, the District has a strong interest in avoiding overincarceration of its residents, especially the disproportionate incarceration of minorities. Because the USAO's FIP Policy targets convicted felons carrying firearms for federal prosecution, this class of offenders will be subject to

---

[4]     *Available at* https://tinyurl.com/dc-fed-ct.

more severe sentences than individuals convicted of the same conduct in the Superior Court.  And because African American residents are more likely to have prior felony convictions, they are at the greatest risk of disparate treatment.  The FIP Policy needlessly disturbs the careful system of dual jurisdiction established between the Council and the federal government, to the detriment of District residents. Because the FIP Policy implicates these important concerns, the District has a strong interest in this matter and supports Mr. Reed's motion to dismiss the indictment.

## ARGUMENT

I.   **There Is No Need To Resort To Federal Prosecution Because The District Has The Authority And The Ability To Punish Local Gun Crimes.**

A.   **Congress granted the D.C. Courts the authority to try local criminal cases.**

Congress created a local court system for the District, and the Supreme Court has recognized that those courts have the authority to adjudicate local criminal offenses.  In 1970, Congress enacted the District of Columbia Court Reorganization Act ("Reorganization Act"), Pub. L. No. 91-358, tit. I, 84 Stat. 475 (codified as amended at D.C. Code § 11-101 *et seq.*), which established a local court system separate from the federal courts in the District.  Under the Reorganization Act, the Superior Court "has jurisdiction of any criminal case under any law applicable exclusively to the District of Columbia," D.C. Code § 11-923(b)(1), and the D.C. Court of Appeals has jurisdiction over appeals from the Superior Court, *id.* § 11-721.

Shortly following the passage of the Reorganization Act, the Supreme Court expressly recognized the authority of the D.C. Courts to adjudicate local criminal cases. In *Palmore v. United States*, 411 U.S. 389 (1973), the Court rejected the defendant's argument that only a court established in accordance with Article III of the Constitution could try him for a felony offense under the D.C. Code. *Id.* at 407-08. The Court observed that the impetus for the Reorganization Act was Congress's conclusion that "there was a crisis in the judicial system of the District of Columbia, that case loads had become unmanageable, and that neither those matters of national concern nor those of strictly local cognizance were being promptly tried and disposed of by the existing court system." *Id.* at 408.

Consequently, the Reorganization Act implemented a two-part remedy. The first part was "to relieve" the federal courts of "the smothering responsibility for the great mass of litigation, civil and criminal, that inevitably characterizes the court system in a major city and to confine the work of those courts . . . to try[ing] cases arising under the Constitution and the nationally applicable laws of Congress." *Id.* at 408-09. The second part, "equally essential, was to establish an entirely new court system . . . with responsibility for trying and deciding those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact beyond the local jurisdiction." *Id.* at 409. Thus, with the passage of

the Reorganization Act, Congress established a local court system fully equipped to handle criminal matters in the District.

**B.  Congress authorized the Council to enact criminal laws for the District.**

Congress also authorized the Council to enact criminal laws based on local priorities.  In 1973, Congress enacted the District of Columbia Self-Government and Governmental Reorganization Act ("Home Rule Act"), Pub. L. No. 93-198, 87 Stat. 774 (codified as amended at D.C. Code § 1-201.01 *et seq.*), which granted residents of the District greater control over local affairs.  The purposes of the Home Rule Act were to "delegate certain legislative powers to the government of the District of Columbia"; provide for elected local officials; grant residents of the District the "powers of local self-government"; revise the "governmental structure" of the District; and, "to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters."  § 102(a), 87 Stat. at 777.

After a brief congressional review period, the Home Rule Act ceded the authority to revise and amend the District's criminal code to the Council. § 602(a)(9), 87 Stat. at 813-14.  As the Chairman of the House Committee on the District of Columbia explained, "it seem[ed] appropriate and consistent with the concept of self-determination, that the Council be given the authority to make whatever . . . modifications in the criminal code as are deemed necessary,"

6

consistent with the role of any local government in our federal system.  Staff of H. Comm. on the District of Columbia, 93d Cong., Home Rule for the District of Columbia 1973-1974, Background and Legislative History of H.R. 9056, H.R. 9682, and Related Bills Culminating in the District of Columbia Self-Government and Governmental Reorganization Act 3042 (Comm. Print 1974) (Dear Colleague Letter from Rep. Charles C. Diggs, Jr., Chairman).

### C.   The Council has enacted robust firearms laws, including a strong prohibition on the possession of a firearm by a convicted felon.

Congress enacted the first set of firearm regulations for the District in 1932. Act of July 8, 1932, ch. 465, Pub. L. No. 72-275, 47 Stat. 650 (codified as amended at D.C. Code §§ 22-4501 to 22-4516).  Since then, however, most of the significant gun legislation in the District "has been the work of local government rather than the United States Congress."  Allen Rostron, *Incrementalism, Comprehensive Rationality, and the Future of Gun Control*, 67 Md. L. Rev. 511, 536 (2008); *see, e.g.*, Firearms Control Regulations Act of 1975, D.C. Law 1-85, 23 D.C. Reg. 2464 (1976) (codified as amended at D.C. Code § 7-2501.01 *et seq.*); Firearms Control Amendment Act of 2008, D.C. Law 17-372, 56 D.C. Reg. 1365 (eff. Mar. 31, 2009) (codified at D.C. Code § 7-2501.01 *et seq.*); Inoperable Pistol Amendment Act of 2008, D.C. Law 17-388, 56 D.C. Reg. 1162 (eff. May 20, 2009) (codified at D.C. Code §§ 22-4501 to 22-4513); Firearms Amendment Act of 2012, D.C. Law 19-170,

59 D.C. Reg. 5691 (eff. Sept. 29, 2012) (codified in scattered sections of D.C. Code Titles 7, 22, and 23).

As relevant here, since 1953, the District has prohibited the possession of a firearm by any individual who has been convicted of a felony.  District of Columbia Law Enforcement Act of 1953, Pub. L. No. 83-85, § 204(b), 67 Stat. 90, 93.  Specifically, it is unlawful for a person to own, keep, or possess a firearm in the District if the person "[h]as been convicted in any court of a crime punishable by imprisonment for a term exceeding one year."  D.C. Code § 22-4503(a)(1).  This prohibition reaches exactly the same conduct as the federal felon-in-possession statute.  *See* 18 U.S.C. § 922(g) (making it unlawful for any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to possess a firearm).  The Council gave teeth to the local felon-in-possession law by imposing mandatory minimum penalties, including a one-year mandatory minimum sentence for any felon in possession of a firearm and a three-year mandatory minimum sentence for a felon with a prior conviction for a crime of violence.  D.C. Code § 22-4503(b)(1); *cf.* 18 U.S.C. § 924(a)(2) (imposing no mandatory minimum sentence for a simple violation of the federal felon-in-possession statute); *id.* § 924(e)(1) (imposing a fifteen-year mandatory minimum sentence for a felon in possession with three prior convictions for "a violent felony or a serious drug offense").

8

Given that the District's felon-in-possession statute prohibits the same conduct as the federal statute and sets a mandatory minimum penalty for any violation, the local law provides a sufficient mechanism to punish felons in possession in the District. *See United States v. Jones*, 36 F. Supp. 2d 304, 315 (E.D. Va. 1999) (per curiam) (reasoning, where "[t]he federal and state statutes prohibiting possession of firearms [we]re not markedly different," that "the law of the Commonwealth of Virginia [was] sufficient to adequately prosecute the same conduct" that had been targeted for federal prosecution).[5]

## II. The USAO's FIP Policy Needlessly Disturbs The Balance Of Federal And Local Authority In The District.

### A. The FIP Policy makes federal cases out of purely local criminal matters.

Under the Home Rule Act, the USAO retains the authority to prosecute many D.C. Code offenses in the District's local courts. *See* D.C. Code § 23-101(c); *In re Monaghan*, 690 A.2d 476, 479 (D.C. 1997). But that authority must be carried out in a manner consistent with the Reorganization Act and Home Rule Act's purposes

---

[5]    The fact that federal law imposes a more severe mandatory minimum for career offenders, 18 U.S.C. § 924(e)(1), does not undermine the efficacy of the District's mandatory minimum, which is appropriately tailored to address local law enforcement objectives. *See, e.g.*, Lauren M. Ouziel, *Legitimacy and Federal Criminal Enforcement Power*, 123 Yale L.J. 2236, 2330 (2014) ("If the communities most affected by street crime want to ensure that judges imprison criminals for certain crimes, *tempered* mandatory penalties can and should be used to achieve that objective." (emphasis added)).

of encouraging the resolution of local criminal disputes in the District's local courts. The FIP Policy flies in the face of that goal, and, unfortunately, is part of a broader pattern of increased federal prosecution of local crime across the country.[6]   Indeed, over the past 20 years, the number of felon-in-possession cases filed in federal court under federal law nationwide has nearly *quadrupled*, from 1,248 prosecutions in 1996 to 4,815 prosecutions in 2016.   Bureau of Justice Statistics, *Federal Criminal Case Processing Statistics*.[7]   Yet the crime of possessing a firearm as a convicted felon, standing alone, does not implicate any significant federal interest.   Although there is nationwide concern about "firearm proliferation and gun-related violence," this is in most cases no more than a "general policing interest."   Dean A. Strang, *Felons, Guns, and the Limits of Federal Power*, 39 J. Marshall L. Rev. 385, 421 (2006).   In a prescient warning in his 1998 report on the federal judiciary, Chief

---

[6]     For a more fulsome discussion of the history of federal programs encouraging U.S. Attorneys' Offices to prosecute in federal court gun crimes that would otherwise have been handled by state and local law enforcement, see, for example, Bonita R. Gardner, *Separate and Unequal: Federal Tough-on-Guns Program Targets Minority Communities for Selective Enforcement*, 12 Mich. J. Race & L. 305, 309-11 (2007); Daniel C. Richman, *"Project Exile" and the Allocation of Federal Law Enforcement Authority*, 43 Ariz. L. Rev. 369, 374-81 (2001); Emma Luttrell Shreefter, *Federal Felon-in-Possession Gun Laws: Criminalizing a Status, Disparately Affecting Black Defendants, and Continuing the Nation's Centuries-Old Methods to Disarm Black Communities*, 21 CUNY L. Rev. 143, 160-64 (2018).

[7]     *Available at* https://tinyurl.com/922-g-stats (select "Number of defendants in cases filed," years 1996 and 2016, 18 U.S.C. § 922(g), HTML output) (last visited Apr. 15, 2020).

Justice Rehnquist cautioned against this "trend to federalize crimes that traditionally have been handled in state courts."  Chief Justice William H. Rehnquist, *The 1998 Year-End Report of the Federal Judiciary*, 11 Fed. Sent'g Rep. 134, 135 (1998).  He observed that:

> Federal courts were not created to adjudicate local crimes, no matter how sensational or heinous the crimes may be.  State courts do, can, and should handle such problems.  While there certainly are areas in criminal law in which the federal government must act, the vast majority of localized criminal cases should be decided in the state courts which are equipped for such matters.

*Id.*  Accordingly, the Chief Justice admonished that "matters that can be handled adequately by the states should be left to them; matters that cannot be so handled should be undertaken by the federal government."  *Id.*  The FIP Policy wholly disregards that warning by diverting the prosecution of local gun crimes from the fully equipped local courts to the federal courts.

### B.    The FIP Policy will strain the limited resources of the district courts.

The FIP Policy will disservice litigants seeking redress before this Court by adding a slog of gun possession cases to this Court's criminal docket, thereby limiting the time and resources the federal courts can devote to civil cases and criminal cases implicating greater federal concerns.  Although felon-in-possession cases "are typically not complex, their quantity alone" has the potential to strain the federal courts' resources.  *Jones*, 36 F. Supp. 2d at 314 (observing, following the

11

implementation of a similar policy in the Eastern District of Virginia, that the quantity of gun prosecutions was "gradually making it more difficult to accord both civil and criminal cases possessing a greater federal interest the attention which they are due").   Moreover, "[c]riminal cases receive top priority" on federal dockets because of the Speedy Trial Act, which requires dismissal of cases not brought to trial within specified time limits.   Sara Sun Beale, *Too Many and Yet Too Few: New Principles to Define the Proper Limits for Federal Criminal Jurisdiction*, 46 Hastings L.J. 979, 987 (1995); *see* 18 U.S.C. § 3162.

Diverting to federal court all the felon-in-possession cases previously brought in the Superior Court will strain the limited resources of this district's federal courts. The USAO has stated that it is prepared to bring "as many as 350 to 400 gun cases a year in federal court."   Hsu & Hermann, *supra* p. 3 (internal quotation marks omitted).   As a result, the FIP Policy "threatens to impair the quality of justice meted out in criminal cases and significantly impair[] federal judges' ability to perform their core constitutional functions in civil cases."   Richman, *supra* note 6, at 409 (internal quotation marks omitted).   There is precedent for this concern in this very district.   In 1991, judges in this district publicly raised concerns that the U.S. Attorney "was bringing minor drug cases" in federal court rather than the Superior Court.   Beale, *supra* p. 12, at 990.   Due to the heavier criminal docket, the judges indicated, "[c]ivil cases had been postponed or simply not set for trial, important

rulings were delayed, and emergency cases were routed to the court of appeals because the district judges lacked time to consider them." *Id.*

A similar result is likely to follow from the FIP Policy. The number of civil cases filed in this district has increased from 2,218 in the 12 months ending March 31, 2014 to 3,376 in the 12 months ending March 31, 2019. *Compare* U.S. Courts, *Table C-3. U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending March 31, 2014*,[8] *with* U.S. Courts, *Table C-3. U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending March 31, 2019*.[9] Moreover, this Court serves as an important forum both for residents of the District and for litigants across the country whose claims implicate the various functions of the federal government. By bringing additional quintessentially local gun charges in this district, the FIP Policy will not only strain the federal courts' time and resources, but also hinder the ability of all litigants to seek complete and timely relief.

---

[8]    *Available at* https://tinyurl.com/civil-2014 (last visited Apr. 15, 2020).

[9]    *Available at* https://tinyurl.com/civil-2019 (download data table) (last visited Apr. 15, 2020).

**III.   The FIP Policy Will Disparately Impact Individuals Selected For Federal Prosecution, Especially Minorities.**

    **A.   The FIP Policy will result in disparate sentences among similarly situated defendants.**

Individuals charged under the FIP Policy will be subject to longer sentences than individuals convicted of the same conduct in the Superior Court.  An ordinary felon in possession is subject to a sentence of imprisonment of at least one year and not more than ten years under local law, D.C. Code § 22-4503(b)(1), and is subject to no mandatory minimum and the same maximum of ten years in prison under federal law, 18 U.S.C. § 924(a)(2).  Despite this apparent similarity between the local and federal penalties, because of the U.S. Sentencing Guidelines, federal defendants in practice often receive significantly longer sentences than their local counterparts.  *Compare* Letter from D.C. Sentencing Comm'n to Charles Allen, Chairman, Council of the District of Columbia Comm. on Judiciary & Pub. Safety 26 (Feb. 1, 2019)[10] (indicating that the average sentence for all D.C. felon-in-possession defendants between July 15, 2017 and July 15, 2018 was 20.89 months), *with* U.S. Sentencing Comm'n, *Quick Facts, Felon in Possession of a Firearm* 2[11] (indicating that the average sentence for all federal felon-in-possession defendants during fiscal year 2018 was 64 months).  The penalties diverge even more

---

[10]    *Available at* https://tinyurl.com/letter-SC.

[11]    *Available at* https://tinyurl.com/quick-facts.

considerably for violent offenders.  A felon in possession who has a prior conviction for a crime of violence is subject to a sentence of imprisonment of at least three years and no more than fifteen years under local law, D.C. Code § 22-4503(b)(1), whereas a felon in possession with three prior convictions for a violent felony or a serious drug offense is subject to a sentence of imprisonment of at least fifteen years and up to life under federal law, 18 U.S.C. § 924(e)(1).

The District's recent efforts to reform sentencing policy will result in even more drastic sentencing disparities.  For example, the D.C. Youth Rehabilitation Act authorizes the Superior Court to exercise its discretion when sentencing a person who was under the age of 25 when he committed a crime other than murder or sexual abuse.  D.C. Code §§ 24-901(6), 24-903.  Among other alternatives, the Superior Court can suspend a sentence and place the individual on probation, *id.* § 24-903(a)(1), or issue a sentence of imprisonment less than the mandatory minimum that would otherwise be required, *id.* § 24-903(b)(2).  Further, the Incarceration Reduction Amendment Act of 2016, enacted as part of the Comprehensive Youth Justice Amendment Act, D.C. Law 21-238, §§ 301-06, 63 D.C. Reg. 15312, 15319-22 (eff. Apr. 4, 2017), allows a defendant who was sentenced to a term of imprisonment for an offense committed before the age of 18 and has served at least 15 years in prison to apply to the Superior Court for a sentence reduction.  D.C. Code § 24-403.03(a).  A bill to expand eligibility for sentence

reduction to defendants who committed their offenses before the age of 25 is currently under consideration before the Council. *See* Second Look Amendment Act of 2019, B23-0127, 23rd Council. None of these opportunities for sentencing alternatives or sentence reduction will be available to defendants tried in federal court under the USAO's FIP Policy.

These reform efforts reflect the District's considered legislative judgment. It was reasonable for the Council to conclude that a trial court should have flexibility in sentencing young offenders. *See, e.g.*, *Holloway v. United States*, 951 A.2d 59, 64 (D.C. 2008) (The legislative history of the D.C. Youth Rehabilitation Act "demonstrates that its purpose was threefold: (1) to give the court flexibility in sentencing a youth offender according to his or her individual needs, (2) to separate youth offenders from more experienced offenders, and (3) to give a youth offender the opportunity to start anew through expungement of his or her criminal record." (citing Council of the District of Columbia Comm. on the Judiciary, Report on Bill 6-47, Youth Rehabilitation Act of 1985, at 2 (1985))). It was also reasonable for the Council to prioritize reducing incarceration by, among other measures, allowing for reconsideration of lengthy sentences imposed on young adults. *See, e.g.*, Council of the District of Columbia Comm. on the Judiciary, Notice of Public Hearing, Bill 21-0683, the "Comprehensive Youth Justice Amendment Act of 2016" (Apr. 15, 2016) (stating that the purpose of the bill "is to enact critical reforms for the juvenile

16

justice system that reduce over-incarceration through intervention and age-appropriate sentencing, prioritize rehabilitation, improve the conditions of confinement, improve accountability through data collection and analysis, and protect[] abused and neglected young immigrants").

Indeed, studies have demonstrated that longer sentences of imprisonment do not reduce crime rates, have limited effects on deterrence and recidivism, and confer "diminishing returns for public safety as individuals 'age out' of the high-crime years." Marc Mauer, *Long-Term Sentences: Time to Reconsider the Scale of Punishment*, 87 UMKC L. Rev. 113, 121 (2018); *see, e.g.*, Shon Hopwood, *Improving Federal Sentencing*, 87 UMKC L. Rev. 79, 89 (2018) ("Researchers now believe that increased incarceration had no statistically significant effect on reducing violent crime and had a small effect on reducing property crime in the 1990s and the 2000s." (internal quotation marks omitted)); Athula Pathinayake, *Should We Deter Against General Deterrence?*, 9 Wake Forest J. L. & Pol'y 63, 109 (2018) ("The data is reasonably clear in finding little to no evidence that increases to severity of punishment have any discernible effect on likelihood to offend."); Todd R. Clear & James Austin, *Reducing Mass Incarceration: Implications of the Iron Law of Prison Populations*, 3 Harv. L. & Pol'y Rev. 307, 310 (2009) ("[R]ecent studies show that the length of stay in prison is not associated with a change in the risk of recidivism. So sending people to prison for shorter periods would not make them more likely to

17

commit crimes upon release."). Rather, studies consistently have found that "deterrence is primarily a function of the *certainty* of punishment, not its *severity*." Mauer , *supra* p. 17, at 123 (citing Daniel S. Nagin, *Deterrence in the Twenty-First Century: A Review of the Evidence*, 42 Crime & Just. 199, 207 (2013)); *see* Pathinayake, *supra* p. 17, at 81-83. Charging felon-in-possession offenses in the Superior Court ensures that "local conditions and the policy preferences of a smaller community [would] govern such important matters as the definition of the conduct that should be criminal and the penalties that should be imposed." Beale, *supra* p. 12, at 995. The FIP Policy upends that assurance.

Meanwhile, the Superior Court continues to try the majority of criminal cases in the District. In calendar year 2018, there were 16,779 criminal cases filed in the Superior Court, of which 3,230 were felonies. District of Columbia Courts, *Statistical Summary* 12 (2018).[12] In comparison, in the 12-month period ending March 31, 2019, there were 518 criminal cases commenced in the district court. U.S. Courts, *Table D-3. U.S. District Courts—Criminal Defendants Commenced (Excluding Transfers), by Offense and District, During the 12-Month Period Ending March 31, 2019*.[13] Of those cases, only 26 involved violent offenses like homicide,

---

[12]    *Available at* https://tinyurl.com/dc-stats.

[13]    *Available at* https://tinyurl.com/crim-2019 (download data table) (last visited Apr. 15, 2020).

robbery, and assault, *id.*, the primary offenses that the FIP Policy is meant to target, *see, e.g.*, Hsu & Hermann, *supra* p. 3 ("What looks like a stand-alone felony possession case, once you dig a little deeper, may be connected to a violent crime or homicide case that allows law enforcement to connect the dots to protect the community." (quoting former U.S. Attorney Liu)).  Thus, a "perverse result" of the FIP Policy is that it "select[s] certain offenders for harsh federal treatment despite the fact that most offenders who commit more serious crimes continue to be prosecuted under a more lenient state court system."  David E. Patton, *Guns, Crime Control, and a Systemic Approach to Federal Sentencing*, 32 Cardozo L. Rev. 1427, 1442 (2011).  It "run[s] counter to most people's intuitions of justice" that a select few offenders will be subject to longer federal sentences for gun possession than most offenders sentenced in the local system for crimes involving the actual use of guns.  *Id.* at 1446.

At the same time, because a felon in possession is more likely to have secured his prior conviction in state court than in federal court, he is unlikely to anticipate the more severe consequences of a federal prosecution.  In other words, "[t]o the extent that offenders have first-hand knowledge of the penal 'market price' for various crimes, it comes from their experience in that [state] system, where sentences for crimes involving actual violence are often lower than the [federal] felon-in-possession sentences."  *Id.* at 1444-45.  As a result, individuals charged

19

under the FIP Policy are not likely to anticipate the longer sentences that will result from federal prosecution for a local gun crime.  Those sentences are therefore unlikely to have additional deterrent effect.

Ultimately, individuals in the District will be "subject to a kind of cruel lottery," by which a subset of defendants charged with firearms offenses are selected for federal prosecution and subjected to longer sentences than individuals prosecuted in the Superior Court.  Beale, *supra* p. 12, at 997.  The resulting sentencing disparity "is completely at odds with the contemporary movement, exemplified by the federal Sentencing Guidelines, to ensure that similarly situated offenders receive the same sentence."  *Id.* at 996.

### B. The FIP Policy will have a disparate impact on African Americans in the District.

The FIP Policy will also have a disparate impact on African Americans in the District because this group is more likely to have a prior felony conviction and therefore more likely to be charged under the FIP Policy.  In 2017, African Americans "represented 12% of the U.S. adult population but 33% of the sentenced prison population."  John Gramlich, *The Gap Between the Number of Blacks and Whites in Prison Is Shrinking*, Pew Res. Ctr. (Apr. 30, 2019)[14]; *see* Shreefter, *supra* note 6, at 157-59.  There are many factors contributing to this imbalance.  For

---

14      *Available at* https://tinyurl.com/prison-gap.

example, studies have demonstrated that "gun-oriented" policing tactics like stop-and-frisk "produced a system in which police arrested people of color at greater rates than whites."  Benjamin Levin, *Guns and Drugs*, 84 Fordham L. Rev. 2173, 2195-96 (2016).  Further, the federal government's "War on Drugs" in the 1990s and 2000s "significantly increase[ed]" the number of African Americans with felony convictions.  Shreefter, *supra* note 6, at 174; *see* Levin, *supra* p. 21, at 2180 (observing that the disparate enforcement of drug laws "helped shape a criminal justice system in which people of color are overrepresented both in arrest pools and prison populations").  In the end, African American men are six times as likely as white men to be incarcerated at some point during their lifetimes.  The Sentencing Project, *Trends in U.S. Corrections* 5 (updated June 2019).[15]

These disparities are, unfortunately, on full display in the District of Columbia.  From October 1, 2014 to September 30, 2015, 90% of D.C. Department of Corrections inmates and 92% of federal prisoners returning to the District were African American.  Flower, *supra* p. 1, at 7, 39.  The result is that African American residents are more likely than any other demographic to have a prior felony conviction, a prerequisite of prosecution for a felon-in-possession offense.[16]  At the

---

[15]    *Available at* https://tinyurl.com/sentencing-trends.

[16]    Disparities in the District's criminal justice system emerge at an early age.  In fiscal year 2018, 98% of youth offenders newly committed to the D.C. Department

same time, the FIP Policy is likely to concentrate on neighborhoods that are predominantly African American.  For example, in 2018, of the 1,926 firearms recovered by the Metropolitan Police Department ("MPD"), over 50% were recovered in the Sixth and Seventh Police Districts.  Metro. Police Dep't, *2018 Annual Report* 25.[17]  Over 92% of the residents of these neighborhoods are African American.  *See* D.C. Health Matters, *2020 Demographics*.[18]

Thus, "[t]he combination of targeting high-crime [] areas" in the District, "coupled with the decision to federally prosecute only those with prior felony convictions—a group that already over-represents African Americans—virtually ensures a racially skewed pool of defendants."  Patton, *supra* p. 19, at 1443; *see* Shreefter, *supra* note 6, at 159.  National demographic data on felon-in-possession offenders confirms this conclusion.  In fiscal year 2018, 54.2% of individuals

---

of Youth Rehabilitation Services following adjudication for a delinquent act were African American.  D.C. Dep't of Youth Rehab. Servs., *Youth Population Snapshot*, https://tinyurl.com/youth-snapshot (last visited Apr. 15, 2020).  The Council specifically expressed concern about this racial inequity among juvenile offenders when it enacted various reforms, *supra* pp. 15-16, designed to reduce incarceration and prioritize rehabilitation.  *See* Council of the District of Columbia Comm. on the Judiciary, Report on Bill 21-0683, the "Comprehensive Youth Justice Amendment Act of 2016," at 5 (2016).

[17]     *Available at* https://tinyurl.com/mpd-2018.

[18]     *Available at* https://tinyurl.com/dc-2020-data (select Ward 7, Ward 8 from dropdown) (last visited Apr. 15, 2020).  MPD's Sixth and Seventh Districts cover approximately the same neighborhoods as Wards 7 and 8.  *Compare* MPD Citywide Map, https://tinyurl.com/mpd-city-map, *with* D.C. Office of Planning, *What's My Ward?*, https://tinyurl.com/dc-ward-map (last visited Apr. 15, 2020).

convicted under 18 U.S.C. § 922(g) were African American, whereas only 24.9% were white. U.S. Sentencing Comm'n, *Quick Facts*, *supra* p. 14, at 1; *see* U.S. Sentencing Comm'n, *2019 Annual Report and Sourcebook of Federal Sentencing Statistics* 141[19] (indicating that, of all firearm offenders sentenced during fiscal year 2019, 53% of offenders were African American whereas only 25.5% were white). Those disparities will only increase under the FIP Policy.

Prior efforts to shift prosecution of gun crimes from local to federal courts in other jurisdictions reinforce this concern. In 1997, the U.S. Attorney's Office for the Eastern District of Virginia announced "Project Exile,"[20] a program in which local police officers reviewed arrests involving firearm possession and, if the conduct violated a federal statute, the police department referred the case to the U.S. Attorney's Office for federal prosecution. Shreefter, *supra* note 6, at 161. In a subsequent lawsuit challenging the constitutionality of Project Exile, the parties stipulated that "as many as ninety percent of the defendants prosecuted under Project Exile [were] African-American." *Jones*, 36 F. Supp. 2d at 307.

Similarly, in 2001, President Bush announced "Project Safe Neighborhoods," which was an effort to increase firearm prosecutions nationwide. The federal

---

[19]   *Available at* https://tinyurl.com/ussc-2019.

[20]   Richman, *supra* note 6, at 379. The title of this program derived from the idea that "the offender would not serve time in his community, but would be 'exiled' to federal prison." Gardner, *supra* note 6, at 309.

government hired hundreds of new assistant U.S. attorneys and agents in the Bureau of Alcohol, Tobacco, Firearms and Explosives to bring federal prosecutions for gun crimes that otherwise would have proceeded in state courts.  Gardner, *supra* note 6, at 311.  Further, the federal government identified certain jurisdictions where its enforcement efforts would be concentrated.  Notably, more than half of all African Americans in the United States live in just 30 cities, all of which were targeted as part of Project Safe Neighborhoods.  Shreefter, *supra* note 6, at 163; Gardner, *supra* note 6, at 316.  The project disparately impacted African Americans in multiple jurisdictions.  In the Eastern District of Michigan, "almost ninety percent of those prosecuted under Project Safe Neighborhoods [were] African American."  Gardner, *supra* note 6, at 317.  Likewise, in the Southern District of New York, "there was testimony showing that more than eighty percent of defendants prosecuted under the project were African American."  *Id.*  And in the Southern District of Ohio, "more than ninety percent" of defendants prosecuted under the program were African American.  *Id.*

These consistent racial disparities in geographically diverse areas of the country illustrate that policies diverting gun crimes to federal court disproportionately subject African Americans to federal prosecution and sentencing. Given the demographic composition of the District and the similarity of the FIP Policy to these prior initiatives, the FIP Policy will likely have a similarly disparate

24

impact on the District's African American residents.  Such inequity is at odds with both racial justice and the fundamental notion that similarly situated defendants who commit the same offense should not receive disparate sentences.

## CONCLUSION

The Court should grant Mr. Reed's motion to dismiss.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Loren L. AliKhan
LOREN L. ALIKHAN
Solicitor General

CAROLINE S. VAN ZILE
Principal Deputy Solicitor General

JACQUELINE R. BECHARA
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 630 South
Washington, D.C. 20001
(202) 727-6287
(202) 730-1864 (fax)
April 2020                    loren.alikhan@dc.gov