**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. Action No. 18-344 (EGS) |
| JAROME F. SIMMONS, | |
| Defendant. | |
| UNITED STATES OF AMERICA, | |
| v. | Crim. Action No. 19-93 (EGS) |
| JOHN VICTOR REED, | |
| Defendant. | |

**MEMORANDUM OPINION**

Pending before the Court are Defendant John Victor Reed's
("Mr. Reed") motion to dismiss and Defendant Jarome Simmons's
("Mr. Simmons")[1] motion to dismiss. Defendants challenge the
authority of the United States Attorney for the District of
Columbia ("U.S. Attorney") to implement and enforce a policy
that calls for certain individuals with a prior felony
conviction who are arrested for gun possession to be prosecuted
under a federal charge in the U.S. District Court for the
District of Columbia ("District Court"), rather than in the

---

[1] The "true name" of Mr. Simmons is Bernard Byrd, and he refers
to himself as "Mr. Byrd" in his motion papers. *See* Simmons Mot.,
ECF No. 37 at 1. To avoid confusion, the Court refers to
defendant as Mr. Simmons, which is the name the government used
in the indictment and the name listed in the case caption. *See*
Indictment, ECF No. 1.

1

Superior Court of the District of Columbia ("D.C. Superior Court" or "Superior Court"). Mr. Reed contends that his case, which prosecutors brought in this Court pursuant to the policy, should be dismissed because the policy violates the Court Reform and Criminal Procedure Act of 1970, 84 Stat. 473; the District of Columbia Self-Government and Governmental Reorganization Act, 87 Stat. 774 ("Home Rule Act"); the Administrative Procedure Act ("APA"); and the Due Process Clause. *See* Mot. Dismiss ("Reed Mot."), ECF No. 37 at 2, *United States v. Reed*, No. 19-cr-93 (2019).[2] Mr. Simmons joins Mr. Reed's arguments,[3] and further contends that the U.S. Attorney's transfer of his case from Superior Court to this Court prior to the policy's adoption constitutes prosecutorial harassment. *See* Mot. Dismiss ("Simmons Mot."), ECF No. 37 at 1, 10-18, *United States v. Simmons*, No. 18-cr-344 (2018). The government opposes. *See* U.S. Consolidated Opp'n Defs.' Mots. Dismiss ("Gov't's Opp'n"), ECF No. 48, *United States v. Reed*, No. 19-cr-93 (2019).[4]

---

[2] When citing to electronic filings throughout this Memorandum Opinion, the Court generally cites to the ECF header page number, not the original page number of the filed document.

[3] Mr. Simmons "adopts and incorporates by reference each of the arguments set forth in Mr. Reed's brief." Reed Mot., ECF No. 37 at 19. The Court therefore cites only to Mr. Reed's arguments throughout this Memorandum Opinion, except for Mr. Simmons's additional prosecutorial harassment argument.

[4] The government filed identical consolidated briefs in response to the motions in both cases. *See* U.S. Consolidated Opp'n Defs.' Mots. Dismiss, ECF No. 50, *United States v. Simmons*, No. 18-cr-

Upon careful consideration of the motions, oppositions, and replies thereto, the amici curiae briefs, the applicable law, and the entire record herein, the Court **DENIES** Mr. Reed's motion and **DENIES** Mr. Simmons's motion.

## I.   Background

### A. Factual Background

#### 1.   The District of Columbia Court Reform and Criminal Procedure Act, the Home Rule Act, and the Role of the U.S. Attorney's Office in the District of Columbia

Prior to Congress's enactment of the Court Reform and Criminal Procedure Act of 1970, original jurisdiction over all felony cases resided in the District Court. *See Palmore v. United States*, 411 U.S. 389, 392 n.2 (1973) (noting that the "the District Court was filling the role of both a local and federal court" prior to 1970). Under this format, however, Congress had concluded that the District Court suffered from "unmanageable" caseloads, and there was some confusion over the overlapping jurisdiction of the federal and local courts in the District.[5] *Id.* at 408.

---

344 (2018). For ease of reference, this Court cites only to the government's opposition that was filed in Mr. Reed's case.
[5] "Before passage of the District of Columbia Court Reform and Criminal Procedure Act of 1970, the local court system consisted of one appellate court and three trial courts, two of which, the juvenile court and the tax court, were courts of special jurisdiction. The third trial court, the District of Columbia Court of General Sessions, was one of quite limited jurisdiction, its criminal jurisdiction consisting solely of

The Court Reform Act attempted to alleviate this burden on the District Court by "reliev[ing]" it "from the smothering responsibility for the great mass of litigation, civil and criminal, that inevitably characterizes the court system in a major city." *Id.* at 408-09; *see also Thompson v. United States*, 548 F.2d 1031, 1033-34 (D.C. Cir. 1976) (explaining the impact of the Court Reform Act). The remedy was to "create an independent judicial system to be responsible for 'local' matters, and . . . free the federal courts of the District of that responsibility." *United States v. Belt*, 514 F.2d 837, 842 (D.C. Cir. 1975) (internal quotation marks and citation omitted). Under the new court system, the D.C. District Court remained "devoted to matters of national concern," while the newly created D.C. Superior Court enjoyed functions "essentially similar to those of the local courts found in the 50 States of the Union with responsibility for trying and deciding those distinctively local controversies that arise under local law, including local criminal laws having little, if any, impact

---

that exercised concurrently with the United States District Court over misdemeanors and petty offenses, D.C. Code Ann. § 11—963 (1967). The court's civil jurisdiction was restricted to cases where the amount in controversy did not exceed $10,000, and it had jurisdiction over cases involving title to real property only as part of a divorce action. *Id.*, §§ 11—961 and 11—1141. The judgments of the appellate court, the District of Columbia Court of Appeals, were subject to review by the United States Court of Appeals for the District of Columbia Circuit. Id., § 11—321." *Palmore*, 411 U.S. at 392 n.2.

4

beyond the local jurisdiction." *Palmore*, 411 U.S. at 408-09.
Pursuant to the Court Reform Act, the U.S. Attorney's Office
retained the authority to prosecute all felonies in the
District. In reorganizing the court system to create the
Superior Court, Congress acknowledged that there would be
"[s]ome overlapping of jurisdiction" when the same person was
"accused of infractions which are both Federal and purely local
violations." H.R. Rep. No. 91-907, 91st Cong., 2d Sess., 33
(1970). But rather than place that responsibility in the hands
of a local D.C. government entity, Congress determined at the
time that such cases could instead be handled "with minimal
procedural difficulties" by the U.S. Attorney's Office for the
District. *United States v. Shepard*, 515 F.2d 1324, 1329 (D.C.
Cir. 1975).

Three years after the Court Reform Act's passage, Congress
enacted the Home Rule Act. The Home Rule Act "called for a
multi-stage transfer of operations from the federal to the
District government," *Thomas v. Barry*, 729 F.2d 1469, 1470 (D.C.
Cir. 1984), and was intended as a "compromise between continued
congressional oversight and District autonomy," *Feldman v.
Bowser*, 315 F. Supp. 3d 299, 303 (D.D.C. 2018). Although
Congress reserved the right to enact legislation concerning the
District on any subject, D.C. Code § 1-206.01, the Act also set
forth D.C.'s Charter, which established the means of governance

of the District and essentially serves as its constitution,
*Jackson v. Dist. of Columbia Bd. of Elections & Ethics*, 999 A.2d
89, 123 (D.C. 2010); *see also* D.C. Code § 1-201.02
("[D]elegat[ing] certain legislative powers to the government of
the District of Columbia . . . and, to the greatest extent
possible, consistent with the constitutional mandate,
reliev[ing] Congress of the burden of legislating upon
essentially local District matters."). Executive power was
vested in a popularly elected mayor and judicial power in the
D.C. court system. *See Clarke v. United States*, 886 F.2d 404,
406-07 (D.C. Cir. 1989). The Charter also established the
Council of the District of Columbia ("D.C. Council") as the
District's legislative branch, and the Council was vested with
legislative power "extend[ing] to all rightful subjects of
legislation within the District." *See* D.C. Code § 1-204.01; *id.*
§ 1-203.02. The Council was "expressly grant[ed] . . . , subject
to a sixty-day period when Congress can nullify such
legislation, the authority to enact 'act[s], resolution[s], or
rule[s] with respect to' . . . the titles pertaining to the
District's substantive and procedural criminal law," *In re
Crawley*, 978 A.2d 608, 610-11 (D.C. 2009), including the right
to enact gun laws, *see Heller v. District of Columbia*, 670 F.3d
1244, 1251 (D.C. Cir. 2011) ("[The District's] authority in the
[Home Rule Act] over 'all rightful subjects of legislation'

affirmatively gives it the power to enact . . . gun laws.").
However, the Home Rule Act specifically denied the D.C. Council
authority to change the "duties or powers" of the U.S.
Attorney's Office, *see* D.C. Code. §1-206.02(a)(8), despite
requests to do so, *see In re Crawley*, 978 A.2d at 613.

Thus, while Congress's enactment of the two statutes in the
1970s substantially altered the organization of both the local
government and the court systems in the District, Congress chose
to keep intact the long-standing authority of the U.S.
Attorney's Office to decide whether and how to prosecute the
majority of crimes committed in the District. *See, e.g.*, 31
Stat. 1189, 1340 (March 3, 1901) (codifying U.S. Attorney's
jurisdiction over "[a]ll" "criminal prosecutions" except
misdemeanor violations of "police or municipal ordinances or
regulations"). Accordingly, the U.S. Attorney's Office in the
District of Columbia enjoys a unique role among federal
prosecutors in the United States. While other states and cities
select the officials who will prosecute local crimes, Congress
has determined that in the District of Columbia ("the District"
or "D.C."), it is the U.S. Attorney who has the authority to
prosecute essentially all D.C. Code felonies and most D.C. Code
misdemeanors. *See* D.C. Code § 23-101(a)-(c). "The U.S. Attorney
is selected by the President without any requirement or even
custom of consultations with the District," and can be "replaced

by the President for no disclosed reason" and without first consulting with District officials. John Payton, *Should the District of Columbia Have Responsibility for the Prosecution of Criminal Offenses Arising Under the District of Columbia Code?*, 11 U.D.C. L. Rev. 35, 37 (2008) ("With respect to who prosecutes serious criminal offices arising under the D.C. Code, . . . the District has traditionally had virtually no role."). Further, because "successive D.C. and federal prosecutions for the same conduct are subject to the bar on double jeopardy," unlike state prosecutions, *United States v. Mills*, 964 F.2d 1186, 1193 (D.C. Cir. 1992), this means that if the U.S. Attorney decides to prosecute an individual for an offense under the U.S. Code in federal court, then prosecution for an identical or lesser included offense under the D.C. Code would be precluded in Superior Court, *see Shepard*, 515 F.2d at 1331 ("[T]he double jeopardy clause of the fifth amendment will bar separate prosecutions under the federal and D.C. statutes for the same offense, i.e., where the offenses are identical or where one offense is a lesser included offense of the other.").

Here, this scheme implicates the substantively identical felon-in-possession statutes under the federal and local codes. At the local level, D.C. Code § 22-4503(a)(1) makes it a felony for any person who "[h]as been convicted in any court of a crime punishable by imprisonment for a term exceeding one year" to

"have a firearm in his or her possession." And at the federal level, the nearly identical 18 U.S.C. § 922(g)(1) also prohibits anyone "convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" from possessing "any firearm." Although Section 922(g) includes a requirement that the firearm in question has passed through interstate commerce, "[t]here are no firearm manufacturers in the District of Columbia." *See* Reed Mot., ECF No. 37 at 19 n.16. As the parties acknowledge, "the U.S. Attorney's decision to prosecute felon-in-possession offenses in this Court under federal law affirmatively precludes prosecution in the Superior Court under the District's own locally enacted statutes." *Id.* at 19-20.

## 2.    The FIP Policy

On February 1, 2019, the U.S. Attorney's Office implemented a policy under which it would prosecute certain defendants arrested for unlawful possession of a firearm under an 18 U.S.C. § 922(g) charge in District Court, rather than under a D.C. Code § 22-4503(a) charge in the Superior Court. *See* Gov't's Opp'n, ECF No. 48 at 8. The new policy, which this Court shall refer to as the "FIP Policy," marked a shift in the U.S. Attorney's strategy toward prosecuting felon-in-possession cases in the city. "[W]hereas for the past decade or so the U.S. Attorney's Office has prosecuted many of the City's felon-in-possession cases in D.C. Superior Court pursuant to D.C. Code § 22-

9

4503(a)(1)," under the FIP Policy, the U.S. Attorney committed to bringing all qualifying cases in federal court pursuant to Section 922(g) instead. *Id.* at 9. At the time of implementation, the U.S. Attorney's Office deemed a felon-in-possession arrest to qualify for federal prosecution when the following three factors were met: (1) the arrest originated in one of three districts within the District of Columbia "experiencing the highest rates of gun crime," specifically, the Fifth, Sixth, and Seventh Police Districts;[6] (2) the arrest was made on or after February 1, 2019; and (3) the case did not involve a co-defendant "with a non-felon-in-possession charge or additional criminal conduct by the arrestee himself," i.e., it was a "stand-alone" case. *Id.* at 10. According to the government, all cases that met the above three factors also were subject to the "governing 'principles of federal prosecution'" to ensure that the prosecutors reasonably exercised their discretion with respect to initiating prosecutions and selecting charges. *Id.*

---

[6] According to amicus curiae the District of Columbia, the geographic focus of the FIP Policy disproportionately affected Black residents: "the majority of the residents of Districts 5, 6, and 7 are Black: 56.5% in Ward 5 (District 5), 92.1% in Ward 7 (District 6), and 92.1% in Ward 8 (District 7)." D.C. Amicus Br., ECF No. 52 at 9; *see also* Gov't's Opp'n, ECF No. 48 at 33-34 (conceding that the FIP Policy presented a "potentially disproportionate impact on African-American men"). Purportedly in response to this concern, the U.S. Attorney's Office later modified the policy to eliminate this focus. *Cf.* Gov't's Opp'n, ECF No. 48 at 33-34.

The FIP Policy was the culmination of discussions between the U.S. Attorney's Office, the Metropolitan Police Department of the District of Columbia ("MPD"), and the Federal Bureau of Investigation ("FBI") following the U.S. Attorney General's direction in March 2017 for "all U.S. Attorney Offices to partner with state and local law enforcement and identify those persons in their districts responsible for 'significant violent crime,'" including "'coordinat[ing]' with their 'state and local counterparts to identify the venue (federal or state) that best ensures an immediate and appropriate penalty for these violent offenders.'" *Id.* at 7. The Attorney General specifically identified Section 922(g) as an offense "designed to target violent crime." *Id.*

At the time of the Attorney General's direction, the District of Columbia was also experiencing a "significant uptick" in gun-related homicides. *Id.* at 8. The alarming statistics the government cites in its brief are worth noting in full:

> Whereas the *Nation*'s murder rate had risen 10.8%, the *District of Columbia*'s had risen nearly 40% in 2018 (*MPD 2018 Annual Report*, 19). Moreover, of the District's 160 homicides in 2018, 79% were committed with a gun (*id.* at 19, 21). Further, 124 of them occurred in just three of the City's seven police districts (*id.* at 19). Those same three districts—the Fifth, Sixth, and Seventh districts ("5D-7D")—accounted for the vast majority of the illegal guns seized in 2018: 1263 of 1926 (*id.* at 25).

11

> Finally, in 2018, about 40% of the District's
> homicide suspects had a prior gun *arrest* and
> 26% had a prior felony conviction (Newsham ¶4;
> *see* Washington Post, *Homicides Were Up in
> 2018.   Is   D.C.'s   Approach   to   Violence
> Prevention Working?* (Jan. 11, 2019)).

*Id.* at 7-8.

On February 6, 2019, D.C. Mayor Muriel Bowser, then-U.S.
Attorney Jessie Liu, and then-MPD Chief Peter Newsham announced
the adoption of the FIP Policy at a joint press conference. *Id.*
at 11. At the conference, however, instead of accurately
describing the three requirements that needed to be present for
federal prosecution under the FIP Policy, U.S. Attorney Liu
described the policy in almost all-encompassing terms. She
announced that: "[W]e had somewhere in the neighborhood of 300
[felon-in-possession cases] last year that were in Superior
Court, and we're sort of phasing in bringing these cases in
District Court. So I think that at some point this year we'll be
bringing essentially all of these in district court." U.S.
Attorney Jessie K. Liu & Mayor Muriel Bowser, Press Conference
(Feb. 6, 2019), at 22:40,
https://www.youtube.com/watch?v=sAUn3C3BN4Y; *see also* Reed Mot.,
ECF No. 37 at 9; Gov't's Opp'n, ECF No. 48 at 12 n.14. She
further stated that the "focus" underlying the FIP Policy
"should be on not so much where we're prosecuting these cases,
but what we're doing to investigate these cases"—specifically,

leveraging "federal law enforcement partners" to investigate the
felon-in-possession cases "thoroughly." U.S. Attorney Jessie K.
Liu & Mayor Muriel Bowser, Press Conference (Feb. 6, 2019), at
10:04-40, https://www.youtube.com/watch?v=sAUn3C3BN4Y; Gov't's
Opp'n, ECF No. 48 at 12-13. Following the FIP Policy's
announcement, ten of thirteen members of the D.C. Council
endorsed a formal resolution of censure denouncing the FIP
Policy. *See* P.R. 194, 2019 Council, 23rd Period (D.C. 2019); *see
also* Reed Mot., ECF No. 37 at 11.

Mayor Bowser and Chief Newsham expressed their support for
the FIP Policy during the press conference. *See* Reed Mot., ECF
No. 37 at 9-10; Gov't's Opp'n, ECF No. 48 at 12-13. However,
after the government filed its opposition brief in this case—
which appears to be the first time the geographic scope of the
policy was publicly revealed—Mayor Bowser withdrew her support.
*See* Def.'s Notice of Suppl. Authority, ECF No. 54 at 1-2. Chief
Newsham also acknowledged that he was unaware of the FIP
Policy's geographic targeting prior to the filing of the
government's brief. *Id.*

In August of 2020, following a "rigorous review" of the FIP
Policy and considerable backlash from portions of the D.C.
community, then-U.S. Attorney Michael Sherwin eliminated the
policy's geographic focus. Gov't's Response to Court's Min.
Order, ECF No. 66 at 2. He also modified the policy by

instructing that Section 922(g) charging decisions pursuant to the FIP Policy be based on "suspects' criminal history and whether they had previous gun charges," as well as "prior relevant conduct—including their age at the time and commission of any violent offenses—and not simply the place of arrest." Ex. A, ECF No. 54-1 at 3.

### B. Procedural History

#### 1.    *United States v. Simmons*, 18-344

On November 15, 2018, Mr. Simmons was arrested and subsequently charged in the D.C. Superior Court with unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of D.C. Code § 22-4503(a)(1). *See* Simmons Mot., ECF No. 37 at 1-2. Following his initial appearance in the case, and pursuant to the government's request for temporary detention, *see* D.C. Code § 23-1322(c)(7), (d)(1), Mr. Simmons was held without bond for three days until his detention and preliminary hearing before the court, *see* Simmons Mot., ECF No. 37 at 2-3. On November 19, 2018, a D.C. Superior Court magistrate judge released Mr. Simmons to await trial under the High Intensity Supervision Program. *Id.*

The same day Mr. Simmons was released by the D.C. Superior Court magistrate judge, a grand jury returned a one-count indictment against Mr. Simmons, charging him with unlawful

14

possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). *See* Simmons Indictment, ECF No. 1. The federal indictment was based upon facts substantively identical to those underlying the D.C. Superior Court case. Simmons Mot., ECF No. 37 at 3.

Mr. Simmons was arrested on the federal charge on November 30, 2018, and appeared before a magistrate judge the same day. *See* Min. Entry (Nov. 30, 2018). The government again requested temporary detention pending a detention hearing. *Id.* On December 4, 2018, the magistrate judge denied the government's motion to detain Mr. Simmons, and he was released into the High Intensity Supervision Program. *See* Min. Entry (Dec. 4, 2018). This Court removed Mr. Simmons from the High Intensity Supervision Program and released him on his own recognizance on May 23, 2019. *See* Min. Entry (May 23, 2019).

On March 11, 2020, Mr. Simmons filed a motion to dismiss. *See* Simmons Mot., ECF No. 37. The government filed its opposition on July 3, 2020, *see* Gov't's Opp'n, ECF No. 50, and Mr. Simmons filed his reply brief on August 28, 2020, *see* Simmons Reply, ECF No. 54. The District of Columbia and the American Civil Liberties Union of the District of Columbia ("ACLU") filed amicus briefs in support of Mr. Reed on April 21, 2020 and April 28, 2020, respectively. *See* D.C. Amicus Br., ECF

15

No. 39; ACLU Amicus Br., ECF No. 42. The District of Columbia further filed a reply to the government's opposition on August 28, 2020. *See* D.C. Reply, ECF No. 53. The Court held a hearing on Mr. Simmons's motion to dismiss on May 19, 2021. *See* Min. Entry (May 19, 2021). The motion is ripe for adjudication.

### 2.    *United States v. Reed*, 19-cr-93

On March 13, 2019, a grand jury returned a one-count indictment against Mr. Reed, charging him with unlawful possession of a firearm and ammunition by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1). *See* Reed Indictment, ECF No. 2.

On March 10, 2020, Mr. Reed filed a motion to dismiss his case. *See* Reed Mot., ECF No. 37. The government filed its opposition on July 3, 2020, *see* Gov't's Opp'n, ECF No. 48, and Mr. Reed filed his reply on August 28, 2020, *see* Reed Reply, ECF No. 53. The District of Columbia and the ACLU filed amicus briefs in support of Mr. Reed on April 21, 2020 and April 28, 2020, respectively. *See* D.C. Amicus Br., ECF No. 39; ACLU Amicus Br., ECF No. 42. The District of Columbia further filed a reply to the government's opposition on August 28, 2020. *See* D.C. Reply, ECF No. 52.  The Court held a hearing on Mr. Reed's motion to dismiss on May 19, 2021. *See* Min. Entry (May 19, 2021). The motion is ripe for adjudication.

16

## II.   Analysis

### A. The FIP Policy Does Not Violate the Court Reform Act or the Home Rule Act

Set against the history of the Court Reform Act and the Home Rule Act, described above, Mr. Reed contends that the FIP Policy violates both statutes by "nullif[ying] the District of Columbia's locally enacted felon-in-possession statute and strip[ping] the Superior Court of the District of Columbia of authority to adjudicate those local offenses." Reed Mot., ECF No. 37 at 2. He contends that the statutes reflect Congress's intent that the D.C. Council and Superior Court take the "lead role in setting local penal policy and in adjudicating 'local criminal laws.'" *Id.* at 14-15 (quoting *Palmore*, 411 U.S. at 409). He argues that the "categorical" FIP Policy "runs roughshod" over this "carefully considered legislative scheme" by "usurp[ing] the authority of the very local government that Congress established." *Id.* at 21. Under the current iteration of the FIP Policy, however, Mr. Reed's arguments are unpersuasive.

"Decisions to initiate charges . . . 'lie[] at the core of the Executive's duty to see to the faithful execution of the laws.'" *United States v. Fokker Servs.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (quoting *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986)). "[S]o long as the prosecutor has probable cause to believe that the accused

committed an offense defined by statute, the decision whether or

not to prosecute, and what charge to file or bring before a

grand jury, generally rests entirely in his discretion."

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). And in the

District of Columbia specifically, "[w]hether prosecution is

brought in this jurisdiction under the D.C. Code or whether it

is brought under an applicable section of the United States Code

is a matter confided solely to the discretion of the United

States Attorney."[7] *Shepard*, 515 F.2d at 1332 n.18 (quoting *United

States v. Greene*, 489 F.2d 1145, 1151 (D.C. 1973)).

---

[7] While the prosecutor enjoys the discretion as to which charge
to bring in federal court, the D.C. Circuit has recognized that
district courts have "broad discretion" in making sentencing
decisions, including the discretion "to begin its analysis with
the U.S. Guidelines and end with the D.C. Guidelines." *United
States v. Washington*, 670 F.3d 1321, 1323 (D.C. Cir. 2012)
(finding that the district court "did not err in failing to give
greater weight to appellant's D.C. Code-based arguments"
pursuant to 18 U.S.C. § 3553(a)(2)). There are limits, however.
First, the D.C. Circuit has instructed that "sentence
disparities between the U.S. and D.C. guidelines are
insufficient to support a variance under § 3553(a)(6)." *United
States v. Williams*, 773 F.3d 98, 108 (D.C. Cir. 2014); *see also
Washington*, 670 F.3d at 1326-27; *United States v. Clark*, 8 F.3d
839, 843 (D.C. Cir. 1993). Second, the prosecutor's discretion
to choose a federal charge over a local charge is not a
"mitigating circumstance" under Section 3553(b) because it is
not "linked to one of the stated purposes of sentencing" listed
in Section 3553(a)(2). *Washington*, 670 F.3d at 1326 (quoting
*Clark*, 8 F.3d at 842). Despite the above, however, it remains an
open question before the D.C. Circuit whether disparities
between the U.S. and D.C. guidelines would be sufficient to
support a variance under a Section 3553(a) factor other than
Section 3553(a)(6). *Cf. Williams*, 773 F.3d at 108-09 (noting
that the U.S. Guidelines were advisory only, but defendant had
"offered no argument that the D.C. Guidelines were relevant to

"Correspondingly, 'judicial authority is . . . at its most limited' when reviewing the Executive's exercise of discretion over charging determinations," *Fokker*, 818 F.3d at 741, including when the charging determinations are made pursuant to overall enforcement strategies and policies, *see Wayte v. United States*, 470 U.S. 598, 600, 607-08 (1985) (affirming lawfulness of a federal "enforcement policy under which the Government prosecutes only those who report themselves as having violated the law, or who are reported by others"); *cf. United States v. Mills*, 925 F.2d 455, 461-62 (D.C. Cir. 1991) (upholding Department of Justice policy in the District of Columbia, pursuant to which the U.S. Attorney "transferred" criminal cases from the Superior Court to District Court). "This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review." *Wayte*, 470 U.S. at 607. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." *Id.*

---

his request for a variance in any way other than under § 3553(a)(6)," and *Washington* precluded that argument).

Prosecutorial discretion is, of course, not "unfettered." *Id.* at 608. "[T]he exercise of prosecutorial discretion, like the exercise of Executive discretion generally, is subject to statutory and constitutional limits enforceable through judicial review." *Nader v. Saxbe*, 497 F.2d 676, 679 n.19 (D.C. Cir. 1974). Nonetheless, "the presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (cleaned up).

Here, Mr. Reed has not established a statutory violation under the Court Reform Act or the Home Rule Act to rebut the presumption of regularity that applies to the U.S. Attorney's charging decisions.

First, the FIP Policy does not "nullify" the D.C. Code felon-in-possession offense or "strip" the Superior Court of its adjudicatory role. Mr. Reed's argument relies heavily on the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") case *United States v. Shepard*, 515 F.2d 1324 (D.C. Cir. 1975). There, the court explained that "[t]he federal and D.C. Criminal Codes 'were intended to exist together' and 'were intended to mesh with each other,'" and the court rejected an argument that would have prohibited the U.S. Attorney's Office from bringing local charges when federal law

would also apply. *Shepard*, 515 F.2d at 1333-34 (holding that the government "is not as a general principle prevented from simultaneously charging in one indictment offenses under similar federal and D.C. statutes arising out of a single transaction").

However, Mr. Reed's argument rests upon a misunderstanding of the scope of the FIP Policy. Although Mr. Reed's motion describes the policy as "categorical" and as calling upon the U.S. Attorney to "prosecute an entire swath of traditional local crime in federal court," Reed Mot., ECF No. 37 at 21, this is incorrect. As the government explains in its opposition and subsequent notices to the Court, the policy has never applied city-wide. *E.g.*, Gov't's Opp'n, ECF No. 48 at 28. Rather, when the policy was first implemented in February 2019, a felon-in-possession arrest qualified for federal prosecution only if: (1) "it originate[d] in one of the three districts experiencing the highest rates of gun crime"; (2) "it was made on or after February 1, 2019"; and (3) "it [was] a 'stand alone' case, which means it does not involve a co-defendant with a non-felon-in-possession charge or additional criminal conduct by the arrestee himself." *Id.* at 10. In the event that a particular case met that criteria, the prosecutor then also applied the "governing 'principles of federal prosecution'" to ensure that the prosecution served a "substantial federal interest." *Id.* at 10-11 & n.12.

Mr. Reed acknowledges his error—which the Court notes is not entirely of his own making[8]—in his reply brief, and attempts to recover by contending that, "[t]o the extent the Initiative continues to apply categorically in *portions* of the District," his arguments should prevail. Reed Reply, ECF No. 53 at 12 n.1 (emphasis added). However, again, Mr. Reed argument addresses a policy that is not in place. After briefing on the motions concluded, the FIP Policy was modified. According to the government, in August of 2020, then-U.S. Attorney Michael Sherwin changed the parameters of the policy by: (1) eliminating its geographic focus; and (2) instructing that "§ 922(g) charging decisions pursuant to the initiative be based on, *inter alia*, an arrestee's individual criminal history, including whether he had committed any prior gun offenses or violent crimes." Gov't's Response, ECF No. 66 at 2.

The D.C. Circuit in *Shepard* used the word "nullify" to mean, in effect, that "a single prosecution under statutes from both schemes was impossible." 515 F.2d 1324. Here, because the FIP Policy no longer includes a geographic focus and instead looks to an individual's particular history and circumstances,

---

[8] The arguments in Mr. Reed's motion are based upon statements made by former U.S. Attorney Liu at the February 6, 2019 press conference, specifically that her office intended to "bring[] essentially all" felon-in-possession cases in federal court after a "phasing in" period. *See, e.g.*, Reed Mot., ECF No. 37 at 9.

it does not apply "categorically" in any sense of the word.
Indeed, according to the government, during the year it
implemented the modifications to the FIP Policy, the U.S.
Attorney's Office continued to bring the majority of felon-in-
possession arrests in Superior Court, not District Court.
Gov't's Response, ECF No. 66 at 3 ("[B]etween February 1, 2020
and February 28, 2021, the Office charged 87 'stand-alone'
felon-in-possession cases in District Court and 217 such cases
in Superior Court."). Accordingly, because prosecution under the
D.C. Code is not rendered "impossible" under the FIP Policy, the
Court does not agree that the policy has nullified the local
statute or prevented the D.C. Superior Court from deciding such
cases.

The Court also does not agree that Congress's "carefully
considered distribution of local and federal power in the
District" has "come undone" as a result of the FIP Policy's
implementation. Reed Mot., ECF No. 37 at 20-21. As explained
above, Congress's enactment of the Court Reform Act and the Home
Rule Act in the 1970s substantially altered the organization of
both the local government and the court systems in the District.
Congress granted the District considerably more authority over
local matters; however, this authority was limited in many
respects. Most significantly, Congress chose to preserve the
U.S. Attorney's authority over whether and how to prosecute most

crimes committed in the District, and prohibited the D.C. Council from enacting any legislation pertaining to the "duties or powers" of the U.S. Attorney's Office. D.C. Code § 23-101(a)-(c); *see also In re Crawley*, 978 A.2d at 617-21 ("[W]e hold that only Congress can alter the prosecutorial authority described in Section 23-101(c), be it for felonies, misdemeanors, or other crimes that fall within that subsection."). And since the passage of the Home Rule Act, "local officials" have continued to lobby for "a city prosecutor to take over local functions from the United States [A]ttorney for the District," but all have been unsuccessful. *See, e.g.*, *In re Crawley*, 978 A.2d at 614. In view of the above, it is clear that Congress granted the District the authority to enact local criminal laws, subject to Congress's right to repeal, and therefore control over local penal policy, *id.* at 610-11, but also that Congress has expressly excluded the U.S. Attorney's Office from the checks and balances of the D.C. government, *cf. id.* at 620 (holding that the D.C. Council could not reassign prosecutions under the false claims statute to the Office of the Attorney General for the District of Columbia). Ultimately, "nothing in the language, structure, or legislative history of" either statute suggests that the U.S. Attorney should choose to prosecute one offense over another. *Batchelder*, 442 U.S. at 123-24 (1979) (holding that federal prosecutors could choose among overlapping statutes). And

to the extent that Mr. Reed argues that a felon-in-possession offense, standing alone, does not implicate any significant federal interest, the Court disagrees. As the government points out, in enacting Section 922(g), "Congress meant to reach possessions broadly" and "buttress the States' efforts" because "State gun control laws were found 'inadequate to bar possession of firearms from those most likely to use them for unlawful purposes.'" *Scarborough v. United States*, 431 U.S. 563, 575 n.11 (1977) (citation omitted); Gov't's Opp'n, ECF No. 48 at 28 n.27.

Because the FIP Policy does not include any "categorical" geographic scope, but instead relies upon the prosecutor's evaluation of an individual's particular circumstances, Mr. Reed has failed to establish that the FIP Policy unlawfully "nullif[ies] the District's local felon-in-possession statute," "strip[s] the Superior Court of jurisdiction over such offenses," or "usurps the local authority conferred on the District by Congress." Reed Mot., ECF No. 37 at 30. The Court therefore concludes that the FIP Policy does not violate the Court Reform Act or the Home Rule Act.

## B. The FIP Policy Is Not Reviewable Under the APA

Mr. Reed next claims that the FIP Policy violates the APA because the manner in which it was adopted was arbitrary and capricious. Reed Mot., ECF No. 37 at 31; *see also* Reed Reply, ECF No. 53 at 12. Before turning to this argument on the merits,

the Court must first address whether the FIP Policy is reviewable under the APA.[9]

"The APA establishes a 'basic presumption of judicial review [for] one 'suffering legal wrong because of agency action.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1905 (2020) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967)). However, the presumption can be rebutted by a showing that the relevant statute "preclude[s]" review, 5 U.S.C. § 701(a)(1), or that the "agency action is committed to agency discretion by law," *id.* § 701(a)(2). The latter exception under Section 701(a)(2) is at issue here.

"[T]o honor the presumption of review," the Supreme Court has "read the exception in § 701(a)(2) quite narrowly." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361,

---

[9] The Court has jurisdiction over this claim. *See* 18 U.S.C. § 3231; *United States v. Ross*, 848 F.3d 1129, 1131 (D.C. Cir. 2017) (addressing criminal defendant's motion to dismiss an indictment on the ground that the government's prosecution was "defective" under the APA); *United States v. Gould*, 568 F.3d 459, 469-70 (4th Cir. 2009) (same); *see also Judulang v. Holder*, 565 U.S. 42, 52-53 (2011) (holding Board of Immigration Appeals' "policy for deciding when resident aliens may apply to the Attorney General for relief from deportation under a now-repealed provision of the immigration laws" was arbitrary and capricious); *Office of Foreign Asset Control v. Voices in the Wilderness*, 382 F. Supp. 2d 54, 58 n.2 (D.D.C. 2005) ("[A] defense under the APA and a claim under the APA both would seek the same relief in the setting of this case—preventing enforcement of the penalty that [the Government] seeks to enforce.").

370 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)).
Under this narrow reading, an action is "committed to agency
discretion" only if "the [applicable] statute is drawn so that a
court would have no meaningful standard against which to judge
the agency's exercise of discretion." *Heckler v. Chaney*, 470
U.S. 821, 830 (1985). In other words, when the applicable
statute does not provide "judicially manageable standards . . .
for judging how and when an agency should exercise its
discretion," *id.*, then a court has no choice but to dismiss the
case because there is "no law to apply," *Citizens to Preserve
Overton Park v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep.
No. 752, 79th Cong., 1st Sess., 26 (1945)). "In such a case, the
statute ('law') can be taken to have 'committed' the
decisionmaking to the agency's judgment absolutely." *Chaney*, 470
U.S. at 830. In determining "whether a matter has been committed
solely to agency discretion, [courts] consider both the nature
of the administrative action at issue and the language and
structure of the statute that supplies the applicable legal
standards for reviewing that action." *Drake v. FAA*, 291 F.3d 59,
70 (D.C. Cir. 2002).

   Here, the applicable statutes do not provide a "meaningful
standard against which to judge the agency's exercise of
discretion." *Chaney*, 470 U.S. at 830; *see also Crowley Caribbean
Transp., Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994) (noting the

presumption of unreviewability "may be rebutted by showing that 'the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers'"). As the government points out, "[t]hose statutes designating the President's law-enforcement officers . . . simply direct that the Attorney General shall 'conduct' the United States' litigation, 28 U.S.C. § 516, and that the country's U.S. Attorneys shall 'prosecute' all 'offenses against the United States,' *id.* § 547(1)." Gov't's Opp'n, ECF No. 48 at 35. The relevant applicable felon-in-possession statutes also do not provide guidance. And Mr. Reed does not contend otherwise. *See* Reed Reply, ECF No. 53 at 12-16. There is thus "no law to apply" in reviewing the U.S. Attorney's weighing of its enforcement considerations. *Overton Park*, 401 U.S. at 410.

Moreover, as the D.C. Circuit explained in *Secretary of Labor v. Twentymile Coal Co.*, 456 F.3d 151 (D.C. Cir. 2006), "with respect to criminal charging decisions, the Supreme Court has made clear that the government's decision 'as to whom to prosecute' is generally unreviewable." *Id.* (quoting *Wayte*, 470 U.S. at 607). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Id.* (quoting *Wayte*, 470 U.S. at

607); *see In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997) ("In the ordinary case, the exercise of prosecutorial discretion, at the very core of the executive function, has long been held presumptively unreviewable."). Indeed, in explaining the types of administrative determinations that may evade review under the APA, the D.C. Circuit cited to *In re Sealed Case*, 131 F.3d 208 (D.C. Cir. 1997), a non-APA case in which the court held that the U.S. Attorney's certification that there was a "substantial federal interest" in a juvenile case "implicates core prosecutorial judgment and discretion" and therefore is normally "not subject to judicial review." *Id.* at 216.

Mr. Reed argues, however, that the FIP Policy is not a matter "committed solely to agency discretion" because it is not a "nonenforcement policy," as described in *Heckler v. Chaney*, 470 U.S. 821 (1985).

In *Chaney*, the Supreme Court held that "agency decisions to refuse enforcement" are presumptively unreviewable under Section 701(a)(2). 470 U.S. at 831-32. In the case, a group of death row prisoners petitioned the Food and Drug Administration ("FDA") to prevent the use in lethal injections of certain drugs that the agency had not approved for that purpose. *Id.* at 823. The FDA refused. *Id.* at 824. The FDA Commissioner explained that it was "unclear" whether it had "jurisdiction over the unapproved use of approved drugs for human execution." *Id.* The Commissioner

also asserted that, even if the agency did have jurisdiction, it would "decline to exercise [that jurisdiction] under [its] inherent discretion to decline to pursue certain enforcement matters." *Id.* at 824–25.

The Court held that the APA precluded review of the Commissioner's decision, finding that such decisions have "traditionally been 'committed to agency discretion,' and . . . that the Congress enacting the APA did not intend to alter that tradition." *Id.* The Supreme Court gave four reasons for the "general unsuitability for judicial review of agency decisions to refuse enforcement": such decisions (1) call for "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise," including "whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, [and] whether the particular enforcement action requested best fits the agency's overall policies"; (2) generally do not involve the exercise of "coercive power over an individual's liberty or property rights, and thus d[o] not infringe upon areas that courts are called upon to protect"; (3) provide no "focus for judicial review," in contrast to an affirmative action; and (4) "share[] to some extent the characteristics of the decision of a prosecutor in the Executive Branch not to indict—a decision which has long been regarded as the special province of the

Executive Branch." *Id.* at 831-32. But the Supreme Court also acknowledged that there could be exceptions to the rule. *Id.* at 833 n.4. Though the Court "express[ed] no opinion on whether such decisions would be unreviewable," it observed that judicial review could be appropriate when an agency premises its nonenforcement "solely on the belief that it lacks jurisdiction"; and when "the agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."[10] *Id.*

Contrary to Mr. Reed's argument, however, the D.C. Circuit has explicitly stated that "refusals to act are not the only kinds of administrative determinations that evade review." *Twentymile*, 456 F.3d at 156 (citing cases); *see, e.g.*, *Lincoln*, 508 U.S. at 192 (finding an agency's "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion"); *Steenholdt v. FAA*, 314 F.3d 633, 634 (D.C. Cir. 2003) (holding that because the decision not to renew an aircraft examiner's authority is committed to the Administrator's discretion under 49 U.S.C. § 44702(d), judicial review of the substantive merits of that decision is precluded under the APA); *Baltimore Gas &*

---

[10] The concurrence in *Chaney* characterized this exception as covering situations in which "an agency engages in a pattern of nonenforcement of clear statutory language." *Id.* at 839.

*Elec. Co. v. FERC*, 252 F.3d 456, 459-60 (D.C. Cir. 2001)
(holding that "FERC's decision to settle its enforcement action
against Columbia was within the agency's nonreviewable
discretion"). *But see Robbins v. Reagan*, 780 F.2d 37, 46 (D.C.
Cir. 1985) (rejecting *Chaney*'s application to a decision to
withhold federal funding from a homeless shelter). The question
of whether the FIP Policy is a nonenforcement policy is
therefore not dispositive.

Neither is Mr. Reed's reliance on *Department of Homeland
Security v. Regents of the University of California*, 140 S. Ct.
1891 (2020), persuasive. In *Regents*, the Supreme Court rejected
the government's argument that the immigration program known as
Deferred Action for Childhood Arrivals ("DACA") was a non-
enforcement policy and that its rescission was therefore
unreviewable. 140 S. Ct. at 1906. Under the DACA program, the
Department of Homeland Security had "solicited applications from
eligible aliens, instituted a standardized review process, and
sent formal notices indicating whether the alien would receive
the two-year forbearance." *Id.* The Supreme Court explained that
"DACA is not simply a non-enforcement policy"; rather, it
involves proceedings that are "effectively adjudications," and
as a "result of these adjudications—DHS's decision to 'grant
deferred action' . . . is an 'affirmative act of approval,' the
very opposite of a 'refus[al] to act.'" *Id.* (quoting *Chaney*, 470

U.S. at 831-32). Further, a grant of deferred action in the DACA program came with other attendant benefits, including work authorization and access to public benefits like Social Security and Medicare, which "provide[d] further confirmation" of the Supreme Court's conclusion that "DACA is more than simply a non-enforcement policy." *Id.* "Unlike an agency's refusal to take requested enforcement action, access to these types of benefits is an interest 'courts often are called upon to protect.'" *Id.* (quoting *Chaney*, 470 U.S. at 832). In view of these aspects, the Supreme Court ruled that "[b]ecause the DACA program is more than a non-enforcement policy, its rescission is subject to review under the APA." *Id.* at 1907.

Mr. Reed argues that, just as in *Regents*, the FIP Policy is "*more* than a non-enforcement policy" because it is a "forum-selection policy." Reed Reply, ECF No. 53 at 16. But *Regents* does not control here, and the FIP Policy is more akin to the nonenforcement decision in *Chaney* than the DACA program. For example, among other aspects, the FIP Policy does not constitute administrative "adjudications," nor does it confer benefits. Although the U.S. Attorney's Office may have already made the decision to bring a case, the FIP Policy calls upon prosecutors to balance case-specific factors, such as an individual defendant's criminal history, to determine whether to file charges under the U.S. criminal code or the D.C. criminal code,

which ultimately involves decisions regarding how to allocate resources between District Court and Superior Court. And though generally in the United States the decision regarding in which venue to bring a case has not "traditionally been 'committed to agency discretion,'"[11] in the District of Columbia, the U.S. Attorney's Office "enjoys free rein in deciding whether to prosecute in federal or in Superior Court, where the facts support a violation of both local and federal law." *Clark*, 8 F.3d at 842; *see also Bordenkircher*, 434 U.S. at 364 ("[T]he decision [of] what charge to file or bring before a grand jury, generally rests entirely in [the prosecutor's] discretion."); *Batchelder*, 442 U.S. at 123–24 ("[W]hen an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.").

Despite the above, however, the D.C. Circuit has held that at least some general enforcement policies may be reviewable under the APA. *See OSG Bulk Ships, Inc. v. United States*, 132 F.3d 808, 812 (D.C. Cir. 1998); *Crowley*, 37 F.3d at 676–77. Mr.

---

[11] Mr. Reed argues that courts play a role in protecting him from unlawful "prosecutorial forum shopping," but the case he cites in support of his argument pertains to improper venue choice between federal districts, not between the District Court and Superior Court. *See United States v. Morgan*, 393 F.3d 192, 201 (D.C. Cir. 2004) (holding that the District of Columbia was an improper venue when the facts required venue in Maryland).

Reed thus contends that even if the Court finds that the U.S. Attorney's charging decisions are generally unreviewable under the APA, this case "falls squarely" within the "line of precedent that applies APA review to a 'general enforcement policy,' even where such review might be unavailable for a 'single-shot' decision in a given case." Reed Mot., ECF No. 37 at 35.

In *Crowley Caribbean Transportation, Inc. v. Pena*, 37 F.3d 671 (D.C. Cir. 1994), the D.C. Circuit addressed whether *Chaney*'s presumption of unreviewability applied to the Maritime Administration's refusal to take an enforcement action under a provision of the Merchant Marine Act of 1936 that the agency thought was inapplicable as a matter of law. 37 F.3d at 672-73. In the case, the court confirmed that enforcement decisions are presumptively unreviewable. *Id.* But it further recognized in dicta that "an agency's statement of a general enforcement policy" may be reviewable if it "actually lay[s] out a general policy delineating the boundary between enforcement and non-enforcement and purport[s] to speak to a broad class of parties." *Id.* at 676-77. The court explained that there are "ample reasons for distinguishing" between an individual nonenforcement decision and a general enforcement policy:

> By definition, expressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings. As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of

> mingled assessments of fact, policy, and law
> that drive an individual enforcement decision
> and that are, as *Chaney* recognizes, peculiarly
> within the agency's expertise and discretion.
> Second, an agency's pronouncement of a broad
> policy against enforcement poses special risks
> that it "has consciously and expressly adopted
> a general policy that is so extreme as to amount
> to an abdication of its statutory
> responsibilities," *Chaney*, 470 U.S. at 833 n. 4,
> 105 S. Ct. at 1656 n. 4 (internal quotation marks
> omitted), a situation in which the normal
> presumption of non-reviewability may be
> inappropriate. Finally, an agency will generally
> present a clearer (and more easily reviewable)
> statement of its reasons for acting when
> formally articulating a broadly applicable
> enforcement policy, whereas such statements in
> the context of individual decisions to forego
> enforcement tend to be cursory, ad hoc, or post
> hoc.

*Id.* at 677. The court noted, however, that "[t]his will not be true

in the ordinary case, . . . and the more reasonable inference when

faced with a context-bound non-enforcement pronouncement is that

the agency has addressed the issue in comparatively ad hoc terms

inherently implicating its non-reviewable enforcement discretion."

*Id.*

In reaching its decision, the D.C. Circuit relied on language

from *ICC v. Brotherhood of Locomotive Engineers ("BLE")*, 482 U.S.

270 (1987). *Id.* The Supreme Court in *BLE* held that the Interstate

Commerce Commission's refusal to reconsider a decision on the basis

of "material error" was "committed to agency discretion by law"

under § 701(a)(2). 482 U.S. at 278-84. To refute the proposition

that "if [an] agency gives a 'reviewable' reason for otherwise

unreviewable action, the action becomes reviewable," the Court
explained:

> it is enough to observe that a common reason for
> failure to prosecute an alleged criminal
> violation is the prosecutor's belief (sometimes
> publicly stated) that the law will not sustain
> a conviction. That is surely an eminently
> "reviewable" proposition, in the sense that
> courts are well qualified to consider the point;
> yet it is entirely clear that the refusal to
> prosecute cannot be the subject of judicial
> review.

*Id.* *Crowley* cited this passage, concluding that, "though not in the
*Chaney* context, [*BLE*] squarely rejects the notion of carving
reviewable legal rulings out from the middle of non-reviewable
actions." *Crowley*, 37 F.3d at 676.

The D.C. Circuit subsequently applied its observations
regarding the differences between individual nonenforcement
decisions and general enforcement policies in *OSG Bulk Ships, Inc.
v. United States*, 132 F.3d 808 (D.C. Cir. 1998). In *OSG*, the
plaintiff challenged the Maritime Administration's policy that
permitted certain vessels, which were built with aid of a
federal subsidy and are limited to service in foreign trade, to
"enter domestic trade after the statutorily defined economic
life of the vessel expires." 132 F.3d at 809. The court easily
concluded that the policy was not presumptively unreviewable
because it was not a "single-shot non-enforcement decision." *Id.*
at 812.

Mr. Reed argues that *Crowley* and *OSG*, read together, stand for the principle that general enforcement policies are always reviewable. Reed Reply, ECF No. 53 at 18-19. He contends that this conclusion is "confirmed" by *BLE*, which he claims makes clear that "reviewability turns on the type of 'formal action' undertaken by the agency, not the reason given." *Id.* at 18.

While such a reading is tempting, this Court does not construe the cases so broadly. Rather, both *Crowley* and *OSG* "involved nonenforcement decisions based solely on agency statutory interpretation." *NAACP v. Trump*, 298 F. Supp. 3d 209, 231 (D.D.C. 2018). The *Crowley* and *OSG* line of cases is therefore better understood as applying the presumption of reviewability only when an agency's general enforcement policy is based on a legal interpretation of the substantive statute. *See, e.g.*, *NAACP*, 298 F. Supp. 3d at 233 ("Properly understood," the *Crowley* "exception to Chaney's presumption of unreviewability applies to a legal interpretation phrased as a general enforcement policy, even if that interpretation concerns the scope of the agency's lawful enforcement authority."); *MediNatura, Inc. v. FDA*, 496 F. Supp. 3d 416 (D.D.C. 2020) (finding that "generalized non-enforcement policies that are premised on interpretation of a statute" were reviewable under the APA); *K-V Pharm. Co. v. FDA*, 889 F. Supp. 2d 119, 136 (D.D.C. 2012) ("Thus, in the cases where courts have reviewed an enforcement policy, they have emphasized that their review was limited to the question of whether or not the agency's

express statement of policy unlawfully construed a statute.")*,
vacated and remanded on other grounds*, 2014 WL 68499, *1 (D.C. Cir.
Jan. 7, 2014) (per curiam). Regarding *BLE*, "as *Crowley* recognized,
*BLE* addressed the reviewability of enforcement decisions only in
dictum; its actual holding concerned the reviewability of an
agency's refusal to reconsider a prior decision." *NAACP*, 298 F.
Supp. 3d at 232. Moreover, *Crowley* relied on *BLE* to reinforce its
holding that *Chaney*'s presumption applies to *individual*
nonenforcement decisions, not general policies. *See id.*; *Crowley*,
37 F.3d at 675-77 (distinguishing—for purposes of judicial review—
between individual enforcement decisions and implementation of
broad enforcement policies).

"Such a conclusion reflects *Crowley*'s observation that review
of generalized non-enforcement policies is appropriate, in part,
because such policies 'are more likely to be direct interpretations
of the commands of the substantive statute.'" *MediNatura*, 496 F.
Supp. 3d at 448 (quoting *Crowley*, 37 F.3d at 677). It also makes
sense as an extension of *Chaney*. In *Chaney*, for example, the
Supreme Court explained that the presumption of unreviewability may
be rebutted by showing that "the substantive statute has provided
guidelines for the agency to follow in exercising its enforcement
powers." 470 U.S. at 833. And though the Court expressed no opinion
on the matter, generalized non-enforcement policies that are
premised on interpretation of a substantive statute "fit more
neatly within . . . the exceptions recognized in *Chaney* itself—

situations in which an agency bases its refusal to initiate enforcement 'solely on the belief that it lacks jurisdiction,'" *MediNatura*, 496 F. Supp. 3d at 448 (quoting *Crowley*, 37 F.3d at 677), and situations in which the agency has "consciously and expressly" acted contrary to clear statutory commands, *Chaney*, 470 at 833 n.4. Moreover, such a reading also does not stand in opposition to the weight of case law both parties cite in support of their arguments. *See, e.g.*, *CREW v. FEC*, 993 F.3d 880, 882 (D.C. Cir. 2021) (declining to review Federal Election Commission's decision to dismiss complaint that "rested on two distinct grounds: the Commission's interpretation of FECA and its 'exercise of . . . prosecutorial discretion'"); *Casa de Maryland v. United States*, 924 F.3d 684, 699 (4th Cir. 2019) (reviewing Department of Homeland Security's decision to rescind DACA where agency claimed decision to rescind "rested on discretionary enforcement concerns and expressed the [agency's] view about the scope of its enforcement authority"); *OSG*, 132 F.3d at 812 (reviewing the Maritime Administration's interpretation of § 506 of the Merchant Marine Act); *Edison Elec. Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993) (concluding challenge to EPA's "interpretation" of hazardous-waste-storage provision of Resource Conservation and Recovery Act advanced in enforcement policy statement was "not the type of discretionary judgment concerning the allocation of enforcement resources that [*Chaney*] shields from judicial review"); *Nat'l Wildlife Fed'n v. EPA*, 980 F.2d 765, 767-68 (D.C. Cir. 1992)

(concluding that an EPA regulation based on agency's "interpretation" of Safe Drinking Water Act was subject to APA review); *NAACP*, 298 F. Supp. 3d at 233 (addressing Department of Homeland Security's decision to rescind DACA because it lacked proper statutory authority); *Wildearth Guardians v. U.S. Dep't of Justice*, 181 F. Supp. 3d 651, 657, 663-69 (D. Ariz. 2015) (holding Department of Justice litigation policy was reviewable in which prosecutors requested specific intent instruction for a federal offense, but Congress had mandated a general intent instruction).

In view of the above, Mr. Reed claims that the FIP Policy "*is* 'based on the agency's legal interpretation' of the governing substantive statute" because the U.S. Attorney's Office "enacted [the policy] because it believes 'federal statutes prohibit the FBI from investigating' local 'D.C. Code violations.'" Reed Reply, ECF No. 53 at 19. However, the statute delineating the FBI's investigatory role is not a "substantive statute" within the meaning of applicable precedent. It does not govern the U.S. Attorney's Office's exercise of its enforcement powers, and thus does not speak to the office's overall authority or whether prosecutors would be "abdicating" his or her statutory responsibilities based on the agency's interpretation. *See Chaney*, 470 U.S. at 833 n.4. Indeed, in the only case the parties provided in which a court found that a Department of Justice policy was subject to APA review, the "litigation policy" at issue had "expressed a general policy of non-enforcement" that went "beyond

41

simply prioritizing cases for prosecution" and instead
"rewr[o]te[]" an offense "to include a *mens rea*" of specific
intent.[12] *Wildearth Guardians*, 181 F. Supp. 3d at 657, 663-69
("Choosing to not enforce 16 U.S.C.A. 1538(a)(1)(B), pursuant to
the guidelines set out in the Final Rule interpreting 16 U.S.C.
1540(b)(1) is arguably an abdication of DOJ's duty under the ESA to
ensure that it uses its authority in furtherance of the purposes of
ESA, i.e.—to protect the Mexican gray wolf."). And here, the FIP
Policy here does not include any interpretation of the U.S.C. §
922(g) offense or the D.C. Code § 22-4503(a)(1) offense.

Accordingly, because the FIP Policy is not reviewable under
the APA, the Court denies Mr. Reed's APA claim.

### C. The FIP Policy Does Not Raise a Presumption of Vindictive Prosecution

Mr. Reed also argues that the FIP Policy violates the Due
Process Clause's ban on vindictive prosecution because "the
circumstances surrounding the policy's adoption and early
implementation create a reasonable likelihood that the

---

[12] Mr. Reed cited the panel decision appended to the *en banc*
decision in *Cox v. United States*, 472 F.2d 334 (4th Cir. 1973),
in claiming that "the Fourth Circuit has expressly held that
courts have the 'authority to review' a prosecutor's decision to
prosecute someone in federal court as opposed to in state court
'under the Administrative Procedure Act.'" Reed Mot., ECF No. 37
at 38. However, in granting the petition for rehearing, the en
banc court vacated the panel decision, and in the en banc
opinion, the court declined to "consider the question of
reviewability of the Attorney General's exercise of the
discretion the statute vests in him." *Cox*, 472 F.2d at 335, 337.

[g]overnment decided to prosecute felon-in-possession defendants in federal court at least in part to retaliate against defendants who routinely and successfully asserted their constitutional right to seek pretrial release in Superior Court." Reed Mot., ECF No. 37 at 46-47. For the reasons below, the Court concludes that Mr. Reed does not succeed on this claim.

The prosecutorial vindictiveness doctrine "precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right available to a defendant during a criminal prosecution." *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001) (internal citation omitted). "At the same time, however, prosecutors have broad discretion to enforce the law, and their decisions are presumed to be proper absent clear evidence to the contrary." *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017) (citing *Armstrong*, 517 U.S. at 464). "Thus, to succeed on a claim of vindictive prosecution, a defendant must establish that the increased charge was 'brought *solely* to 'penalize' [him] and could not be justified as a proper exercise of prosecutorial discretion.'" *Id.* (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.12 (1982)).

A defendant may prevail on a claim of prosecutorial vindictiveness by establishing either "(i) evidence of the prosecutor's actual vindictiveness or (ii) evidence sufficient

to establish a realistic likelihood of vindictiveness, thereby raising a presumption the [g]overnment must rebut with objective evidence justifying its action." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (per curiam). "To prove actual vindictiveness requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. Such a showing is normally exceedingly difficult to make." *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002) (quoting *Maddox*, 238 F.3d at 446). "To invoke the presumption of vindictiveness, [the court] must find that a reasonable likelihood of vindictiveness exists—that is, that the second indictment was 'more likely than not attributable to the vindictiveness on the part of' the [g]overnment." *Id.* (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989)). "[C]oncerns over alleged vindictiveness do not relate to whether a prosecutor has acted maliciously or in bad faith, but whether prosecutor's actions are designed to punish a defendant for asserting her legal rights." *Id.* at 35. Moreover, "[i]n a pre-trial setting, 'the prosecutor's assessment of the proper extent of prosecution may not have crystallized,' so an increase in charges may be the result of additional information or further consideration of known information, rather than a vindictive motive." *United States v. Slatten*, 865 F.3d 767 (D.C. Cir. 2017) (quoting *Goodwin*, 457 U.S. at 381). "The routine exercise of many pre-

trial rights also weakens any inference of vindictiveness, i.e., that a prosecutor would retaliate simply because a defendant sought a jury trial or pleaded an affirmative defense." *Id.* (citing *Goodwin*, 457 U.S. at 381).

"Where the defendant provides evidence sufficient to support a presumption of vindictiveness, the burden shifts to the government to produce 'objective evidence' that its motivation in charging the defendant was lawful." *United States v. Meadows*, 867 F.3d 1305, 1312 (D.C. Cir. 2017) (quoting *Safavian*, 649 F.3d at 694). "That burden is 'admittedly minimal—any objective evidence justifying the prosecutor's actions will suffice.'" *Id.* (quoting *Safavian*, 649 F.3d at 694). If the government can produce objective evidence that its motive in prosecuting the defendant was not vindictive, then "the defendant's only hope is to prove that the justification is pretextual and that actual vindictiveness has occurred." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987). "But if the government fails to present such evidence, the presumption stands and the court must find that the prosecutor acted vindictively." *Id.*

The evidence in this case does not support a claim of actual vindictiveness, and Mr. Reed does not contend that it does. *See* Reed Mot., ECF No. 37 at 46-47. Instead, Mr. Reed proceeds on a theory of presumptive vindictiveness, arguing that

the government adopted the FIP Policy in retaliation against defendants who chose to seek pretrial release in D.C. Superior Court. *Id.* Mr. Reed points out that while judges in the D.C. Superior Court were releasing defendants pretrial in 55% of cases in the months prior to the FIP Policy's adoption, judges in this District were releasing defendants in only 23% of cases. *Id.* at 47. Mr. Reed argues that the government must have been aware of this difference due to its role as "the only institutional actor consistently appearing before both [courts]," and thus acted to exploit this fact by moving an "entire class of felon-in-possession defendants" to federal court—in some cases, he claims, even defendants who had already been released pending trial in Superior Court. *Id.*

Mr. Reed's argument, however, suffers from at least one fatal roadblock: Mr. Reed never sought pretrial release in D.C. Superior Court, and therefore he has not suffered an injury-in-fact. Rather, pursuant to the FIP Policy, the government first filed Mr. Reed's case in this Court. *See id.* at 14. The initial element required to establish a vindictive prosecution claim—that a defendant assert a constitutional right, for which he was punished—is not present here, and Mr. Reed therefore cannot say that his Section 922(g) charge is in retaliation or a punishment for his own actions.

46

Mr. Reed concedes that "[i]n the ordinary case, vindictive prosecution claims are raised by individual defendants based on rights that they personally invoked prior to the [g]overnment's vindictive action." Reed Mot., ECF No. 37 at 48. But he asserts that "by its very nature, the [g]overnment's policy affirmatively strips defendants—including Mr. Reed—of the benefit of any opportunity to seek pretrial release in Superior Court,"[13] and argues that the Court should therefore "assess Mr. Reed's vindictive prosecution claim from the perspective of the relevant class of defendants, who invoked their right to seek pretrial release in the Superior Court." *Id.* He contends that, because the FIP Policy "views, treats, and targets an entire class of criminal defendants as a group," *id.* at 50, "[a]ny judicial effort to protect defendants against the policy must therefore see the affected defendants as a group as well," *id.* at 52. In support of his argument, Mr. Reed notes that, in contexts different from this case, "courts assessing constitutional violations" have "observed that 'a class of indigent defendants may seek relief for a widespread,

---

[13] Although Mr. Reed's argument assumes that, but for the adoption of the FIP Policy, his case would have been filed in D.C. Superior Court, the record does not include any evidence to support this claim. It is undisputed that, prior to the FIP Policy's implementation, the U.S. Attorney's Office chose to file at least some portion of felon-in-possession cases in federal court, including Mr. Simmons's case. *See* Simmons Mot., ECF No. 37 at 2-4.

systematic' constitutional violation." *Id.* at 51 (citing *Kuren v. Luzerne Cty.*, 146 A.3d 715, 743 (Pa. 2016); *Hurrell-Harring v. New York*, 930 N.E.2d 217 (N.Y. 2010)).

However, as the D.C. Circuit has explained, "'[p]rosecutorial vindictiveness' is a term of art with a *precise* and *limited* meaning," and, pursuant to this doctrine, "a prosecutorial action is 'vindictive' *only* if designed to penalize a defendant for invoking legally protected rights." *Meyer*, 810 F.2d at 1245 (emphasis added). The Court is unaware of any authority—and Mr. Reed provides none—that would permit one defendant to pursue a vindictive prosecution claim on another's behalf where the defendant had not personally been penalized or punished. Accordingly, in view of the D.C. Circuit's direction to construe such claims narrowly, the Court declines to expand the meaning of prosecutorial vindictiveness beyond "a situation in which the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights." *Id.* (citing *Goodwin*, 457 U.S. at 372).

Even if this claim was properly before the Court, Mr. Reed has not demonstrated a reasonable likelihood that the government would not have adopted the FIP Policy had defendants facing felon-in-possession charges in D.C. Superior Court not succeeded in seeking pretrial detention in that court. Mr. Reed alleges

that "the circumstances surrounding the policy's adoption and
early implementation create a reasonable likelihood that the
[g]overnment decided to prosecute felon-in-possession defendants
in federal court at least in part to retaliate against
defendants who routinely and successfully asserted their
constitutional right to seek pretrial release in Superior
Court." Reed Mot., ECF No. 37 at 47. Specifically, Mr. Reed
points to the government's "consistent pattern" of behavior in
previous felon-in-possession cases that were transferred to D.C.
District Court from Superior Court. *Id.* at 54. As he describes
it:

> A Superior Court judge *released* the defendant
> pending trial. The Government then re-indicted
> the defendant in federal court for the exact
> same alleged offense, and immediately sought
> a second bite at the pretrial detention apple.
> As part of this maneuver, the Government
> unilaterally forced the released defendant to
> be re-arrested. *See* Fed. R. Crim. P. 9(a).
> Once the defendant was brought to Court, it
> then unilaterally forced a three-day period of
> incarceration by moving to continue the
> federal detention hearing that commences a
> federal prosecution. *See* 18 U.S.C. §
> 3142(f)(1)(E). The Government sought these
> continuances even though it had already
> litigated—and lost—the question of the
> defendant's release at a *local* detention
> hearing. . . . Perhaps most strikingly, the
> Government often employed these tactics
> without mentioning to the federal magistrate
> judges that the defendants had been released
> by the Superior Court and were in full
> compliance with the terms of their release at
> the time of their federal re-arrest.

*Id.* at 54-55.

However, as the D.C. Circuit explained in *Meyer*, "proof of a prosecutorial decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption [of vindictiveness] in the pretrial context" because "this sequence of events, taken by itself, does not present a 'realistic likelihood of vindictiveness.'" *Meyer*, 810 F.2d at 1246 (quoting *Goodwin*, 457 U.S. at 381) (considering the government's "disparate treatment" of a defendant who exercised a legal right; the "simplicity and clarity of both the facts and law underlying [the prosecution]"; the "government's conduct after levelling [an] increased charge[] against [a] defendant[]"; and "the government's motivation to act vindictively in this case"). For example, in *United States v. Mills*, 925 F.2d 455 (D.C. Cir. 1991), the D.C. Circuit considered the claims of three defendants who "were initially charged in [D.C.] Superior Court, but those charges were later dropped in favor of a subsequent prosecution in federal court for the same criminal conduct, effectively 'transferring' the cases from one court system to the other." *Mills*, 925 F.2d at 226. The transfers took place pursuant to an "initiative to crack down on drug-related crime in the nation's capital" that had been announced by "high-ranking officials in the Bush administration" to "take advantage of the stricter penalties

50

available under the federal sentencing guidelines." *Id.* The D.C.
Circuit noted that the lower court had found that, "[i]n case
after case, the particular defendant whose case was transferred
had declined to plead guilty in Superior Court prior to his
indictment in this Court. Indeed, in several instances, the
relationship between the refusal to enter a guilty plea and
indictment in federal court was explicitly spelled out." *Mills*,
925 F.2d at 463. However, despite these "circumstantial
findings," the court concluded that there was otherwise "no
basis for finding that the transfer decisions were undertaken
somehow to *penalize* the appellees for the exercise of their
constitutional rights in D.C. Superior Court." *Id.* at 232.
Rather, the record reflected that the cases had been transferred
upon the prosecutors' reassessment of "the societal interest in
prosecution" and the government had provided a "consistent and
nonretaliatory explanation" for its decisions. *Id.* at 233.

Similarly, here, there is "no fact beyond the mere sequence
of events to support any presumption of improper motivation."
*Id.* at 232. As the government points out, the cases that Mr.
Reed describes were not transferred to this District pursuant to
the FIP Policy; rather, each predates the policy's
implementation. *See* Gov't's Opp'n, ECF No. 48 at 50. According
to the government, because the cases were not analyzed pursuant
to the FIP Policy, they were "individually evaluated to

51

determine" whether they merited transfer to this District. Crabb
Decl., ECF No. 48-3 ¶16. The Court finds no evidence to
discredit the government's explanation or to deem it
inconsistent. *Cf. Goodwin*, 457 U.S. at 382 ("A prosecutor should
remain free before trial to exercise the broad discretion
entrusted to him to determine the extent of the societal
interest in prosecution."). Further, "[g]iven *Goodwin*'s
unequivocal teaching that . . . a change of course in the
pretrial setting does not give rise to a presumption of
vindictiveness, a finding of vindictive prosecution could be
supported in this case only by evidence of actual vindictive
motivation beyond the mere sequence of events." *Mills*, 925 F.2d
at 233. As stated above, however, the Court has not found actual
vindictiveness in this case, and neither has Mr. Reed asserted
any such vindictiveness exists.

In view of the above, the Court therefore concludes that
the FIP Policy does not violate the Due Process Clause's ban on
vindictive prosecution.

### D. The Prosecution of Mr. Simmons Does Not Constitute Prosecutorial Harassment

Finally, Mr. Simmons contends his indictment must be
dismissed with prejudice because the government engaged in
"unlawful prosecutorial harassment" when it transferred his case
from D.C. Superior Court to this Court "to gain impermissible

tactical litigation advantages," namely, to maximize the likelihood that he would be detained pretrial. Simmons Mot., ECF No. 37 at 1, 10-18. Mr. Simmons argues that when a case has been dismissed in one court and refiled in another to gain a position of advantage or to escape from a position of less advantage, a defendant can invoke the doctrine of prosecutorial harassment in either of the two courts to seek dismissal of his case. *Id.* at 10-11. While this doctrine is most frequently invoked when the government moves to dismiss an indictment pursuant to Federal Rule of Criminal Procedure 48(a),[14] Mr. Simmons argues that "the harassment doctrine's core logic applies with equal force when it is invoked . . . after the [g]overnment has already dismissed charges in one forum and recharged the defendant in another," as is the case here. *Id.* at 11-12 (quotation marks and alterations omitted). In Mr. Simmons's view, the government's conduct in this case—which includes charging him first in D.C. Superior Court, losing its pretrial detention motion there, and then dropping that case to recharge him in this Court and seek pretrial detention a second time—is precisely the sort of "gamesmanship" that the prosecutorial harassment doctrine prohibits. *Id.* at 13-14.

---

[14] Under Federal Rule of Criminal Procedure 48(a), the "government may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a); *see also United States v. Pitts*, 331 F.R.D. 199, 202 (D.D.C. 2019).

The government, in opposition, argues that the Court "lacks authority" to dismiss the indictment pursuant to Rule 48(a) because "the government has never moved this Court to dismiss any criminal charges against [Mr.] Simmons, which is a plain language requirement" of the rule. Gov't's Opp'n, ECF No. 48 at 53. Rather than filing a motion to dismiss in D.C. Superior Court, the government filed a Dismissal Praecipe after the grand jury indicted Mr. Simmons on the federal charge in this case. *See* Gov't's Opp'n, ECF No. 48 at 54. That praecipe was filed pursuant to D.C. Superior Court Rule of Criminal Procedure 48(a)(1), which does not require leave of court. *See* D.C. Super. Ct. R. Crim. P. 48(a)(1) ("The government may file a dismissal or nolle prosequi of an information or complaint. Such a dismissal is without prejudice unless otherwise stated. The government may not dismiss the prosecution during trial without the defendant's consent."). *Id.* at 54. Further, the government argues that even if the Court did have the authority to dismiss the indictment, Mr. Simmons has not rebutted the presumption of validity that applies to a prosecutor's charging decisions. Gov't's Opp'n, ECF No. 48 at 56.

The Court agrees with the government. Even assuming that the Court has the authority, in the absence of a Rule 48(a) motion, to dismiss Mr. Simmons's indictment pursuant to a free-standing prosecutorial harassment doctrine, *see United States v.*

*Fields*, 475 F. Supp. 903, 907 (D.D.C. 1979) (holding, in the alternative, that dismissal of second indictment against defendant was appropriate under the theory that "the government is not free to indict, dismiss, and reindict solely to achieve a more favorable prosecutorial posture"), Mr. Simmons has not shown that the prosecutor's conduct in this case rises to the level of harassment.

"When the prosecutor's discretion is challenged, the prosecutor has the initial burden of explaining that a dismissal without prejudice would be in the public interest." *United States v. Florian*, 765 F. Supp. 2d 32, 35 (D.D.C. 2011) (citing *United States v. James*, 861 F. Supp. 151, 155 (D.D.C. 1994)). "Once the prosecutor has discharged that threshold burden, its decision is presumptively valid and the district court may not substitute its judgment for that of the prosecutor even if it might have reached a different conclusion were it presented with the issue in the first instance." *Id.* In order to set aside the presumption of validity, the court must conclude that a dismissal without prejudice "would result in harassment of the defendant or would otherwise be contrary to the manifest public interest." *United States v. Poindexter*, 719 F. Supp. 6, 10 (D.D.C. 1989). Courts have found that government conduct constitutes harassment if the reason for the dismissal is to gain a tactical advantage. *Id.* at 12 (dismissing with prejudice

when government's reason for dismissal was to better position its case); *see also United States v. Borges*, 153 F. Supp. 3d 216, 220 (D.D.C. 2015) ("[A] strategy of dismissing a case without prejudice in order to bring it again under 'more advantageous' circumstances is precisely the kind of 'tactical situation' that is prohibited by Rule 48(a) and its progeny." (citing *United States v. Salinas*, 693 F.2d 348, 353 (5th Cir. 1982)). In other words, "the government [cannot] validly use Rule 48(a) to gain a position of advantage, or to escape from a position of less advantage in which it found itself as a result of its own election." *Poindexter*, 719 F. Supp. at 11 (citing *Salinas*, 693 F. 2d at 353). Thus, "although there remains a strong presumption in favor of a no-prejudice dismissal, the ultimate decision in that regard depends upon the purpose sought to be achieved by the government and its effect on the accused." *Poindexter*, 719 F. Supp. at 10.

Here, the government asserts that it decided to dismiss the D.C. Superior Court complaint and pursue a federal indictment against Mr. Simmons because it believed that his "demonstrated danger to the community merited a § 922(g) charge" and that a federal charge "would lead to a more just sentence." Gov't's Opp'n, ECF No. 48 at 56. The government explains that on November 16, 2018, Mr. Simmons was arraigned in D.C. Superior Court. Crabb Decl., ECF No. 48-3 at 7 ¶ 15, 9. On the same day,

the U.S. Attorney's Office received a letter from then-MPD Chief

Newsham stating:

> We have long agreed that to reduce gun
> violence, we must deal more effectively with
> the people most likely to commit crimes with
> guns. An individual like Mr. [Simmons], who
> has already been convicted of multiple felony
> offenses and then chooses to possess a firearm
> illegally shows a clear disregard for the law
> and poses a higher risk for District
> residents. . . . Based on his criminal
> history, it is clear that Mr. [Simmons] poses
> a substantial danger to the community and
> should be detained pending trial.

Crabb Decl., ECF No. 48-3 at 7 ¶ 15, 9. "In light of Chief

Newsham's letter," the then-principal assistant U.S. Attorney

asked the Violent Crime and Narcotics Trafficking Section

("VCNT")[15] to review Mr. Simmons's case for possible federal

prosecution. *Id.* The Bureau of Alcohol, Tobacco, Firearms, and

Explosives ("ATF")[16] also referred the matter to the VCNT for

review. *Id.* The same day, the VCNT decided to charge Mr. Simmons

with violating Section 922(g) "[i]n light of [Mr.] Simmons's

extensive criminal history, to include a conviction for an

assault involving a firearm." *Id.* The government sought the

---

[15] The Violent Crime and Narcotics Trafficking Section, which is
a section within the United States Attorney's Office for the
District of Columbia's Criminal Division, "handles most firearms
prosecutions brought in the district court." *See* Crabb Decl.,
ECF No. 48-3 at 7 ¶ 14.
[16] At the time, the ATF had detailed an attorney to the VCNT to
assist with the prosecution of Section 922(g) violations. *See*
Crabb Decl., ECF No. 48-3 at 7 ¶ 14.

federal indictment on the following Monday, November 19, 2018, which coincided with Mr. Simmons's pretrial detention hearing in D.C. Superior Court. *Id.*

In view of the above, the government has "discharged its initial burden" of explaining that the D.C. Superior Court dismissal without prejudice was in the public interest. *Florian*, 756 F. Supp. 2d at 35; *see also Poindexter*, 719 F. Supp. at 11 (explaining that the question is not whether the government was acting in bad faith, but rather whether the actions of the government objectively amounted to harassment). D.C. Circuit precedent also supports the government's position. As detailed above in Section II.C, "[i]t is established . . . that the U.S. Attorney for the District of Columbia may elect to prosecute a given criminal defendant on federal rather than District charges, even though the former carry stiffer penalties." *Mills*, 925 F.2d at 461 (citations omitted). "In fact, the prosecutor may select one alternative charge over another precisely because the selected offense carries a more severe sentence." *Id.* Moreover, "the prosecutor retains the right before trial to change his mind and to re-indict a criminal defendant on more serious charges if the prosecutor decides that the charges initially brought do not adequately reflect the gravity of the defendant's conduct." *Id.* (citing *Goodwin*, 457 U.S. at 381-82). Accordingly, the government's decision to recharge Mr. Simmons

in federal court, rather than in D.C. Superior Court, was a
valid exercise of prosecutorial discretion.

Mr. Simmons's arguments to the contrary are unavailing. Mr.
Simmons argues that Chief Newsham's letter to the U.S.
Attorney's Office amounts to a "smoking gun" that shows that the
decision to transfer the case "was never about securing a 'more
just' federal sentence," but rather an attempt to get "two bites
at the pretrial detention apple." Simmons Mot., ECF No. 54 at 2-
3. Mr. Simmons argues that there are multiple tactical benefits
that flow from prevailing on a motion for pretrial detention in
federal court. *Id.* at 16-17 (noting, among other things, the
higher rates of pretrial detention in federal court versus D.C.
Superior Court, and that defendants detained pretrial are more
likely to receive longer prison sentences).

The letter on its own, however, is not sufficient to
demonstrate a government scheme to gain unfair tactical
advantage. *See* Crabb Decl., ECF No. 48-3 at 7 ¶ 15. Though it is
true that the government does not explain why it chose to
proceed with the pretrial detention hearing in D.C. Superior
Court after it had already decided to seek the Section 922(g)
charge, it is undisputed that prior to any determination on
detention in D.C. Superior Court, the VCNT had already decided
to seek the federal charge. Gov't's Opp'n, ECF No. 48 at 56; *see*

*also* Crabb Decl., ECF No. 48-3 at 7 ¶ 15; Hr'g Tr., ECF No. 75 at 58-59.

The Court's ruling today, however, should not be interpreted as an endorsement of the government's overall conduct in this case, which unfortunately is not as "unusual" as the Court previously believed. *See, e.g.*, *United States v. Pitts*, 331 F.R.D. 199, 205 (D.D.C. 2019) (describing government's decision to re-arrest defendant in this Court based on the same alleged conduct underlying the first arrest in D.C. Superior Court, while the defendant was fulfilling the obligations of his D.C. Superior Court release conditions). Mr. Simmons was arrested and detained twice based on the same alleged criminal conduct. *See* Simmons Mot., ECF No. 34 at 3-4. Following both arrests, the government requested an automatic period of incarceration pending a formal detention hearing, and in both cases, the courts denied the government's detention motions. *Id.* At the very least, the government's conduct was disruptive to Mr. Simmons's life. *See, e.g.*, Simmons Mot., ECF 37 at 4 (noting that, prior to his second arrest for this case, Mr. Simmons was meeting with his social worker three to four times a week, and that the government's attempts to detain him pretrial threatened his placement in a job training program). Indeed, though the grand jury returned the Section 922(g) indictment November 19, 2018, the government did not request

that the D.C. Superior Court dismiss Mr. Simmons's pending D.C.
Code complaint until January 25, 2019, resulting in, among other
things, Mr. Simmons receiving a "notice of non-compliance" in
the D.C. Superior Court based on his federal re-arrest for the
same alleged conduct. *Id.* at 4 n.2; Crabb Decl., ECF No. 48-3 at
8 ¶ 15.

This Court has previously called strikingly similar
government conduct "disturbing" and "outrageous." *See Pitts*, 331
F.R.D. at 205. However, such behavior, without more, does not
demonstrate an attempt to prosecute Mr. Simmons "under more
advantageous circumstances." *Borges*, 153 F. Supp. 3d at 220; *see
also Poindexter*, 719 F. Supp. at 10 (explaining that case law
requires courts to assess not only the "effect on the accused,"
but also the "purpose sought to be achieved by the government").
For example, in *United States v. Pitts*, 331 F.R.D. 199 (D.D.C.
2019), while the Court noted the "disturbing" facts surrounding
the defendant's arrest—facts that largely mirror the facts in
this case—as support for its decision, the Court ultimately
dismissed the case with prejudice because the government's "sole
reason" for seeking dismissal was to allow it additional time to
obtain DNA test results that it had failed to timely request.
*Pitts*, 331 F.R.D. at 204. Thus, because the government's
"purpose" was "clearly tactical" and the "effect on the accused"
was harmful, the Court held that "it would be contrary to the

manifest public interest and amount to objective harassment to leave the threat of arrest and prosecution—for a third time— looming simply because the government seeks to cure its self-inflicted defects in this case." *Id.* Similarly, in *United States v. Armstrong*, No. 2017 CF2 2998, 2019 WL 964532 (D.C. Super. Ct. Feb. 15, 2019), on which Mr. Simmons relies, the D.C. Superior Court dismissed the defendant's indictment with prejudice because the government had sought to rebring the case in federal court specifically "to increase its chances of prevailing on the suppression motion." *Armstrong*, 2019 WL 964532, at *4. Here, in contrast, the record does not support a finding that the government dismissed the D.C. Superior Court complaint to gain a tactical advantage.

Accordingly, the Court denies Mr. Simmons's motion with respect to this claim.

## III.   Conclusion

For the foregoing reasons, the Court **DENIES** Mr. Reed's motion and **DENIES** Mr. Simmons's motion. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:   **Emmet G. Sullivan**
          **United States District Judge**
          **May 2, 2022**